**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x

BRIAN COKE NG

Plaintiffs,

-against-

SEDGWICK CMS HOLDINGS, INC.;
FIDELITY SEDGWICK CORPORATION;
FIDELITY SEDGWICK HOLDINGS, INC.;
THE CARLYLE GROUP INC.,
DAVE NORTH;

Defendants.

-------------------------------------------------------------------x

**Case:**

# 23 CV 10380

**VERIFIED COMPLAINT**

Brian Coke Ng, ("Plaintiff", Pro-se) respectfully alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge, facts, and the attachments/exhibits to this Verified Complaint, as follows:

## INTRODUCTION AND NATURE OF THIS ACTION

1.      This separate action is being brought against all defendants as per Permission and Order of the above mentioned Court dated 11/20/2023, under case number 1:23-cv-02145 (MKV)(BCM), Dkt 46. This is an action for **(1)** Promissory Estoppel, **(2)** Equitable Estoppel and **(3)** Negligent Misrepresentation against the defendants here, ("Sedgwick CMS Holdings, Inc., Fidelity Sedgwick Corporation, Fidelity Sedgwick Holdings, Inc., The Carlyle Group Inc., Dave North").

2.      This is <u>not</u> an action against Kmart Pharmacy, Kmart Holding Corporation, and Sears Holding Corporation.

## PARTIES

1

3.    At all times relevant to this matter, I, Mr. Brian Coke Ng was a customer at the Kmart Pharmacy, which was located at 770 Broadway, New York, N.Y. 10003, and a consumer who had an exposure to toxic substances, and chemicals, in amounts combined, and much higher than the recommended dosage in milligrams (mg), by the way of ingestion of tremendous amounts of Sertraline/Zoloft at a combined and dangerous health and life threatening dosage levels, to which had later developed manifestation of exposure, the manifestation and symptoms of the latent disease and injury that the harmful toxic substance produced, and the resulting illness and the discernible bodily symptoms etc.

4.    At all relevant times, Sedgwick Claims Management Services Inc. "Independent adjuster" and is also a third party claims administrators, who handle claims, among other thing for Kmart Pharmacy, Kmart Holding Corporation and Sears Holding Corporation, and was an authorized foreign business corporation in New York State, with its principal place of business at 8125 Sedgwick Wy, Memphis, Tennessee 38125. Upon information and belief, Sedgwick Claims Management Services, Inc. is owned by Sedgwick CMS Holdings, Inc. their address is 1100 Ridge Way Loop Road, Memphis, TN, 38120. Upon information and belief, Sedgwick CMS Holdings, Inc. is owned by Fidelity Sedgwick Corporation, their address is 1100 Ridge Way Loop Road, Memphis, TN, 38120. Upon information and belief, Fidelity Sedgwick Corporation, is owned by Fidelity Sedgwick Holdings, Inc., their address is 1100 Ridge Way Loop Road, Memphis, TN, 38120. Upon information and belief, Fidelity Sedgwick Holdings, Inc., in part or whole, is owned by Dave North, his address is 1100 Ridge Way Loop Road, Memphis, TN, 38120. Upon information and belief, The Carlyle Group, Inc., maintained its headquarters at 1001 Pennsylvania Avenue NW, Washington, DC, 20004-2505, and has obtained majority ownership, investor and/or shareholder of Sedgwick.

2

5.    Ms. Sandra Brach is a "Independent adjuster" and an employee at Sedgwick CMS Holdings, Inc./Sedgwick Claims Management Services, Inc. Upon information and belief, her home State is Illinois, with business address located at 370 Fountain Ave, Elgin, IL 60124-3831.

## THE INDEPENDENT ADJUSTERS IN THIS MATTER

(A).    At all relevant times, N.Y. Ins. Law § 2101(g)(1) defines the term "independent adjuster" as:

[A]ny person, firm, association or corporation who, or which, for money, commission or any other thing of value, acts in this state on behalf of an insurer in the work of investigating and adjusting claims arising under insurance contracts. Although the Insurance Law does not specifically define the term "adjust", it means to settle or bring to a satisfactory state so that the parties will agree in the result. See Blacks Law Dictionary 27 (6th ed.1993).

## INDEPENDENT ADJUSTER'S LICENSE

(B).    At all relevant times, N.Y. Ins. Law § 2102(a)(1) prohibits any person, firm, association or corporation from acting as an insurance agent, insurance broker, reinsurance intermediary or insurance adjuster in New York without the appropriate license. Furthermore, N.Y. Ins. Law Section 2108(a)(3) requires that no adjuster shall act on the behalf of an insurer without possessing an independent adjuster's license.

3

## BONDING WAS REQUIRED FOR LICENSED "INDEPENDENT ADJUSTER"

**(C).**    At all relevant times, N.Y. Ins. Law § 2108(l) prescribes the

bonding requirements for a licensed adjuster and states in

pertinent part:

(l)(1)   No adjuster's license or renewal license shall be issued to

any applicant unless there shall be on file with the superintendent a bond,

executed by such the applicant and by approved sureties, in the penal sum

of one thousand dollars conditioned on the faithful performance by such

licensee and by all sub-licensees named in such license, of their duties as

such adjusters.

(2) Such bond shall be approved as to form by the attorney

general and as to sufficiency of security by the superintendent.

(3) Such bond shall be made to the state of New York and shall

specifically authorize recovery by the state of the penal sum

provided therein in case the adjuster or any sub-licensee shall

have been guilty of fraudulent or dishonest practices in

connection with the transaction of his or its business as such

adjuster or shall have been convicted under any of the sections

contained in article one hundred fifty of the penal law.

**(D).**    Thus, § 2108(l) requires any adjuster who applies for a license during the

relevant times, to have executed a bond that can be recovered by the state

should there be a penalty against the licensee or the sub-licensee. The

bond covers all sub-licensees of the licensee, but does not cover

employees who are individually licensed.

4

## JURISDICTION AND VENUE

6.      Jurisdiction is proper pursuant to 28 U.S.C. § 1332(a) as there exists diversity of citizenship between the parties, and the aggregate amount in controversy is more than approximately $3.8 million dollars, exclusive of interests and costs, further details below.

7.      This Court has personal jurisdiction over the defendants because it conducts and transacts business within New York and contracts to investigate claims and handle claims within New York.

8.      Venue is proper because a substantial part of the events and omissions giving rise to the claims occurred in this district.

## GENERAL FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### Brief Introduction and Background Regarding Sertraline/Zoloft

9.      Sertraline/Zoloft is used to treat depression and anxiety issues and problems. According to the Sertraline/Zoloft "Product Monograph" in separate parts, "Musculo-Skeletal System Disorders", such as "Myalgia", among many other disease and disorders, are some of the "Adverse Experience" and/or events that relates to and associated with Sertaline/Zoloft. **See copy attached at Exhibit (1).**

10.      Additionally, according to the Sertaline/Zoloft "Product Monograph" in separate parts, "Nervous System Disorders" such as "Serotonin Syndrome, Extrapyramidal Symptoms (including Akathisia and Dystonia), Oculogyric Crisis" are medical issues and problems that relates to, and associated with Sertraline/Zoloft. **See copy attached at Exhibit (1).**

5

**Toxicology**

11.    There are studies and findings to show "acute toxicity" and "chronic toxicity/oncogenicity" in mice and rats.

12.    Additionally, there's a "Summary of Pharmacokinetics for Sertraline and the primary amine metabolite in the mouse, rat, dog and man.

13.    Also, there are more studies and findings to show "acute toxicity" and "chronic toxicity/oncogenicity" in mice and rats. **See copy attached at Exhibit (2).**

**Dosage and Administration:**

14.    "SERTRALINE (Sertraline) is not indicated for use in children under 18 years of age (See WARNINGS: POTENTIAL ASSOCIATION WITH BEHAVIORAL AND EMOTIONAL CHANGES, INCLUDING SELF-HARM)"

**General:**

15.    "SERTRALINE should be administered with food once daily preferably with the evening meal, or, if administration in the morning is desire, with breakfast."

**Initial Treatment:**

16.    "Depression and Obsessive-Compulsive Disorder: As no clear dose-response relationship has been demonstrated over a range of 50-200mg/day, a dose of 50mg/day is recommended as initial dose."

17.    "Panic Disorder: SERTRALINE (Sertraline hydrochloride) treatment should be initiated with a dose of 25mg once daily. After one week, the dose should be increased to 50mg

6

once daily depending on tolerability and clinical response. No clear dose-response relationship has been demonstrated over a range of 50-200mg/day.

**Titration:**

18.    "In depression, OCD and panic disorder, a gradual increase in dosage may be considered if no clinical improvement is observed. Based on Pharmacokinetic Parameters, steady-state Sertraline Plasma levels are achieved after approximately 1 week of once daily dosing; accordingly, dosage changes, if necessary, should be made at intervals at least one week. Dosage should not exceed a maximum of 200mg/day.".

19.    "The full therapeutic response may be delayed until 4 weeks of treatments or longer. Increasing the dosage rapidly does not normally shorten this latent period and may increase the incidence of side effects.

**Maintenance:**

20.    "During long-term therapy for any indication, the dosage should be maintained at the lowest effective dose and patients should be periodically reassessed to determine the need for continued treatment." See copy attached at **Exhibit (3).**

## A VISIT TO KMART PHARMACY AND THE EXPOSURE TO TOXIC SUBSTANCES

21.    I have a pre-existing medical conditions, and was receiving therapy by means of prescribed Sertraline/Zoloft in 2010. Unfortunately I had an exposure to toxic substances in combined amounts of Sertraline/Zoloft, to which bring on a temporary symptom(s) such as vomiting, serotonin syndrome, and other things unknowing during the time, to which later developed and bring on delay manifestation, latent effects and latent injury.

7

22.     These medical issues and medical problems came about, and arise as result of, and as a consequence of Kmart Pharmacy and Kmart pharmacist had misfilled my prescription and gave me wrong instructions, directions, and wrong dosages amounts combined and totaling to tremendous **450mg/day**.

23.     During the time, I had received some medical treatments and medical care for the first symptoms (vomiting and Serotonin Syndrome) to which had appeared temporary, and so, they were not visible or showing after the medical treatments that was received. However, I needed medical monitoring and medical surveillance, so to receive periodic testing, so to identify any possible latent effects symptoms and latent injury which may not visible, or known. Thereafter, I had received many tests.

24.     On July 23, 2010, I had written to the Kmart Pharmacy about the events. The letters was sent via regular USPS mail to Kmart Pharmacy, at 770 Broadway, New York, N.Y. 10003 on two separate occasions. I had also hand delivered a copy of the letter to one of the Kmart pharmacist, named Darshanie Sankar.

**<u>Visit to New York-Prebysterian Hospital</u>**

25.     On February 22, 2017, I had received medical testing, medical care, and medical treatments at New York-Prebysterian Hospital, during which time I was diagnosed with Myalgia. Such an instant medical issues and problems to which had manifested and developed was very sudden and new.

26.     I had discovered that this new medical issues and problems (Myalgia, and involuntary muscle movements) are associated and linked to the Sertraline/Zoloft.

8

## ADDITIONAL CONTACTS WITH KMART PHARMACY

27.    On February 24, 2017, I had made one additional/follow-up phone call to the Kmart Pharmacy, and was able to speak with a Kmart pharmacist name Jessica Hom. I had shared with her the ongoing situations, and my concerns, and she then had provided a fax number and email contact information for the Kmart Pharmacy district manager, named Dennis Tokofsky.

28.    On that same day (February 24, 2017), I had then sent an email and fax to Mr. Dennis Tokofsky. Although I had made mentioned about my latent injury in my email and fax, those documents and accompanying attachments did not disclosed all the details pertaining to the latent effects, latent injuries and the discovery of it. Thus, my latent injury claim(s) had specifically requested a correspondence from Kmart Pharmacy. I had stated in email, among other things, in separate parts, at the end, on quote: "Please advise. Thank you". Mr. Dennis Tokofsky had never replied. **See a true copy of my email and its attachment at Exhibit (4).**

**Quality Related Event Report**

E.    On this very same day, (February 24, 2017) Jessica Hom, (the Kmart pharmacist) filed a "Quality Related Event Report". **A copy attached hereto at Exhibit (5).**

F.    At some point during the time, the "Quality Related Event Report" was forwarded and submitted to Sedgwick Claims Management Services Inc., and Sandra Brach to investigate the claim. Full details of its travel and route, **attached hereto at Exhibit (5).**

**Legal Framework and Duty of Care In New York State**

G.    New York Insurance Law prohibits misrepresentation, fraud, dishonest practices, untrustworthiness, etc. As described below, the defendants here, owed a duty of care.

9

H.    Specifically, section 2110(a)(4)(A) of the N.Y. Insurance Law prohibits fraudulent, coercive or dishonest practices;

I.    Additionally, Section 2110(a)(4)(C) of the N.Y. Insurance Law prohibits untrustworthiness;

J.    Financial Services Law Section 408 provides that the Superintendent may, after notice and hearing, levy a civil penalty for, among other things, any intentional fraud or intentional misrepresentation of a material fact with respect to a financial product or service or involving any person offering to provide or providing financial products or services.

K.    "Financial product or service" includes, among other things, any financial product or service provided by a person regulated by the Superintendent under the New York Insurance Law, including health insurance products.

L.    Further, Article 24 of the New York Insurance Law prohibits any unfair and deceptive acts or practices in the insurance business in New York.

M.    Section 2430 of the New York Insurance Law provides that "[n]o person shall engage in this state in any trade practice constituting a defined violation or a determined violation as defined herein." The term "defined violation" is defined in New York Insurance Law § 2402(b) to mean the commission by a person of an act prohibited by a series of enumerated statutes. Each of the violations of the New York Insurance Law described as licensing requirements below is so enumerated. Pursuant to Section 2402(c), the term "determined violation" means "any unfair method of competition or any unfair or deceptive act or practice, which is not a defined violation but is determined by the superintendent pursuant to section two thousand four hundred five of this article to be such method, act or practice."

## NEUROLOGIST DIAGNOSIS AND MEDICAL REPORT

29.    On February 28, 2017, I was examined by a neurologist. I had received a diagnosis of "Drug Induced Movement Disorder". I had received medical treatments, and medical care from the neurologist, and still, is receiving medical treatments and medical care.

### THE TELEPHONE CALLS,
### THE STATEMENTS/REPRESENTATIONS AND
### PROMISE MADE ON MARCH 14, 2017

30.    On February 28, 2017, I had received a phone call voicemail message from a woman who had identified herself as Sandra Brach, from Sedgwick, in which she had requested that I give her a call back.

31.    On March 1, 2017, I had received another phone call voicemail message from Ms. Sandra Brach, in which she again requested that I should give her a call back.

32.    On March 14, 2017, I had returned the telephone call to Ms. Sandra Brach, and had left her a voicemail message for her.

33.    Later that same day on (March 14, 2017), I had received another phone call voicemail message from Ms. Sandra Brach, in which she again had requested that I give her a call back.

34.    At approximately 12:30pm on March 14, 2017, I had returned the phone call to Ms. Sandra Brach, and I was able to speak with her directly for about thirty one (31) minutes.

35.    I had recorded the telephone call, and the audio recording is in a digital format. I had also made a transcript. A copy of the transcript is annexed as **Exhibit (6).**

11

36.    After the greetings moment between Ms. Sandra Brach and myself during the telephone call on March 14, 2017, Ms. Brach had requested that I tell her what happen because she "wanted to confirm some things" with me. See line **No. 7** of the transcript annexed as **Exhibit (6).**

37.    Although I was not doing very well and in a poor shape, medically, I had tried to explain what the matter was about, and had indicated to her how the drug overdosed happen, I had described what the visible and temporary symptoms were during the time, I had described to her the delayed manifestation of symptoms which had began in December 2016, I had also informed her that my pre-existing medical condition was aggravated by the events, and that I pay out of pocket costs and co-payments and I was not happy about it, I had also informed her that I have to take medications for the movements that had developed, the current injury and further told her that's where my troubles are. See lines no. 10, 12, 14, 16, 18, 20 and 22 of the transcript annexed as **Exhibit (6).**

38.    At that juncture, I had requested Ms. Sandra Brach to give me a response.

39.    Ms. Sandra Brach's statements/representations and responses, where relevant are as follows:

| 23. | **Sandra:** | Well, I want to confirm some things, so this was a prescription that was filled in July 2010, is that right?... |
|-----|-------------|-------------------------------------------------------------------------------------------------------------------|
| 24. | **Brian:** | Yes... |
| 25. | **Sandra:** | Ok... |
| 26. | **Brian:** | I think it was July...let me look on the bottle, the bottle says... |
| 27. | **Sandra:** | But, it was 2010 |

12

| 28. | **Brian:** | Yes… |
|---|---|---|

| 29. | **Sandra:** | Ok, so I had looked to see if there's anything else on file, and we don't have, we don't show anything else been reported, and I don't know how familiar you are with the way claims work, but there is something call a statue of limitation, and if you go beyond that date, and it based on the day of an injury or the day an incident happen…so, in your case it would be the day that you have gone into the hospital after you took the medication or you went to the doctor, you said…so, that would be that Sunday, I don't think you say a specific day, but that Sunday after you… |
|---|---|---|

| 30. | **Brian:** | It was a Monday that I went to…and saw the doctor… |
|---|---|---|

| 31. | **Sandra:** | It's a Monday, ok, it would be from that day in 2010, and in New York, the statute is three (3) years, now what that means is, if there aren't any legal thing file, so if there isn't anything file by the end of three (3) years, there's no…there's nothing further we can do, because the statute has run, and we don't have any record that there was any claim filed back in 2010 or anytime until those claims… until just in February of this year…does that make sense? |
|---|---|---|

### THE CONSENSUS, CONFIRMATION AND ACCEPTANCE OF THE LATENT EFFECTS AND LATENT INJURY CLAIMS

40.     After I had confirmed with Ms. Sandra Brach, that, my claims are based on the latent effects and the latent injuries, it was pellucidly clear that there was a consensus and acceptance of my latent effects and latent injury claim. There were no further contention and no further argument about any Statue of Limitation. The Statue of Limitation question and concern to which Ms. Sandra Brach had attempted to raised early, disappeared, gone and off the table in its entirety, as I was lead on to understand, and I was further lead on to believe that we are moving forward amicably.

13

41.    Ms. Sandra Brach statements/representations and responses, including among other things, on quote: "I want to confirm what your injuries are, so I'll know what I'm addressing for your claim.", and where relevant, as follows:

**32.    Brian:**    Well, that sounds very strange…well, the injury that I am suffering now is what I am claiming about…my injury now occurred in December, so…

**33.    Sandra:**    But you said they directly related that to the…when you went to the hospital before…the first time…

**34.    Brian:**    No, no…when I saw the doctor…the first events that happen was that I take the medication and then, in the late hours later I started to vomit and those were pretty much symptoms…I never developed anything like what I am going through now…this is the first time I started to have these type of illness, this injury that I have now…

**35.    Sandra:**    And what is it specifically?

**36.    Brian:**    It's…involuntary movements,…let me tell you what the doctor have…the diagnosis…Drug Induced Movement Disorder…I never have this before…

**37.    Sandra:**    Drug Induced Movement Disorder…

**38.    Brian:**    I was told that it's also called Tardive…let me look on my papers here, just a minute…Tardive Akathisia…so,

**39.    Sandra:**    Ok, and they are related that to…?

**40.    Brian:**    The drug…the overdosed that I had…because it was pointed out to me…because I tried to get an explanation as to where this coming from and they said that the drug…leaded on this late…late, late…effects…late…late…late injury…

**41.    Sandra:**    Latent…a latent effects?

14

42.  **Brian:**    Yes, so...because the...one of the doctor, had advised me of the effect of the...latent effect from the drug...and the doctor...the neurologist advised me, the same...I have a psychiatrist, I have a neurologist...and they've advised me of the same...so...I called up...I called...I forgot the name of the company that I called and they advised me also that the Zoloft does caused the problem that I have and it could happen years later...so, I am very curious as to...but I am advised that this...even though its such a long time...I don't believe I should have to be suffering this type of thing all of a sudden, and this is something I never have before, and the medicine that I am taking now, I don't know if I am going to get better by it or what, I'm just taking it pretty much.

43.  **Sandra:**    Ok. Well, you've said you got something that you were looking at that says your diagnosis, can you send me a copy of that?

42.    Ms. Sandra Brach's response of "ok" or "okay" after it was confirmed with her that my claims are based on the latent effects and the latent injuries, was indeed "affirmative conduct", and pellucidly clearly evidencing acceptance and liability my claims based on the latent effects and the latent injuries.

43.    Ms. Sandra Brach went further, to show that a consensus had arrived, by specifically requested my medical report document to which show my diagnosis.

44.    I was completely convinced, in such a way, which had caused me to rely on Ms. Sandra Brach statements/representations and everything to which appeared, because (1) She had accepted liability of my latent effects and latent injuries claims; and (2) She had indicated readiness to investigate/review my latent effects and latent injuries claims, but, waiting on the medical documents and other documents she had requested from me.

45.    For example, Ms. Sandra Brach, made the statements/representations in separate parts as follows:

- *"Well, you've said you got something that you were looking at that says your diagnosis, can you send me a copy of that?"*

- *"Sure! Sure! Yeah, whatever you have, send me any whatever documents you have, send me a copy of it so that I can look it over."*

- *"Send me whatever information you have, especially anything from the doctor saying what you have, what your conditions is now, so I can review it."*

- *"Well, that's what I'm doing now, so I'm following-up with you, so I'll be your contact now, going forward, but I want to confirm what your injuries are, so I'll know what I'm addressing for your claim."*

- *"Yes...Yes...If you got them, please do, I would love to see those."*

- *"Ok, all right, well send me whatever you have, and I'll go over it all, and I'll see...and I'll be in contact with you, once I get that from you...ok?"*

## THE PROMISES

46.    On March 14, 2017, close to the end of the telephone call, Ms. Sandra Brach had made a clear and unambiguous promise, that, I should send her "whatever" I have, pertaining to my latent effect claims, and latent injury claims, and she will go over it all, and that, she will be in contact with me once she get that from me.

47.    On March 14, 2017, during the telephone call, Ms. Sandra Brach had advised, and informed me, that she want to confirm what my injuries are, so she will know what she's addressing for my claims.

16

48.     I had relied on Ms. Sandra Brach's statements, representations, and promises upon doing so, I had sent the documents to which I have during the time. For example: I have sent to her among other, the following:

(a).     Via email on March 14, 2017, a copy of Dr. Xie (Neurologist) medical report dated 2/28/2017 with my diagnosis and/the other information I had sent.

(b).     Via email on April 7, 2017, a copy of the section of the CPLR 214-c.

(c).     It costs me time, effort and money to get documents scan and sent. I had to ride train to Staples store to get the papers scan to flash drive cost $1.00 per page. Train fare round trip was $2.75 x 2.

(d).     I had seek and get my wife help and assistance. This cost her time and effort and money to travel.

(e).     I did not submit additional claims for medical monitoring damages. I was entitled to enjoy the benefits of Sertaline/Zoloft, without any disturbance overdose and toxic exposure to combine substances, and its consequences. As a result of the events, I had became curious, because of the risks of contracting additional serious manifestation of latent diseases, and further curious to know more, the risk required a need for future care, and future care is to monitor risk of disease. Thus, there is need for the performance of routine effective oversight.

17

**A DENIAL LETTER DATED MARCH 21, 2017**

49.    On March 23, 2017, Ms. Sandra Brach had sent me an email, with an attached letter dated March 21, 2021, indicated that my claim is denied, based upon an alleged Statute of Limitation. See copy at **Exhibit (7).**

50.    First, pursuant to CPLR 214-c, my latent injury claim, and latent effect claim was not time barred by any Statute of Limitation;

51.    Second, my present injury was a delayed manifestation, and caused by the latent effects of the exposure to the toxic substances combined with the overdose created from the Sertraline/Zoloft;

52.    Third, the medical reports dated February 28, 2017, from the neurologist, Dr. Xie, had clearly shown and indicate that the latent effects and latent injury started in December 2016;

**A Significant Negligent Misrepresentation and Dishonesty by Ms. Sandra Brach**

**a).**    On March 14, 2017, during the telephone conversations with Ms. Sandra Brach, she had made misrepresentations and stated in separate part, on quote: *"we don't have any record that there was any claim filed back in 2010 or anytime until those claims...until just in February of this year"*.  But, such statements by Ms. Brach, are false and in conflict with Kmart.

**b).**    When Ms. Sandra Brach ("the independent adjuster") had received the "Quality Related Event Report", dated February 24, 2017, and we then had the telephone conversations on March 14, 2017, a special relationship had developed between us, imposing a duty of care on both Ms. Brach ("an independent adjuster") and Sedgwick (also, "independent adjuster") to render accurate information while handling, investigating and/or adjusting the claim.

18

**The Excited Utterances and Admission as per Rule 803,**
**and Exclusion From Hearsay As Per Federal Rules of Evidence 801(d)(2)(D)**

**a).**    On March 24, 2017, during the conversations and communications between Ms. Jessica Hom and myself, on the topic of Kmart's failure to respond to my original complaint/claim dated and submitted to them in 2010, and nobody from Sedgwick or Kmart had provide any straight and official response to the matter, Ms. Jessica Hom had explained and stated in separate part, during the time, that, on quote: *"Yeah, I know that we should've follow up definitely, and I agreed with you that we should have follow up, because this is a very serious matter, you know, like..."*

**b).**    Ms. Jessica Hom had further stated in separate part, that, on quote: *"Yeah, it has been...its more than...it is almost...its more than 5 years and you haven't got any... any straight answers."*.

**c).**    Ms. Jessica Hom had also stated and explained that, after she had submitted her "Quality Related Event Report", she did not heard from anyone, who may have interest to investigate the matter. (neither Sedgwick or Kmart). Ms. Jessica Hom had full and complete access to all the past and present records, complaint/claims, notes, protected health information and all important information in the patient's electronic medical records/files at Kmart Pharmacy, and had agreed with all my claims. **A copy of the transcripts is attached hereto** at **Exhibit (8).**

**CPLR §214-c BY THE LEGISLATURE**

**First.**    CPLR §214-c Had Became Questionable And an Issue In this Case.

**Second.**    On April 7, 2017, I had sent a copy of the CPLR §214-c to Ms. Sandra Brach via email, because she had requested it, and, as per her findings.

53.    New York Legislature's passage of CPLR §214-c did not affect prior precedent regarding when toxic injury is deemed to occur. What the statute changed was the date a cause of action for toxic injury to person or property was deemed to have accrued. After the passage of CPLR §214-c, the Statute of Limitation in New York is now measured not from the date the injury occurred (the accrual event under the Common Law), but from the date the Plaintiff had actual or constructive knowledge of that injury.

54.    CPLR §214-c (2) provides, "[n]otwithstanding the provisions of Section 214, the three-year period within which an action to recover damages for personal injury or injury to property caused by the latent effects of exposure to any substance or combination of substances, in any form, upon or within the body or upon or within property must be commenced shall be computed from the date of discovery of the injury by the Plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the Plaintiff, whichever is earlier."

55.    Since its enactment in 1986, the Court of Appeals has consistently interpreted CPLR §214-c to toll the running of the Statute of Limitations until discovery of the injury rather than redefine when the injury occurred:

The legislative history and objectives of Section 214-c have been well articulated by this Court (See e.g. MRI Broadway Rental v. United States Min. Prods. Co., 92 N.Y.2d 421,681 N.Y.S.2d783,704 N.E. 2d550[1998]; Jensen v. General Elec. Co., 82 N.Y.2d77,603 N.Y.S.2d420,623 N.E.2d547[1993]). As part of its 1986 tort reform package, the legislature added a new section to CPLR article 2 (L.1982,ch682) creating a date of discovery Statute of Limitations for toxic torts. The amendment was intended to remedy the inequities that arose from

application of the Common-Law exposure rule to toxic tort cases. In his Approval Memorandum

Governor Mario Cuomo observed that the existing three-year Statute of Limitations measured

from the date of exposure "fail[ed] to recognize that the adverse effects of many of these toxic

substances do not manifest themselves until many years after the exposure take place," and

consequently, many claims were barred even before potential Plaintiffs were aware of their

injuries (Governor's Approval Mem, Bill Jacket, L 1986,ch 682; see matter of Steinhardt v.

Johns-Manville Corp., 54 N.Y.2d1008, 446 N.Y.S.2d244,430 N.E.2d1297[1981] mot to amend

remittitur granted 55N.Y.2d825, cert. denied 456 U.S.967[1982]). The adoption of the date of

discovery rule therefore results in the tolling of the Statute of Limitations until a party harmed by

a toxic substance discovers or should have discovered the injury. Germantown Cent. Sch. Dist. v.

Clark, Clark, Mills & Gilson, ALA, 100N.Y.2d202,205-06(2003).

56.    Also, the CPLR §214-c serves to toll the Statute of Limitations rather than

redefine when the injury was suffered was confirmed years later by the Courts of Appeals in

Consorti v. Owens-Corning Fiberglass Corp., 86 N.Y.2d449. There, a husband's action for

personal injury arising from his diagnosis with mesothelioma many years after inhaling asbestos

was held to be timely under CPLR §214-c because he brought suit within three years of his

mesothelioma diagnosis. The question that the Second Circuit certified to the New York Court of

Appeals was whether his spouse could assert a loss of consortium claim when the asbestos

inhalation occurred before the marriage, but the diagnosis of mesothelioma occurred after the

marriage. The Court of Appeals concluded that the spouse did not have a timely claim because

such a derivative claim "does not lie if the allege tortious conduct and resultant injuries occurred

prior to the marriage." Id. at 450 (quoting Anderson v. Lilly & Co. 79N.Y.2d797,798(1991)

(emphasis added)). The Court of Appeals reiterated that in New York, "a bright line, readily

21

verifiable rule was adopted in which, as a matter of law, the tortious injury is deemed to have occurred upon the introduction of the toxic substance into the body." Id.at 452 (emphasis added).

57.    Additionally, in considering the relationship between temporary symptoms and the application of the discovery rule, New York's Court of Appeals interpreted its discovery rule to trigger the Statute of Limitations when the injured party discovers the primary condition on which the claim is based. In re-New York County DES Litigation (Wetherill v. Eli Lilly & Co.), 678N.E.2d474(N.Y.1997). In Wetherill, the Court recognized that "there may be situations in which the claimant may experience early symptoms that are too isolated or inconsequential to trigger the running of the Statute of Limitations..." Id. at 478, n.4.

58.    In another case, In Johnson v. Exxon Corp. 685N.Y.S.2d530(N.Y.App.Div.1999), a New York Appellate Court addressed the application of the discovery rule, as construed in Wetherill, in the context of an action for work-related injuries allegedly sustained from toxic exposure. In Johnson, the claimant in that case had experienced occasional aliments over a two(2) year period as a result of exposure to chemicals. In a memorandum opinion, the Court determined the claimant did not "discover" the condition on which the claim was based until an occurrence when she was "overcome by fumes while working and suffered body tremors, a feeling of intoxication, a shooting pain in her head, rashes on her face and neck, and nausea." Id. The Court determined it was at this point, when claimant could not return to work, that the statute was triggered, as opposed to previous occurrences where plaintiff suffered isolated and inconsequential symptoms.

59.    See also, O'Halloran v. 345 Park Co., 675N.Y.S.2d55(N.Y.App.Div.1998), leave to appeal dismissed, 707N.E.2d445(1998) (The Court concluded symptoms were too isolated or

22

inconsequential to trigger statute, where claimant only missed two and a half days of work and did not seek medical attention or file a workers' compensation claim at that time.

60.    On May 3, 2017, I have submitted a document(s) to Kmart Pharmacy #7777, 770 Broadway, New York, N.Y. 10003. The document(s) entitled New Claim, and reference submitting a claim that involved latent effect injury from exposure to toxic drug substances. I was later directed to make contact with an attorney named Tom Lynch, if I have any question(s)/concern(s) regarding my latent injury claims that was submitted on May 3, 2017. Upon contact with Tom Lynch he had expressed and explained that there were no need for Sedgwick or anyone to investigate the latent injury claims. As a result, my latent injury claims, questions and concerns have not resolved under Tom Lynch's demand(s). Tom Lynch had demanded and stated among other things, that, I must go find a doctor. Tom Lynch had specifically stated on quote: **"get the doctor opinion, that this latent injury is based on something that happen back 7 years ago, and then they will send out a report to me, Kmart, or to Sedgwick, and then, Sedgwick would then retain me, and I will deal with it. But you do not have a lawyer talking to right now, I don't believe you spoken to a doctor yet, who to tell you that & years ago, the prescription you took just causing your problem now."**.

## THE LAWSUIT

61.    On March 28, 2018, I filed with the Supreme Court of the State of New York, County of New York, a Summons and Complaint, entitled Brian Coke Ng (Plaintiff) v. Kmart Pharmacy, Kmart Holding Corporation **("Debtors")** and Sedgwick Claims Management Services, Inc. **("Non-Debtors")** Index No.: 100386/2018. Ms. Bella I. Pevzner and her law firm ("Sobel Pevzner, LLC") represent defendants in the case. Mr. Harshall Y. Jani (an attorney) was handling the case. A copy of the complaint annexed as **Exhibit (9).**

23

62.     On September 12, 2018, I had received an email from Mr. Jani, separate parts of the email reads as follows: "*Additionally, "as there is a pending motion to amend the complaint to add additional parties and additional new claims against my client, we suggest amicably working out any issues at the upcoming preliminary conference scheduled for September 20, 2018. Lastly, as previously stated our client is open to alternative dispute resolution, however, we have yet to receive a proper numerical settlement demand from you. Please provide a numerical settlement demand after which we will be in a position to discuss same with our client and engage in settlement discussion with you.*". See a true copy annexed as **Exhibit 10.**

63.     Defendants through their attorneys, had explicitly recommended/suggested that the parties amicably work any issues at the Preliminary Conference held on September 20, 2018.

64.     Specifically, the Defendants have explicitly expressed and stated through their attorneys, that they are open to Alternative Dispute Resolution.

65.     Specifically, the Defendants through their attorneys, via email dated September 12, 2018, had made their first request for "*a numerical settlement demand*" from Plaintiff.

66.     And defense counsel, in this case, had promised to discuss the same settlement demand, upon their receipt, with their clients/defendants, and to engage in further settlement discussion/negotiation with Plaintiff.

67.     Indeed, as they had requested, the defense attorney(s) did in fact received a numerical settlement demand reflecting $3.8 million dollars for the initial consideration. The parties had participated in further good faith communications for purpose of finding and reaching a compromise and monetary settlement, and have reached a fruitful and promising stage during the settlement conference that was held on September 20, 2018. The parties had met on that day, sit together, and participated in negotiations/discussions that reached a promising and fruitful end goal through compromise.

24

68.    During the settlement conference on September 20, 2018, the defense attorney (Mr. Harsal Y. Jani) had advised that the $3.8 million demand was over the top and not reasonable, and told plaintiff to consider a fair, reasonable and proper numerical figure somewhere between $300,000 and $400,000 because that is his client(s) settlement posture. The plaintiff had then proposed $380,000 for consideration. Mr. Jani had then advised that he need time to set up a conference with their insurance company, and demanded that Plaintiff withdraw a motion to amend the complaint while he make preparation to confer with the insurance company. Plaintiff had agreed to the withdrawal of the motion so to facilitate the settlement.

On October 15, 2018, Sears Holdings Corporation and its debtor affiliates, including Kmart Pharmacy and Kmart Holding Corporation as debtors and debtors in possession in their Chapter 11 cases, each commenced a voluntary case under Chapter 11 of Title 11 of the United States Code (11 U.S.C. §101 et seq.) in the United States Bankruptcy Court for the Southern District of New York. The cases are jointly administered under Case No. 18-23538 (RDD).

**This Court First Order To Defendants For Status Update Report Dated November 6, 2018**

69.    On November 6, 2018, United State District Court Magistrate Judge Hon. Barbara C. Moses, had issued an Order, which in separate parts reads as follows: " ***Defendants are hereby ORDERED to notify the Court within 30 days of any action or order of the Bankruptcy Court that would affect the automatic stay.***". But, the defendants did not respond to this Court.

70.    On November 30, 2018, I filed a Motion and seek relief from the automatic stay in order to proceed with Alternative Dispute Resolution and numerical settlement interest, among other(s).

25

71.    The debtors attorneys then sent me a letter dated February 6, 2019, and had indicated in separate parts, that the debtors has no available coverage or it is exhausted. **See Exhibit (11 ).**

72.    The debtors attorneys then filed papers with the Bankruptcy Court, and had indicated, in separate parts, on quote: *"any potentially applicable insurance coverage has been exhausted, the relief is unavailable.".*

**This Court Second Order For A Status Update Report Dated October 7, 2021**

73.    On October 7, 2021, United State District Judge Hon. Alison J. Nathan, had issued an Order, which in separate parts reads as follows: *"On November 6, 2018, the Court ordered the parties to inform it within 30 days of any action or Order of the Bankruptcy Court that would affect the automatic stay in this case. Dkt. No. 6. The parties are ordered to submit a joint status update on or before October 28, 2021, informing the Court if the Bankruptcy Court has taken any action that would affect the automatic stay.".*

74.    On October 27, 2021, an attorney, (Ms. Judy Meisel) from Sobel Pevzner LLC, made contact with me for the first time via email message and had advised that, she is the person handling the case file with Ms. Bella I. Pevzner, and had further indicated, that she did not agree with the proposed four (4) page status update report. Notably, she had also added Ms. Bella I. Pevzner, and Ms. Janice Mauro-Douglass to the email threads/email conversations.

75.    Very shortly thereafter, during the time, on October 27, 2021, I sent a reply email message, in response to Ms. Meisel's email message on the same email thread. My email message was also delivered to all persons who are involved in the conversation, including (**Ms. Judy Meisel, Ms. Bella Pevzner and Ms. Janice Mauro-Douglass**).

76.     Shortly after I had responded to Ms. Judy Meisel's email message, at approximately 1:32p.m. local time on October 27, 2021, Ms. Bella Pevzner had authored and sent out a reply email message, and commented on the same email threads, on the same thread topic, on the same thread index, and had begun to engaged in undignified and/or discourteous conduct, and vituperative personal attacks against me.

**The Statements and Comments By Ms. Bella I. Pevzner**

77.     On October 27, 2021, Ms. Bella I. Pevzner had authored and sent out statements, with vituperative personal attacks, insulting, and offensive statements about me, which reads in separate parts, an quote: *" Judy - just to you. If you recall - this guy lives in a shelter and has nothing but time. We are not making a motion to lift the stay and we are not doing a 4 pg update. I agree with you. All the court needs to know is that there is still a stay."*.

**The Status Update Response Ordered To Be Submitted By October 28, 2021**

78.     On October 28, 2021, Sobel Pevzner LLC., by Ms. Bella Pevzner, wrote and sent the plaintiff a copy of letter they had filed with this Court and to Hon. Alison J. Nathan, and stated in separate, on quote: *" The Bankruptcy Court has not taken any action that would affect the automatic stay in place."*

**The Status Update Response Ordered To Be Submitted By December 9, 2022**

79.     On December 2, 2022, Sobel Pevzner LLC., by Ms. Bella Pevzner, wrote and sent the plaintiff a copy of a second letter they had filed with this Court and to Hon. Mary Kay Vyskocil, and had stated in separate, on quote: *"In regards to the Temporary Stay in place since the Bankruptcy filing, the court has now approved a Plan under Chapter 11 which in part, converts the Temporary Stay into a Permanent Injunction."*.

80.    On January 11, 2023, this Court held a status conference. The parties agreed that all claims against the debtor defendants in the case are permanently enjoined by Order of the Bankruptcy Court, and as a result, the parties had discussed appropriate dismissal of those claims. Defendants during the time, had advised the Court that, Sedgwick Claims Management Service, Inc. had planned to move to dismiss the remaining claims against it.

**(A).**    Suddenly and just recently, Sedgwick Claims Management Service, Inc. had appeared before this court and arguing that the Bankruptcy Court had issued an order in 2018 or 2019 extending the Automatic Stay to certain non-party debtors specifically including Sedgwick claims management services, Inc. But, they had failed to informed this court of such since 2018.

### AS FOR A FIRST CAUSE OF ACTION
### FOR PROMISSORY ESTOPPEL
### <u>(Against All Defendants)</u>

81.    Brian Coke Ng, Plaintiff, Pro-se, hereby incorporate by reference repeats and realleges each and every allegation and facts contained and outlined in the preceding paragraphs 1-80 of this Complaint as if they were set forth at length here, and fully at this point.

82.    Defendants promised to review/investigate my latent effects claim and latent injury claim, and had specifically requested the medical report that says what the diagnosis is. For example, Ms. Sandra Brach had made these representations, in separate parts, as follows:

- **"Well, you've said you got something that you were looking at that says your diagnosis, can you send me a copy of that?"**

- **"Sure! Sure! Yeah, whatever you have, send me any whatever documents you have, send me a copy of it so that I can look it over."**

- **"Send me whatever information you have, especially anything from the doctor saying what you have, what your conditions is now, so I can review it."**
- **"Well, that's what I'm doing now, so I'm following-up with you, so I'll be your contact now, going forward, but I want to confirm what your injuries are, so I'll know what I'm addressing for your claim."**
- **"Yes...Yes...If you got them, please do, I would love to see those."**
- **"Ok, all right, well send me whatever you have, and I'll go over it all, and I'll see...and I'll be in contact with you, once I get that from you...ok?"**

83.    I have relied on defendants representation and promise, in this regard to my detriment, by not filing a medical monitoring claim, and I had discovery and knew the existence of the cause of the manifestation of the latent effect, and latent injury, but defendants misconduct had caused the delay by concealing the existence of my diagnosis, the manifestation of the latent effects, the latent injury and further went on to address something else in their denial letter dated March 21, 2017.

84.    The denial letter dated March 21, 2017, did not addressed or revealed Dr. Xie medical report, to which disclosed the diagnosis, my current injury and/or the manifestation of the latent effects and latent injury. All of which was discussed, and confirmed, and to which there was a consensus and agreement created between us.

85.    The delayed manifestation claim and/or latent effects and latent injury is what my claim based on, all of which was discussed, confirmed, and a consensus created and developed between us.

29

86.    I had relied on the defendants conduct, statements, representations and the promise made to me on March 14, 2017, all of which had induced me and caused me to engaged into providing them with full disclosure of my doctors report, dated February 28, 2017, to shows the diagnosis and the latent effects and latent injury.

87.    In so doing, it also costs me money (out-of-pocket), time, effort, and money to scan and sent everything to them, and I had to seek and get help to get everything completed and finalized to forward to them, so to satisfy their expectations.

88.    I was expecting their investigation and report/letter to include findings based on everything including the manifestation of the latent effects, latent injury and the diagnosis of the current injury as discussed on March 14, 2017.

89.    Under the circumstances described herein, it would be inequitable to permit defendants to break their promise to me. Ms. Sandra Brach had not fulfill her promise, and should not be allowed to resile. The promise must be enforce to avoid injustice.

90.    My detrimental reliance on defendants' statements, representations and promise has caused me to suffer damages and injuries in an amounts currently unknown, but reasonably believed to be in excess of $3.8 million dollars.

91.    Additionally, I have Article III standing to sue Sedgwick Claims Management Services, Inc. and Ms. Sandra Brach. I have indeed suffered injury in fact as a result of the defendants conduct, to which had created costs/expenses on me personally. Their conduct had specifically caused me to spend money. This included costs and expenses to get photographs taken of specific items, the costs and expenses to get a USB flash drive, the costs and expenses to get copies of private medical documents scanned, the costs and expenses to travel by train to and from so to get them what they have requested, etc. Plus the other costs and expenses totaling over $30,000.00 dollars.

30

## AS FOR A SECOND CAUSE OF ACTION
## FOR EQUITABLE ESTOPPEL
## (Against All Defendants)

92.    Brian Coke Ng, Plaintiff, Pro-se, hereby incorporate by reference repeats and realleges each and every allegation and facts contained and outlined in the preceding paragraphs 1-91 of this Complaint as if they were set forth at length here, and fully at this point.

93.    I had relied on Ms. Sandra Brach's statements, responses, and representations (that appears and looked like she was acting in good faith and doing the right things), and upon I relying on such, I did not take any action to submit an additional claim for medical monitoring and/or medical monitoring damages. I was leaded-on, and induced into believing that, Ms. Sandra Brach's statements, representations and plan(s), moving forward, directly in my interests, were genuine, good, and truthful, and furthermore, ready with a good faith, to get everything resolve peacefully.

94.    But, everything, including the consensus that was created and developed on March 14, 2017, between us, had turn out on their part, shows deceptive and fraudulent, and a complete misrepresentation(s) of all the truthful facts. On their part, there's concealment of all the material facts, but the defendants here, have received, confirmed, and have knowledge of the real truthful facts of the manifestation of the latent effects, latent injuries, and current injury shows in the medical report from Dr. Xie dated February 28, 2017, all of which they had received from me, and also, had confirmed with me.

95.    Ms. Sandra Brach had indeed accepted all my position as it relates to the manifestation of my latent effects claim, and latent injury claim on March 14, 2017, she had used the word "OK"/"Okay". It was clear and unambiguous.

31

96.    Ms, Sandra Brach's responded "OK"/"Okay" to my position as it relates to the manifestation of my latent effects claim and latent injury claim had also pellucidly clearly and unambiguously evidencing acceptance and liability of my claims as it relates to manifestation of my latent effects claim and latent injury claim.

97.    The word "OK" or "Okay" has meaning. I have found in other jurisdiction (s) where "OK" or "Okay" has been addressed before. See reference copy annexed **Exhibit (12).**

98.    Additionally, the Black's Law Dictionary, Second Edition, 1910, had published the definition of "OK" in separate part, in a relevant sense as follows: "correct", "approved", "accepted", "satisfactory", or "assented". See reference copy annexed **Exhibit (13).**

99.    Sedgwick Claims Management Services, Inc. by Ms. Sandra Brach with their misrepresentations, was designed and made with the intent that I would rely upon them in giving up and disclosed relevant documents, including the medical report from Dr. Xie to which showing the current diagnosis and current injury, and to then denied my claims as it relates to the manifestation of latent effects and latent injury as a result of the exposure to the toxic combined substances, and for them to earned money.

100.    The current diagnosis shown in Dr. Xie's medical report dated February 28, 2017, shows my current injury, to which my latent effect claim and latent injury claim is based upon. Thus, my latent effects claim and latent injury claim is not time barred, pursuant to CPLR 214-c.

101.    Ms. Sandra Brach's email and denial letter dated March 21, 2017 and March 23, 2017, respectively, is misleading and false.

102.    Ms. Sandra Brach did not addressed and set forth any finding(s) with any specifics from any review and/or investigation that relates to:

32

**(A).**    My current diagnosis and latent effects claim and latent injury claim and its manifestation theory, and,

**(B).**    The Section of CPLR 214-c to which had specifically provide for the manifestation of my latent effects claims and latent injury claim, including mine.

**(C).**    She had instead made reference to something else, that she had requested. Specifically, stated that she wanted her "**any-whatever documents you have**". Then, when she had received the "any-whatever documents you have", she then choose the one she wants, and then make big deal about everything, in a negative and misleading way, to have unfair advantages over you, and with bad faith behavior, to hamper your potential success, and deprived you of your rights, that is what had exactly occurred to me. I had suffered complete abuse in this matter. They simply care less.

103.    As a result of the defendants conduct, to which described herein, Kmart insurance policy, then got depleted and exhausted before I get any opportunity to file a claim for necessary and needed medical monitoring. Documents filed with the Bankruptcy Court, and the letter that was sent to me shows that they cannot and could not afford any medical monitoring damages.

33

## AS FOR A THIRD CAUSE OF ACTION
## FOR NEGLIGENT MISREPRESENTATION
## (Against All Defendants)

104.    Brian Coke Ng, Plaintiff, Pro-se, hereby incorporate by reference repeats and realleges each and every allegation and facts contained and outlined in the preceding paragraphs 1-103 of this Complaint as if they were set forth at length here, and fully at this point.

105.    As state before, when Ms. Sandra Brach ("the independent adjuster") had received the "Quality Related Event Report", dated February 24, 2017, and we then had the telephone conversations on March 14, 2017, a special relationship had developed between us, imposing a duty of care on both Ms. Sandra Brach ("an independent adjuster") and Sedgwick Claims Management Services, Inc. (also, "independent adjuster") to render accurate information while handling, investigating and/or adjusting the claim and pursuant to all applicable New York Insurance Law, and as described herein.


106.    Ms. Sandra Brach, had negligently provided incorrect information, all of which I had described and shows in details herein. Also, Ms. Sandra Brach provided statements, and information, that, on quote: "*we don't have any record that there was any claim filed back in 2010 or anytime until those claims…until just in February of this year*", all of which are false.

107.    For example, on March 14, 2017, during our telephone conversations Ms. Sandra Brach, made the statements/representations, all of which leaded me to believe her and trust her in good faith, in furtherance of her to adjust the claims, for the purpose to settle or to bring the matter to a satisfactory state so that the parties will agree in the result and with good faith. Those statements and representations reflects and resides in separate parts, and as follows:

34

- *"Well, you've said you got something that you were looking at that says your diagnosis, can you send me a copy of that?"*

- *"Sure! Sure! Yeah, whatever you have, send me any whatever documents you have, send me a copy of it so that I can look it over."*

- *"Send me whatever information you have, especially anything from the doctor saying what you have, what your conditions is now, so I can review it."*

- *"Well, that's what I'm doing now, so I'm following-up with you, so I'll be your contact now, going forward, but I want to confirm what your injuries are, so I'll know what I'm addressing for your claim."*

- *"Yes…Yes…If you got them, please do, I would love to see those."*

- *"Ok, all right, well send me whatever you have, and I'll go over it all, and I'll see…and I'll be in contact with you, once I get that from you…ok?"*

108.    After Ms. Sandra Brach had induced, persuaded, encouraged,  and convinced or influenced me to send her my personal and private medical records documents, all of which she had received, she then, on March 21, 2017, created  and sent a denial letter, and rendering it with false statements indicating that, my claims, including the latent injury claim is time barred as per 3 year statute of limitation in New York. Ms. Sandra Brach conduct and actions is fraudulent.

109.    Ms. Sandra Brach statements or conduct exaggerated and/or misstated the facts.

110.    All misrepresentations resulted from their negligence and lack of due diligence.

111.    I had relied on the defendants misrepresentations, as I have described and shown herein. Ms. Brach and Sedgwick, had violated N.Y. Ins. Laws, as described and shown herein.

112.    As a result, I have suffered damages, as I have described and shown herein.

35

113.    As I have described and shown herein, both Ms. Sandra Brach (independent adjuster) and Sedgwick Claims Management Services, Inc. (also, "independent adjuster") during the relevant time, was obligated to render accurate information while handling, investigating and/or adjusting the claim and pursuant to all applicable New York Insurance Law, and as described herein. They are bound to the People of New York, including me. There is a special relationship here, and a duty of care must be maintained at all relevant times.

114.    As stated previously herein, at all relevant times, N.Y. Ins. Law § 2108(l) prescribes the bonding requirements for a licensed adjuster and states in pertinent part:

> (l)(1)    No adjuster's license or renewal license shall be issued to
> any applicant unless there shall be on file with the superintendent a bond,
> executed by such the applicant and by approved sureties, in the penal sum
> of one thousand dollars conditioned on the faithful performance by such
> licensee and by all sub-licensees named in such license, of their duties as
> such adjusters.

115.    At all relevant times, all Independent Adjusters licensed to investigate and/or adjust claims must complied with the Bond requirements, and the "***Bond must be in the amount of $1,000.***". Based on information and belief, the bond assets for both Ms. Sandra Brach and Sedgwick Claims Management Services, Inc., is $1,000 dollars each. See details at **Exhibit (14).**

116.    Ms. Sandra Brach statements or conduct exaggerated and/or misstated the facts. Her misrepresentations resulted from all the defendants negligence and lack of due diligence.

**a).**    As previously stated herein, on March 24, 2017, during the conversations
and communications between Ms. Jessica Hom and myself, on the topic of
Kmart's failure to respond to my original complaint/claim dated and

submitted to them in 2010, and nobody from Sedgwick or Kmart had

provide any straight and official response to the matter, Ms. Jessica Hom

had explained and stated in separate part, during the time, that, on quote:

*"Yeah, I know that we should've follow up definitely, and I agreed with*

*you that we should have follow up, because this is a very serious matter,*

*you know, like..."*

**b).**   Ms. Jessica Hom had further stated in separate part, that, on quote: *"Yeah,*

*it has been...its more than...it is almost...its more than 5 years and you*

*haven't got any... any straight answers."*.

**c).**   Ms. Jessica Hom had also stated and explained that, after she had

submitted her "Quality Related Event Report", she did not heard from

anyone, who may have interest to investigate the matter. (neither

Sedgwick or Kmart). Ms. Jessica Hom had full and complete access to all

the past and present records, complaint/claims, notes, protected health

information and all important information in the patient's electronic

medical records/files at Kmart Pharmacy,  and had agreed with all my

claims. **A copy of the transcripts is attached hereto** at **Exhibit (8).**

**d).**   Ms. Hom had participated in the claim processing, and knew the truthful facts.

## THE ONGOING MEDICAL EXPENSES/COSTS AND DAMAGES

117.   Since the manifestation of  the latent effects and latent injury, a preliminary

review of my medical expenses/costs at this juncture, had already total more than thirty thousand

dollars (U.S$30,000.00), including my out of pocket amounts, and collateral source amounts, to

which I am obligated to pay back, and pursuant to 42 U.S.C. § 1396k(a)(1)(A).

- Estimated Future Medical Expenses Damages is approximately $630,000.00
- Economic Damages = approximately $730,000.00
- Non Economic Damages = approximately $2,883,650.00

## THE APOLOGY THAT WAS SENT FROM SEDGWICK CMS AND MS. SANDRA BRACH

118.    By letter dated March 1, 2017, and March 3, 2017, respectively, signed by Ms. Sandra Brach, Sedgwick had issued an apology. Separate part of both of the letters reads, on quote: "*On behalf of our client, I would like to apologize for any inconvenience this incident may have caused you.*". See a copy of the details attached hereto as **Exhibit (15).**

119.    In my view, given where we are today, such apology was not presented to me with good faith, heartfelt, truthfulness, genuineness and sincerity. The defendants should address and tell this court, what in their view, had happen to honesty, empathy and trustworthiness that usually comes with and accompanying an apology?

## REQUEST/RELIEF FOR PIERCING THE CORPORATE VEIL

120.    I respectfully requesting this Court issued a relief to permit plaintiff to hold the owner(s) and shareholder(s) (Sedgwick CMS Holdings, Inc., Fidelity Sedgwick Corporation, Fidelity Sedgwick Holdings, Inc., The Carlyle Group Inc., and Dave North), liable in this matter.

121.    As explained and described in details herein, there is fraud, misrepresentation, violation(s) of N.Y. Ins. Law(s), and in my view, I believe Sedgwick Claims Management Services, Inc. has been used as an alter ego, dominated and controlled by its owner(s) and shareholder(s), and its bond assets as an "Independent Adjuster" reflecting only $1,000 dollars is also wholly inadequately capitalized, and is insufficient as per the damages described herein.

38

**First**, the $1,000 dollars bond assets for defendant Sedgwick Claims Management Services, Inc., and the separate the $1,000 dollars bond assets for defendant Sandra Brach are miniscule, in this matter.

**Second**, If I am to prevail in this action, any award reasonably calculated to compensate me for my loss and damages, could not be satisfied out of the available bonds assets of defendant Sedgwick Claims Management Services, Inc., and defendant Sandra Brach.

**Third**, faced with this sobering realization that success at trial may be no more than a pyrrhic victory, I had now take necessary legal steps for the owner(s) and shareholder(s) (Sedgwick CMS Holdings, Inc., Fidelity Sedgwick Corporation, Fidelity Sedgwick Holdings, Inc., The Carlyle Group Inc., and Dave North), to join as defendants liable and seeking to pierce the corporate veil for the purpose of holding the entire economic entity liable in this matter.

**Fourth**, the courts have morally condemned the obvious devices, artifices and stratagems engaged in by owners of large corporations/companies to deny injured plaintiffs a fair and just measure of compensation for injuries sustained.

### The Fraud and/or illegality Activities

**Fifth**, Upon information and belief, there is conspiracy, fraud, and illegality in the activities of Sedgwick Claims Management Services, Inc. On May 3, 2017, after I had submitted a claim for my latent injuries, the defendants had obtained private medical records, including PHI of a next patient.

**Sixth,** after Sedgwick Claims Management Services, Inc. had obtained that other person's private medical records and his protected health information (PHI), Sedgwick Claims Management Services, Inc. then they had further assigned the same claim numbers (L1702245137-0001) that has been assigned to my claim. The medical document shows that, the

39

person's private medical records and his protected health information was accessed and created at a Kmart Pharmacy Store #4483 in Alexandra Virginia and the person's initials who actually accessed and created that patient's private medical records and his protected health information. No part of this private medical records and protected health information is related to my claim or medical circumstances whatsoever, and that patient is not related to me. The defendants here, had now decided to use such private medical records and protected health information against me, and had attempted to make frivolous claims against me, pertaining to such private medical records and protected health information. I have Redacted the patient's name, home address, telephone numbers, date of birth, his doctor name, and other PHI of that person. See a copy attached hereto as **Exhibit (16).**

## ALTERNATIVE RELIEF SOUGHT

A.    **(Injunctive Relief)**

122.    I hereby respectfully seek and request:

1.    The establishment of an independent panel of scientists, including but not limited to epidemiologist, toxicologists, medical doctors, and exposure-risk assessors, to be jointly selected by the parties (the "Setraline/Zoloft and Drug Induced Movements Disorder, Akathisia and Myalgia panel") and tasked with independently studying, evaluating, reviewing, identifying, publishing, and notifying/informing me, (Brian Coke Ng) of sufficient results, and at the expenses of all defendants.

B. **(Equitable Relief)**

1.    The establishment of a panel of scientists to study the harmful effects, latent effects, and latent injuries of Sertraline/Zoloft at specifically the toxic dosages levels of 450mg, and at other values, if possible, e.g. "LD**50**", "LC**50**", "LD**01**", "LD**100**", "LDLO", "TDLO",

40

and with relevant ages, genders, and the long term, short term, latency perspectives, etc. and, especially when taken with other prescribed drugs, and at the expense of all defendants.

## **PRAYER FOR RELIEF**

Brian Coke Ng, Plaintiff, Pro-se, respectfully request the Court to enter judgment against the defendants, as follows:

A.    Compensatory damages in an amount to be determined, but in no event less than $3.8 million dollars, or other fair amounts as the Court see just and proper, and alternatively, specific performance by the defendants, on the promises they undertook to Brian Coke Ng as described herein and additional reasonable amounts for consideration and for purpose of a peaceful good faith resolution to all matter;

B.    An Order requiring defendants to implement the reliefs sought under paragraph 122 of this complaint;

C.    Punitive and exemplary damages in an amounts sufficient to punish defendants for their wrongful conduct and to dissuade defendants and the public from committing such actions in the future;

D.    An award of attorney's fees and costs, as permitted by law or if applicable;

E.    An award of pre-judgment and post-judgment interest, as provided by Law;

F.    I respectfully requesting this Court issued a relief to permit plaintiff to hold the owner(s) and shareholder(s) (Sedgwick CMS Holdings, Inc., Fidelity Sedgwick

41

Corporation, Fidelity Sedgwick Holdings, Inc., The Carlyle Group Inc., and Dave North), liable

in this matter

G.    Leave to amend this Complaint to conform to the evidence produced at

trial, and;

H.    Such other relief as may be appropriate under the circumstances and/or

permitted by law or as the Court deems just and proper.

### JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demand a trial by jury of any

and all issues in this action so Triable of right.

Dated: November 28, 2023
New York, New York

Respectfully submitted

Brian Coke Ng
Church Street Station
P.O. Box 2723
New York, N.Y. 10008
646-820-9238

Sworn to before me this
28th day of November 2023

_____
Notary Public

LUZ M. FELIPE
Notary Public, State of New York
Reg. No. 01FE6446625
Qualified in Kings County
Commission Expires January 23rd, 2027

42

EXHIBIT  1

# PRODUCT MONOGRAPH

## SERTRALINE
(sertraline hydrochloride)
25, 50, and 100 mg Capsules

**Antidepressant / Antipanic / Antiobsessional Agent**

SANIS HEALTH INC.                          Date of Preparation:   February 9, 2010
333 Champlain Street, Suite 102
Dieppe, NB E1A 1P2

Control#: 136307

## TABLE 1
## TREATMENT-EMERGENT ADVERSE EXPERIENCE
## INCIDENCE IN PLACEBO-CONTROLLED CLINICAL TRIALS*

| Adverse Experience | Percent of Patients Reporting | |
| --- | --- | --- |
| | Sertraline Hydrochloride (N=861) | Placebo (N=853) |
| **Autonomic Nervous System Disorders** | | |
| Mouth Dry | 16.3 | 9.3 |
| Sweating Increased | 8.4 | 2.9 |
| **Cardiovascular** | | |
| Palpitations | 3.5 | 1.6 |
| Chest Pain | 1.0 | 1.6 |
| **Central & Peripheral Nervous System Disorders** | | |
| Headache | 20.3 | 19.0 |
| Dizziness | 11.7 | 6.7 |
| Tremor | 10.7 | 2.7 |
| Paresthesia | 2.0 | 1.8 |
| Hypoesthesia | 1.7 | 0.6 |
| Twitching | 1.4 | 0.1 |
| Hypertonia | 1.3 | 0.4 |
| **Disorders of Skin and Appendages** | | |
| Rash | 2.1 | 1.5 |
| **Gastro-Intestinal Disorders** | | |
| Nausea | 26.1 | 11.8 |
| Diarrhea/Loose Stools | 17.7 | 9.3 |
| Constipation | 8.4 | 6.3 |
| Dyspepsia | 6.0 | 2.8 |
| Vomiting | 3.8 | 1.8 |
| Flatulence | 3.3 | 2.5 |
| Anorexia | 2.8 | 1.6 |
| Abdominal Pain | 2.4 | 2.2 |
| Appetite Increased | 1.3 | 0.9 |
| **General** | | |
| Fatigue | 10.6 | 8.1 |
| Hot Flushes | 2.2 | 0.5 |
| Fever | 1.6 | 0.6 |
| Back Pain | 1.5 | 0.9 |
| **Metabolic and Nutritional Disorders** | | |
| Thirst | 1.4 | 0.9 |
| **Musculo-Skeletal System Disorders** | | |
| Myalgia | 1.7 | 1.5 |



# PRODUCT MONOGRAPH

## SERTRALINE
(sertraline hydrochloride)
25, 50, and 100 mg Capsules

**Antidepressant / Antipanic / Antiobsessional Agent**

SANIS HEALTH INC.
333 Champlain Street, Suite 102
Dieppe, NB E1A 1P2

Date of Preparation:   February 9, 2010

Control#: 136307

HIGHLIGHTS OF PRESCRIBING INFORMATION
These highlights do not include all the information needed to use
ZOLOFT safely and effectively. See full prescribing information for
ZOLOFT.

ZOLOFT (sertraline hydrochloride) tablets, for oral use
ZOLOFT (sertraline hydrochloride) oral solution
Initial U.S. Approval: 1991

---

**WARNING: SUICIDAL THOUGHTS AND BEHAVIORS**
*See full prescribing information for complete boxed warning.*

- Antidepressants increased the risk of suicidal thoughts and behaviors
  in pediatric and young adult patients (5.1)
- Closely monitor for clinical worsening and emergence of suicidal
  thoughts and behaviors (5.1)

---

----------------------INDICATIONS AND USAGE----------------------
ZOLOFT is a selective serotonin reuptake inhibitor (SSRI) indicated for the
treatment of (1):
- Major depressive disorder (MDD)
- Obsessive-compulsive disorder (OCD)
- Panic disorder (PD)
- Post-traumatic stress disorder (PTSD)
- Social anxiety disorder (SAD)
- Premenstrual dysphoric disorder (PMDD)

----------------DOSAGE AND ADMINISTRATION----------------

| Indication | Starting Dosage | Maximum Dosage |
|---|---|---|
| MDD (2.1) | 50 mg per day | 200 mg per day |
| OCD (2.1) | 25 mg per day (ages 6-12)<br>50 mg per day (ages ≥ 13) | 200 mg per day |
| PD, PTSD, SAD (2.1) | 25 mg per day | 200 mg per day |
| PMDD (2.2)<br>continuous dosing | 50 mg per day | 150 mg per day |
| PMDD (2.2)<br>intermittent dosing | 50 mg per day during<br>luteal phase only | 100 mg per day during<br>luteal phase only |

- If inadequate response to starting dosage, titrate in 25-50 mg per day
  increments once weekly in MDD, OCD, PD, PTSD, and SAD (2.1)
- See Full Prescribing Information for titration in PMDD (2.2)
- Hepatic impairment:
  o Mild: Recommended starting and maximum dosage is half
    recommended dosage (2.3)
  o Moderate or severe: Not recommended (2.4)
- When discontinuing ZOLOFT, reduce dose gradually (2.5, 5.4)
- Oral solution: Must be diluted before administration (2.6)

----------------DOSAGE FORMS AND STRENGTHS----------------
- Tablets: 25 mg, 50 mg and 100 mg (3)
- Oral solution: 20 mg/mL (3)

----------------------CONTRAINDICATIONS----------------------
- Concomitant use of monoamine oxidase inhibitors (MAOIs), or use within
  14 days of stopping MAOIs (4, 7.1)
- Concomitant use of pimozide (4, 7.1)
- Known hypersensitivity to sertraline or excipients (4, 5.4)
- ZOLOFT oral solution only: Concomitant use of disulfiram (4)

----------------WARNINGS AND PRECAUTIONS----------------
- Serotonin Syndrome: Increased risk when co-administered with other
  serotonergic agents (e.g., SSRI, SNRI, triptans), but also when taken alone.
  If it occurs, discontinue ZOLOFT and initiate supportive treatment. (5.2)
- Increased Risk of Bleeding: Concomitant use of aspirin, nonsteroidal anti-
  inflammatory drugs (NSAIDs), other antiplatelet drugs, warfarin, and other
  anticoagulants may increase this risk. (5.3)
- Activation of Mania/Hypomania: Screen patients for bipolar disorder. (5.4)
- Seizures: Use with caution in patients with seizure disorders. (5.6)
- Angle Closure Glaucoma: Avoid use of antidepressants, including
  ZOLOFT, in patients with untreated anatomically narrow angles. (5.7)

----------------------ADVERSE REACTIONS----------------------
Most common adverse reactions (≥5% and twice placebo) in pooled placebo-
controlled MDD, OCD, PD, PTSD, SAD and PMDD clinical trials were
nausea, diarrhea/loose stool, tremor, dyspepsia, decreased appetite,
hyperhidrosis, ejaculation failure, and decreased libido (6.1)

To report SUSPECTED ADVERSE REACTIONS, contact Pfizer Inc at
1-800-438-1985 or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.

----------------------DRUG INTERACTIONS----------------------
- Protein-bound drugs: Monitor for adverse reactions and reduce dosage of
  ZOLOFT or other protein-bound drugs (e.g., warfarin) as warranted. (7.1,
  12.3)
- CYP2D6 substrates: Reduce dosage of drugs metabolized by CYP2D6 (7.1,
  12.3)

----------------USE IN SPECIFIC POPULATIONS----------------
- Pregnancy: Third trimester use may increase risk for persistent pulmonary
  hypertension and withdrawal in the neonate (8.1)
- Pediatric use: Safety and effectiveness of ZOLOFT in pediatric patients
  other than those with OCD have not been established (8.4)

See 17 for PATIENT COUNSELING INFORMATION and Medication
Guide
                                                    Revised: 12/2016

---

- **are pregnant or plan to become pregnant.** Your baby may have withdrawal symptoms after birth or may be at increased risk for a serious lung problem at birth. Talk to your healthcare provider about the benefits and risks of taking ZOLOFT during pregnancy.
- **are breastfeeding or plan to breastfeed.** A small amount of ZOLOFT may pass into your breast milk. Talk to your healthcare provider about the best way to feed your baby while taking ZOLOFT.

**Tell your healthcare provider about all the medicines that you take,** including prescription and over-the-counter medicines, vitamins, and herbal supplements.

ZOLOFT and some medicines may interact with each other, may not work as well, or may cause serious side effects.

Your healthcare provider or pharmacist can tell you if it is safe to take ZOLOFT with your other medicines. **Do not** start or stop any medicine while taking ZOLOFT without talking to your healthcare provider first.

## How should I take ZOLOFT?

- Take ZOLOFT exactly as prescribed. Your healthcare provider may need to change the dose of ZOLOFT until it is the right dose for you.
- ZOLOFT Tablets may be taken with or without food.
- ZOLOFT Oral Solution may look cloudy or hazy after mixing, this is normal.
- ZOLOFT Oral Solution must be diluted before use:
  - o **Do not** mix ZOLOFT until you are ready to take it.
  - o When diluting ZOLOFT Oral Solution, use **only** water, ginger ale, lemon/lime soda, lemonade, or orange juice.
  - o The oral dropper contains latex. If you are sensitive or allergic to latex, ask your healthcare provider or pharmacist about the best way to measure your medicine.
- If you miss a dose of ZOLOFT, take the missed dose as soon as you remember. If it is almost time for the next dose, skip the missed dose and take your next dose at the regular time. **Do not** take two doses of ZOLOFT at the same time.

**If you take too much ZOLOFT, call your healthcare provider or poison control center right away, or go to the nearest hospital emergency room right away.**

## What should I avoid while taking ZOLOFT?

ZOLOFT can cause sleepiness or may affect your ability to make decisions, think clearly, or react quickly. You should not drive, operate heavy machinery, or do other dangerous activities until you know how ZOLOFT affects you. **Do not** drink alcohol while you take ZOLOFT.

## What are the possible side effects of ZOLOFT?

ZOLOFT may cause serious side effects, including:
- See "**What is the most important information I should know about ZOLOFT?**"

**The most common side effects in adults who take ZOLOFT include:**

- nausea, loss of appetite, diarrhea, or indigestion
- increased sweating
- tremor or shaking
- agitation
- change in sleep habits including increased sleepiness or insomnia
- sexual problems including decreased libido and ejaculation failure
- feeling tired or fatigued
- anxiety

**The most common side effects in children and adolescents who take include** abnormal increase in muscle movement or agitation, nose bleeds, urinary incontinence, aggressive reaction, possible slowed growth rate, and weight change. Your child's height and weight should be monitored during treatment with ZOLOFT.

Tell your healthcare provider if you have any side effect that bothers you or that does not go away. These are

*Musculoskeletal and connective tissue disorders* – arthralgia, muscle spasms, tightness, or twitching

*Nervous system disorders* - ataxia, coma, convulsion, decreased alertness, hypoesthesia, lethargy, psychomotor hyperactivity, syncope

*Psychiatric disorders* - aggression, bruxism, confusional state, euphoric mood, hallucination

*Renal and urinary disorders* - hematuria

*Reproductive system and breast disorders* - galactorrhea, priapism, vaginal hemorrhage

*Respiratory, thoracic and mediastinal disorders* - bronchospasm, epistaxis, yawning

*Skin and subcutaneous tissue disorders* - alopecia; cold sweat; dermatitis; dermatitis bullous; pruritus; purpura; erythematous, follicular, or maculopapular rash; urticaria

*Vascular disorders* - hemorrhage, hypertension, vasodilation

### 6.2 Postmarketing Experience

The following adverse reactions have been identified during postapproval use of ZOLOFT. Because these reactions are reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship to drug exposure.

*Bleeding or clotting disorders* - increased coagulation times (altered platelet function)

*Cardiac disorders* – AV block, bradycardia, atrial arrhythmias, QT-interval prolongation, ventricular tachycardia (including Torsade de Pointes)

*Endocrine disorders* - gynecomastia, hyperprolactinemia, menstrual irregularities, SIADH

*Eye disorders* - blindness, optic neuritis, cataract

*Hepatobiliary disorders* – severe liver events (including hepatitis, jaundice, liver failure with some fatal outcomes), pancreatitis

*Hemic and Lymphatic* – agranulocytosis, aplastic anemia and pancytopenia, leukopenia, thrombocytopenia, lupus-like syndrome, serum sickness

*Immune system disorders* - angioedema

*Metabolism and nutrition disorders* – hyponatremia, hyperglycemia

*Nervous system disorders* - serotonin syndrome, extrapyramidal symptoms (including akathisia and dystonia), oculogyric crisis

*Psychiatric disorders* – psychosis, enuresis, paroniria

*Renal and urinary disorders* - acute renal failure

*Respiratory, thoracic and mediastinal disorders* - pulmonary hypertension

*Skin and subcutaneous tissue disorders* – photosensitivity skin reaction and other severe cutaneous reactions, which potentially can be fatal, such as Stevens-Johnson Syndrome (SJS) and toxic epidermal necrolysis (TEN)

*Vascular disorders* - cerebrovascular spasm (including reversible cerebral vasoconstriction syndrome and Call-Fleming syndrome), vasculitis

## 7 DRUG INTERACTIONS

### 7.1 Clinically Significant Drug Interactions

Table 5 includes clinically significant drug interactions with ZOLOFT *[See Clinical Pharmacology (12.3)]*.

# PRODUCT MONOGRAPH

## PrZOLOFT®

(sertraline hydrochloride)

25, 50 and 100 mg Capsules

### Antidepressant / Antipanic / Antiobsessional Agent

Pfizer Canada Inc.
17300 Trans Canada Highway
Kirkland, Quebec.    H9J 2M5

Date of Revision: 08 July 2016

**Control Number: 192642**
®TM Pfizer Products Inc.
  Pfizer Canada Inc., Licensee

©Pfizer Canada Inc. 2016

# PRECAUTIONS

## Abnormal Bleeding:

SSRIs and SNRIs, including **ZOLOFT**, may increase the risk of bleeding events by causing abnormal platelet aggregation. Concomitant use of acetylsalicylic acid (ASA), nonsteroidal anti-inflammatory drugs (NSAIDs), warfarin, and other anticoagulants may add to this risk. Case reports and epidemiological studies (case-control and cohort design) have demonstrated an association between use of drugs that interfere with serotonin reuptake and the occurrence of gastrointestinal bleeding. Bleeding events related to SSRIs and SNRIs use have ranged from ecchymoses, hematomas, epistaxis, and petechiae to life-threatening hemorrhages.

Patients should be cautioned about the risk of bleeding associated with the concomitant use of **ZOLOFT** and NSAIDs, ASA or other drugs that affect coagulation (see DRUG INTERACTIONS, Drugs Affecting Platelet Function). Caution is also advised in patients with a history of bleeding disorders or predisposing conditions (e.g., thrombocytopenia).

## Activation of Mania/Hypomania:

During clinical testing in depressed patients, hypomania or mania occurred in approximately 0.6% of **ZOLOFT** (sertraline hydrochloride) treated patients. Activation of mania/hypomania has also been reported in a small proportion of patients with Major Affective Disorder treated with other marketed antidepressants.

## Akathisia

The use of sertraline has been associated with the development of akathisia (psychomotor restlessness), characterised by a subjectively unpleasant or distressing restlessness and need to move often accompanied by an inability to sit or stand still. This is most likely to occur within the first few weeks of treatment. In patients who develop these symptoms, increasing the dose may be detrimental.

## Carcinogenesis:

In carcinogenicity studies in CD-1 mice, sertraline at doses up to 40 mg/kg produces a dose related increase in the incidence of liver adenomas in male mice. Liver adenomas have a very variable rate of spontaneous occurrence in the CD-1 mouse. The clinical significance of these findings is unknown:



**Pfizer Inc**
235 East 42nd Street
Medical Information
New York, NY 10017



ZIP 27560  **$ 001.6**
02 4W
0000336922 MAR 21 20

Requested Medical Information to:



Brian Coke Ng
Church Street Station
P.O. Box 2723
NEW YORK NY 10008

# PRODUCT MONOGRAPH

[Pr] **pms-SERTRALINE**
Sertraline Hydrochloride Capsules
25 mg, 50 mg and 100 mg
Sertraline (as sertraline hydrochloride)

**Antidepressant / Antipanic / Antiobsessional Agent**

**PHARMASCIENCE INC.**
6111 Royalmount Ave., Suite 100
Montréal, Québec
H4P 2T4

www.pharmascience.com

Submission Control No: 214726

**Date of Revision:**
April 10, 2018

| ADVERSE EVENTS | Percent of Patients Reporting | |
| --- | --- | --- |
| | Sertraline hydrochloride (N=861) | Placebo (N=853) |
| Anorexia | 2.8 | 1.6 |
| Abdominal Pain | 2.4 | 2.2 |
| Appetite Increased | 1.3 | 0.9 |
| **General** | | |
| Fatigue | 10.6 | 8.1 |
| Hot Flushes | 2.2 | 0.5 |
| Fever | 1.6 | 0.6 |
| Back Pain | 1.5 | 0.9 |
| **Metabolic and Nutritional Disorders** | | |
| Thirst | 1.4 | 0.9 |
| **Musculo-Skeletal System Disorders** | | |
| Myalgia | 1.7 | 1.5 |
| **Psychiatric Disorders** | | |
| Insomnia | 16.4 | 8.8 |
| Sexual Dysfunction - Male [1] | 15.5 | 2.2 |
| Somnolence | 13.4 | 5.9 |
| Agitation | 5.6 | 4.0 |
| Nervousness | 3.4 | 1.9 |
| Anxiety | 2.6 | 1.3 |
| Yawning | 1.9 | 0.2 |
| Sexual Dysfunction - Female [2] | 1.7 | 0.2 |
| Concentration Impaired | 1.3 | 0.5 |
| **Reproduction** | | |
| Menstrual Disorder [2] | 1.0 | 0.5 |
| **Respiratory System Disorders** | | |
| Rhinitis | 2.0 | 1.5 |
| Pharyngitis | 1.2 | 0.9 |
| **Special Senses** | | |
| Vision Abnormal | 4.2 | 2.1 |
| Tinnitus | 1.4 | 1.1 |
| Taste Perversion | 1.2 | 0.7 |
| **Urinary System Disorders** | | |
| Micturition Frequency | 2.0 | 1.2 |
| Micturition Disorder | 1.4 | 0.5 |

* Events reported by at least 1% of patients treated with sertraline hydrochloride are included.

[1] % based on male patients only: 271 sertraline hydrochloride and 271 placebo patients. Male sexual dysfunction can be broken down into the categories of decreased libido, impotence and ejaculatory delay. In this data set, the percentages of males in the group with these complaints are 4.8%, 4.8% and 8.9%, respectively. It should be noted that since some sertraline hydrochloride patients reported more than one category of male sexual dysfunction, the incidence of each category of male sexual dysfunction combined is larger than the incidence for the general category of male sexual dysfunction, in which each patient is counted only once.

[2] % based on female patient only: 590 sertraline hydrochloride and 582 placebo patients.

## Panic Disorder

In placebo-controlled clinical trials, 430 patients with panic disorder were treated with sertraline hydrochloride in doses of 25-200 mg/day. During treatment, most patients received doses of 50-200 mg/day. Adverse events observed at an incidence of at least 5% for sertraline hydrochloride

other symptoms. Your doctor may adjust the dosage of pms-SERTRALINE to alleviate the symptoms.

| SERIOUS SIDE EFFECTS, HOW OFTEN THEY HAPPEN AND WHAT TO DO ABOUT THEM | | | |
|---|---|---|---|
| Symptom / effect | Talk with your doctor or pharmacist | | Stop taking drug and get immediate medical help |
| | Only if severe | In all cases | |
| **Akathisia:** feeling restless and unable to sit or stand still | | √ | |
| **Allergic reactions:** rash, hives, swelling of the face, lips, tongue or throat, difficulty swallowing or breathing | | | √ |
| **Bruising** or unusual bleeding from the skin or other areas | | √ | |
| **Liver Disorder:** yellowing of the skin or eyes, dark urine, abdominal pain, nausea, vomiting, loss of appetite | | √ | |
| **Low blood sugar:** symptoms of dizziness, lack of energy, drowsiness | | √ | |
| **Low sodium level in blood:** symptoms of tiredness, weakness, confusion combined with achy, stiff or uncoordinated muscles | | √ | |
| **Mania/hypomania:** elevated or irritable mood, decreased need for sleep, racing thoughts | | √ | |
| **Uncontrollable movements** of the body or face | | √ | |
| **Heart Rhythm problems:** dizziness, increased heart rate, fainting or seizures | | | √ |
| **Gastrointestinal bleeding:** vomiting blood or passing blood in stools | | √ | |

(Uncommon spans Akathisia through Mania/hypomania and Uncontrollable movements; Rare spans Heart Rhythm problems and Gastrointestinal bleeding)

| SERIOUS SIDE EFFECTS, HOW OFTEN THEY HAPPEN AND WHAT TO DO ABOUT THEM | | | |
|---|---|---|---|
| Symptom / effect | Talk with your doctor or pharmacist | | Stop taking drug and get immediate medical help |
| | Only if severe | In all cases | |
| **Glaucoma:** swelling or redness in or around the eye, eye pain and changes in vision | | | √ |
| **Seizures:** loss of consciousness with uncontrollable shaking "fit" | | | √ |
| **Low Platelets:** Bruising or unusual bleeding from the skin or other areas | | √ | |
| **Serotonin syndrome:** a combination of most or all of the following; confusion, restlessness, sweating, shaking, shivering, sudden jerking of the muscles, hallucinations, fast heartbeat | | √ | |
| **Changes in feelings or behaviour** (anger, anxiety, suicidal or violent thoughts) | | √ | |

(Unknown spans Glaucoma through Low Platelets; See Warnings and Precautions spans Serotonin syndrome and Changes in feelings or behaviour)

*This is not a complete list of side effects. For any unexpected effects while taking, pms-SERTRALINE contact your doctor or pharmacist.*

## HOW TO STORE IT

- Store between 15°C and 30°C.

- Keep container tightly closed.

- Keep all medicines out of the reach and sight of children.

- If your doctor tells you to stop taking pms-SERTRALINE, please return any leftover medicine to your pharmacist.

# ZOLOFT®
## (sertraline hydrochloride)
## Tablets and Oral Concentrate

**Suicidality and Antidepressant Drugs**

Antidepressants increased the risk compared to placebo of suicidal thinking and behavior (suicidality) in children, adolescents, and young adults in short-term studies of major depressive disorder (MDD) and other psychiatric disorders. Anyone considering the use of Zoloft or any other antidepressant in a child, adolescent, or young adult must balance this risk with the clinical need. Short-term studies did not show an increase in the risk of suicidality with antidepressants compared to placebo in adults beyond age 24; there was a reduction in risk with antidepressants compared to placebo in adults aged 65 and older. Depression and certain other psychiatric disorders are themselves associated with increases in the risk of suicide. Patients of all ages who are started on antidepressant therapy should be monitored appropriately and observed closely for clinical worsening, suicidality, or unusual changes in behavior. Families and caregivers should be advised of the need for close observation and communication with the prescriber. Zoloft is not approved for use in pediatric patients except for patients with obsessive compulsive disorder (OCD). (See Warnings: Clinical Worsening and Suicide Risk, Precautions: Information for Patients, and Precautions: Pediatric Use)

## DESCRIPTION

ZOLOFT® (sertraline hydrochloride) is a selective serotonin reuptake inhibitor (SSRI) for oral administration. It has a molecular weight of 342.7. Sertraline hydrochloride has the following chemical name: (1S-cis)-4-(3,4-dichlorophenyl)-1,2,3,4-tetrahydro-N-methyl-1-naphthalenamine hydrochloride. The empirical formula $C_{17}H_{17}NCl_2 \cdot HCl$ is represented by the following structural formula:

**Musculoskeletal System Disorders**–*Frequent:* myalgia; *Infrequent:* arthralgia, dystonia, arthrosis, muscle cramps, muscle weakness.

**Psychiatric Disorders**–*Frequent:* yawning, other male sexual dysfunction, other female sexual dysfunction; *Infrequent:* depression, amnesia, paroniria, teeth-grinding, emotional lability, apathy, abnormal dreams, euphoria, paranoid reaction, hallucination, aggressive reaction, aggravated depression, delusions; *Rare:* withdrawal syndrome, suicide ideation, libido increased, somnambulism, illusion.

**Reproductive**–*Infrequent:* menstrual disorder, dysmenorrhea, intermenstrual bleeding, vaginal hemorrhage, amenorrhea, leukorrhea; *Rare:* female breast pain, menorrhagia, balanoposthitis, breast enlargement, atrophic vaginitis, acute female mastitis.

**Respiratory System Disorders**–*Frequent:* rhinitis; *Infrequent:* coughing, dyspnea, upper respiratory tract infection, epistaxis, bronchospasm, sinusitis; *Rare:* hyperventilation, bradypnea, stridor, apnea, bronchitis, hemoptysis, hypoventilation, laryngismus, laryngitis.

**Special Senses**–*Frequent:* tinnitus; *Infrequent:* conjunctivitis, earache, eye pain, abnormal accommodation; *Rare:* xerophthalmia, photophobia, diplopia, abnormal lacrimation, scotoma, visual field defect.

**Urinary System Disorders**–*Infrequent:* micturition frequency, polyuria, urinary retention, dysuria, nocturia, urinary incontinence; *Rare:* cystitis, oliguria, pyelonephritis, hematuria, renal pain, strangury.

**Laboratory Tests**–In man, asymptomatic elevations in serum transaminases (SGOT [or AST] and SGPT [or ALT]) have been reported infrequently (approximately 0.8%) in association with ZOLOFT (sertraline hydrochloride) administration. These hepatic enzyme elevations usually occurred within the first 1 to 9 weeks of drug treatment and promptly diminished upon drug discontinuation.

ZOLOFT therapy was associated with small mean increases in total cholesterol (approximately 3%) and triglycerides (approximately 5%), and a small mean decrease in serum uric acid (approximately 7%) of no apparent clinical importance.

The safety profile observed with ZOLOFT treatment in patients with major depressive disorder, OCD, panic disorder, PTSD, PMDD and social anxiety disorder is similar.

**Other Events Observed During the Post marketing Evaluation of ZOLOFT**–Reports of adverse events temporally associated with ZOLOFT that have been received since market introduction, that are not listed above and that may have no causal relationship with the drug, include the following: acute renal failure, anaphylactoid reaction, angioedema, blindness, optic neuritis, cataract, increased coagulation times, bradycardia, AV block, atrial arrhythmias, QT-interval prolongation, ventricular tachycardia (including torsade de pointes-type arrhythmias), hypothyroidism, agranulocytosis, aplastic anemia and pancytopenia, leukopenia, thrombocytopenia, lupus-like syndrome, serum sickness, hyperglycemia, galactorrhea,

EXHIBIT  2

EXHIBIT  2

# PRODUCT MONOGRAPH

## SERTRALINE
(sertraline hydrochloride)
25, 50, and 100 mg Capsules

**Antidepressant / Antipanic / Antiobsessional Agent**

SANIS HEALTH INC.
333 Champlain Street, Suite 102
Dieppe, NB E1A 1P2

Control#: 136307

Date of Preparation:  February 9, 2010

## TOXICOLOGY

**Acute Toxicity:**  mice and rats

### ACUTE ORAL AND INTRAPERITONEAL TOXICITY STUDIES IN MICE AND RATS

| Species | Sex | LD$_{50}$ (mg Sertraline base/kg) | | Max Mortality (hr) | |
|---------|-----|------|-----|------|-----|
| | | Oral | IP | Oral | IP |
| Mice | M | 548 (495-612) | 73 (66-79) | 2 1/4 | 1 |
| | F | 419 (371-465) | | 1 3/4 | |
| Rats | M | 1591 (1348-1847) | 79 (70-90) | 24 | 24 |
| | F | 1327(1071-1562) | | 4.5 | |

Signs of toxicity observed in both mice and rats dosed orally and by intraperitoneal administration included hyperactivity, convulsions, depression, weakness, decreased food consumption, and weight gain inhibition.  Oral administration in both mice and rats produced exophthalmia, soft stools, and laboured respiration.  Orally dosed rats also showed marked salivation.  Acute oral administration produced no gross pathological findings.  Acute intraperitoneal administration, on the other hand, caused adhesion of the intestines or pancreas to the liver in 2 of 10 male mice and liver lobe adhesions which were dose-related in rats.

Sertraline was also given in single doses of 10, 20, 30, and 50 mg base/kg p.o. (in capsules) to two female beagle dogs at each dose.  At the lowest level, dogs were mydriatic and anorectic but otherwise asymptomatic.  At higher doses, increased salivation, tremors and twitches were observed, along with the mydriasis and anorexia.  None of the dogs at any dose level exhibited motor stimulation, circling or stereotypy.

The duration of the anorexia was 12 to 15 hr., but eating resumed late in the day after treatment and the dogs recovered uneventfully.

**Chronic Toxicity/Oncogenicity**

| SPECIES | ROUTE | DOSE MG/KG/DAY | ANIMAL PER DOSE | DURATION | FINDINGS |
|---|---|---|---|---|---|

**36 Day Diet Study in Mice**

Drug and desmethyl metabolite serum levels drug related:

| | Serum Concentration (ng/mL) | | | |
|---|---|---|---|---|
| | Drug | | Metabolite | |
| Dose (mg/kg/day) | Male | Female | Male | Female |
| 10 | 22 | 17 | 40 | 23 |
| 40 | 52 | 16 | 181 | <10 |
| 80 | 142 | 63 | 307 | 169 |

| SPECIES | ROUTE | DOSE MG/KG/DAY | ANIMAL PER DOSE | DURATION | FINDINGS |
|---|---|---|---|---|---|
| CD-1 Mice | Diet | 0<br>10<br>40<br>80 | 10/sex | 36 Days | Some degree of alopecia occurred in three mid-dose animals and one high-dose animal. Fatty change occurred in the livers of 8/10 high-dose males compared to 3/10 control males. On the basis of these findings, daily doses of 10, 20 and 40 mg sertraline hydrochloride base/kg were proposed for the 2-year feeding study. |

**2 Year Diet Study In Mice**

| SPECIES | ROUTE | DOSE MG/KG/DAY | ANIMAL PER DOSE | DURATION | FINDINGS |
|---|---|---|---|---|---|
| CD-1 Mice | Diet | 0<br>0<br>10<br>20<br>40 | 50/Sex | 24 Months | Survival of drug treated females was slightly less than control. Bronchioalveolar adenomas occurred in 9/49, 1/50, and 12/50 low-, mid-, and high-dose females compared to 6/50 and 2/50 in females of the two control groups. Hepatocellular adenomas were observed in 8/50, 8/50 and 12/50 low-, mid-, and high-dose males compared to 3/50 and 4/50 males in the two control groups. These tumours were benign and the type usually occurring spontaneously in this strain of mouse. There were no treatment-related increases in tissue specific or total malignant tumours. |

**16 Day P.O. Study In Rats**

| SPECIES | ROUTE | DOSE MG/KG/DAY | ANIMAL PER DOSE | DURATION | FINDINGS |
|---|---|---|---|---|---|
| Sprague Dawley Rats | Gavage | 0<br>40<br>80<br>160 | 5/sex | 16 Days | Anorexia and transient body weight gain inhibition; latter effect was high in high-dose females. Dose-related increase in liver weights due to microsomal enzyme induction; centrilobular degeneration at all dose levels and slightly elevated SGPT and SGOT at 160 mg/kg only. |

**6 Week Diet Study In Rats**

| SPECIES | ROUTE | DOSE MG/KG/DAY | ANIMAL PER DOSE | DURATION | FINDINGS |
|---------|-------|----------------|-----------------|----------|----------|
| Sprague Dawley Rats | Diet | 0 10 40 80 | 10/sex | 6 Weeks | Minimal effect on body weight gain of males and slight inhibition of body weight (<10%) in mid- and high dose females. Liver weight increase in mid- and high dose males and females; hepatocellular hypertrophy and minimal midzonal fatty change in high-dose males and females and mid-dose males accompanied by slight elevations in serum SDH, GOT and 5'NT in some animals. No adverse effect level: 10 mg/kg/day. |

**3 Month P.O. Study In Rats**

| Sprague Dawley Rats | Gavage | 0 10 40 80 | 15 M 10 F | 3 Months | Dose related plasma levels at 10 and 40 mg/kg. |
|---------|--------|------------|-----------|----------|---------------------------------------------------|

Plasma Levels ($\mu$g/mL) of Drug 2h Post-Dose on Days 1, 5 and 30.

| Dose (mg/kg/day) | Sex | | Day 1 | Day 5 | Day 30 |
|------------------|-----|------|-------|-------|--------|
| 80 | M | Mean | 0.63 | 0.31 | 0.46 |
|    |   | ± SD | 0.19 | 0.05 | 0.20 |
|    | F | Mean | 0.75 | 0.37 | 0.84 |
|    |   | ± SD | 0.19 | 0.10 | 0.48 |
| 40 | M | Mean | 0.70 | 0.20 | 0.32 |
|    |   | ± SD | 0.11 | 0.06 | 0.18 |
|    | F | Mean | 0.42 | 0.33 | 0.92 |
|    |   | ± SD | 0.14 | 0.05 | 0.28 |
| 10 | M | Mean | 0.25 | 0.10 | 0.10 |
|    |   | ± SD | 0.10 | 0.03 | 0.03 |
|    | F | Mean | 0.19 | 0.14 | 0.27 |
|    |   | ± SD | 0.06 | 0.03 | 0.08 |

Dose related increases in absolute and relative liver weights due to induction of microsomal enzymes; increases associated with centrilobular hepatocellular hypertrophy; mild midzonal fatty changes observed in 10/15 males and 1/10 females at 80mg/kg.

| 2 Year Diet Study In Rats | | | | | |
|---|---|---|---|---|---|
| Long Evans Rats | Diet | 0<br>10<br>20<br>40 | 65/sex | 24 Months | Interim sacrifice (15/sex) at 6 months: Kidney/body weight was increased. Increase in mean absolute and relative liver weights in males and females at high dose and in females at mid-dose.<br>2 year sacrifice: Deaths were dose-related; inhibition of weight gain was dose-related in males and present at high dose only in females. Slight elevations of serum 5'nucleotidase (5'NT) activity in the high and mid-dose groups occurred throughout the study.<br>Increase of liver and kidney/body weight ratios. These effects are considered to be related to drug-metabolizing enzyme induction. Hepatocytes with large clear fat-containing vacuoles were observed; number of affected animals in groups was dose related in females but distribution was more erratic in males. In no case was there evidence of necrosis or of an inflammatory response.<br>There were no treatment related effects on the number of tumour bearing animals, total malignant tumours or total benign tumours in either sex. Hence, there was no evidence of oncogenic potential. |
| **Rat (Special Toxicology Study) I.V.** | | | | | |
| Sprague Dawley Rats | I.V. | 0<br>0.125<br>0.250<br>0.500 | 10/sex | 15 days<br>16 days<br>17 days<br>18 days | Hemoglobinuria, identifiable only by reagent test strip as early as 5 minutes after injection, the only treatment related clinical pathology finding, was not dose-related. It is analogous to the *in vitro* hemolytic effects of sertraline hydrochloride in the concentrations utilized in this study, i.e. 0.125, 0.25, and 0.5 mg/mL. No hemolysis was detected *in vitro* when red cells were exposed to 0.005 mg/mL sertraline hydrochloride. *In vitro* studies have also demonstrated incompatibility (cloudiness) of plasma exposed to equal volumes of 0.25 and 0.5 mg sertraline hydrochloride/mL. These data suggest that intravenous sertraline hydrochloride solutions should be administered by drip rather than by bolus injections. A total of 3 high-dose and 12 control rats had perivascular hemorrhage and/or chronic perivasculitis at the injection site in the tail. |

| SPECIES | ROUTE | DOSE MG/KG/DAY | ANIMAL PER DOSE | DURATION | FINDINGS |
|---|---|---|---|---|---|
| **7 Day Oral Study In Dogs** | | | | | |
| Beagle | Oral Capsule | 0<br>15<br>45 | 2 Males | 7 Days | Slight anorexia, body weight loss and hind limb weakness at high dose. Plasma drug levels suggested good oral absorption. Plasma Concentrations of Drug 3 h Post Dose on days 1 and 7 (see sub-table below). Apparent losses of small lymphocytes from thymus was observed; lymphoid depletion in spleen, mesenteric lymph nodes and ileum were seen in one high dose dog. |
| **14 Day Oral Study In Dogs** | | | | | |
| Beagle | Oral Capsule | 0<br>40<br>80<br>160 | 1/sex | 14 Days | Dose related anorexia and body weight loss. Increase of serum alkaline phosphatase at high dose and of SGPT in the high dose females. Depletion of small lymphocytes from spleen in the 80mg male and from spleen and ileum in the high dose male. |
| **3 Month Oral Study in Dogs** | | | | | |
| Beagle | Oral Capsule | 0<br>10<br>40<br>80 | 3/sex | 3 Months | Dose-related CNS stimulation during the first one or two weeks of treatment. One high-dose animal died of convulsions 5.5 hours after drug administration on the first day of treatment. Necropsy of this animal revealed generalized congestion and lymphoid depletion of the thymus, spleen and mesenteric lymph node consistent with the cause of death. Elevated alkaline phosphatase (ALP) values were measured in all dogs of the high-dose group and in 2 males and 2 females of the mid-dose group. The ALP elevation together with a trend toward increased liver weights reflect the ability of sertraline hydrochloride to induce drug metabolizing enzymes at 40 and 80 mg/kg. Slight SGPT elevations in the high-dose animals were not associated with histopathological changes. |
| **6 Month Oral Study In Dogs** | | | | | |

Plasma Concentrations of Drug 3 h Post Dose on days 1 and 7:

| Dose (mg/kg/day) | Dog No. | Plasma Concentration ($\mu$g/mL) Day 1 | Day 7 |
|---|---|---|---|
| 45 | 832255 | 2.28 | 2.48 |
| | 832259 | 2.04 | 0.82 |
| 15 | 832258 | 1.12 | 0.13 |
| | 832260 | 0.42 | 0.68 |

| Beagle | Oral Capsule | 0 10 30 90 | 4/sex | 6 Months | Pronounced clinical signs of CNS stimulation were observed at high dose; they diminished in intensity or completely disappeared after 1 to 2 weeks of dosing. At the 90 mg/kg dose level increase in absolute and relative liver weights, proliferation of smooth endoplasmic reticulum and mild serum alkaline phosphatase elevations were all consistent with sertraline hydrochloride being an enzyme inducer. This was demonstrated by a shortening of the plasma half-life of antipyrine at the high-dose level only (30 min compared to 54 min). A few dogs at 30 mg/kg had slight sporadic alkaline phosphatase elevations. Some dogs at the high-dose level only had SGPT elevations. The mild bile duct hyperplasia detected in two high-dose males could have been drug-related; however, this lesion sometimes is observed in control beagle dogs. |
|--------|--------------|------------|-------|----------|--------|

| SPECIES | ROUTE | DOSE MG/KG/DAY | ANIMAL PER DOSE | DURATION | FINDINGS |
|---|---|---|---|---|---|
| **1 Year Oral Study in Dogs** | | | | | |
| Beagle | Oral Capsule | 0 10 30 90 | 4/sex | 1 Year | Dose-related incidences of central and autonomic nervous system clinical signs during the first few weeks of the study were observed.  Slight to moderate elevations in serum alkaline phosphatase activity occurred in 1/8, 4/8 and 7/8 low-, mid- and high-dose dogs, respectively.  SGPT levels were increased in 2/8 high-dose animals.  Liver/body weight ratios were increased in high-dose males (25%).  Sertraline hydrochloride was previously shown to be an inducer of hepatic microsomal drug metabolizing enzymes, a phenomenon often associated with elevated liver weights and serum alkaline phosphatase activity in dogs.  There were no gross or microscopic histologic changes in the liver or in other tissues.  Plasma levels of sertraline hydrochloride and its desmethyl metabolite, CP-62, 508, confirmed dose-related systemic exposure throughout the study: |

$C_{max}$ of Drug and 0-24 Hour AUC of Metabolite

| (mg/kg) | | Cmax CP-51,974 ($\mu$g/mL) | | | AUC CP-62,508 (mg.hr/l) | | |
|---|---|---|---|---|---|---|---|
| | | Day 1 | Day 99 | Day 274 | Day 1 | Day 99 | Day 274 |
| 10 | Mean | 0.344 | 0.218 | 0.262 | 3.4 | 2.6 | 3.0 |
| | S.D. | 0.165 | 0.142 | 0.190 | 1.7 | 0.8 | 1.0 |
| 30 | Mean | 0.723 | 0.643 | 1.26 | 4.9 | 8.8 | 11.6 |
| | S.D. | 0.454 | 0.299 | 0.90 | 2.3 | 4.4 | 5.0 |
| 90 | Mean | 1.33 | 1.06 | 2.16 | 11.8 | 12.2 | 39.9 |
| | S.D. | 0.81 | 0.61 | 1.24 | 6.2 | 5.0 | 25.1 |

**Reproduction and Teratology**
**Fertility and Reproductive Performance**

| SPECIES | ROUTE | DOSE MG/KG/DAY | ANIMAL PER DOSE LEVEL | DURATION | Findings |
|---|---|---|---|---|---|
| **A Study of the Reproduction and Fertility of Rats. Segment I (Extended to produce $F_2$ litters)** | | | | | |
| Rat | Oral (gavage) | 0<br>10<br>40<br>80 | $F_0$=30F/dose<br><br>$F_0$=15M/dose | | $F_0$ males were treated in the 64 days prior to mating and throughout mating. $F_0$ females were treated in the 14 days prior to mating and during mating and gestation. Offspring ($F_1$ generation) were raised for 3 months free of drug treatment and then mated to produce the $F_2$ generation which, together with $F_1$ dams were sacrificed 21-24 days post-partum. The $F_0$ treated dams showed decreased pregnancy rates, most marked at 80 mg/kg. The pregnancy rates were 47%, 83%, 92% and 100% respectively in the high, mid, low dose and control groups. Survival of $F_1$ pups to Day 4 post-partum was also depressed in a dose-related order. High-dose $F_1$ pups showed evidence of earlier behavioural development. |
| **Fetotoxicity and Fertility Study (FDA Protocol, Segment I) in Rats by Oral Administration** | | | | | |

| Rat | Oral (gavage) | 0<br>10<br>40<br>80 | 20M<br>40F | | Males were treated for 71 days before mating.  Females were treated for 2 weeks before mating, during mating and throughout gestation.  Four additional groups of 20 undosed females were mated with the same males to test their fertility.  Drug treatment produced inhibition (approximately 20 g) during pregnancy in all treated females and reduced birth weights of pups at Day 1 post partum (males 0.15 g, females: 0.3 g).  At Days 4 and 21 of age, the weights of the pups treated also led to a lower neonatal survival rate at the two highest doses (survival was 61% and 69% respectively at high- and mid-dose groups compared with a survival of 94% in the low-dose group and 98% in controls at 21 days).  Some of this mortality was attributed to a higher incidence of hemoperitoneum in 18 high dose and 12 mid-dose than in 6 low-dose and 1 control $F_1$ neonates.  Hemoperitnoneum was not seen in newborn pups in any of the other studies.  In behavioural tests, some early hyperactivity observed in pups of the treated groups was consistent with the pharmacology of the drug.  No adverse effects were observed in the $F_2$ generation. |

**Teratology**

| SPECIES | ROUTE | DOSE MG/KG/DAY | ANIMAL PER DOSE LEVEL | DURATION | FINDINGS |
|---------|-------|----------------|-----------------------|----------|----------|
| **Fetotoxicity Study (Segment II) in Rat by the Oral Route** | | | | | |
| Rat | Oral (gavage) | 0<br>10<br>20<br>80 | 20F | | Drug administered to inseminated females at days 6-15 post insemination. Treatment caused transient aggressiveness at the beginning of the treatment period and reduced body weight gain (an average of 26 g) of the high-dose dams. A slight delay in ossification of fetuses appears to be related to lower fetal weights in the mid- and high-dose groups which were probably functions of maternal toxicity (Ex: delay in ossification of metacarpus in 20 pups among 1181 at 80 mg/kg and in 13 pups among 1825 in the control group). |
| **Fetotoxicity Study (FDA Segment II) in Rabbits by the Oral Route** | | | | | |
| Rabbit | Oral (gavage) | 0<br>5<br>20<br>40 | 20F | | Sertraline hydrochloride administered to pregnant rabbits during organogenesis (days 7 to 18 post insemination). At the highest dose level of 40 mg/kg, the compound induced severe maternal toxicity which in turn delayed the ossification processes of the fetuses (Ex: delay in ossification in hyoid bone: control= 20%. 40 mg/kg = 36%; in Talus bone: control = 27%, 40 mg/kg= 44%). |

**Peri- Post-Natal Studies**

| SPECIES | ROUTE | DOSE MG/KG/DAY | ANIMAL PER DOSE LEVEL | DURATION | FINDINGS |
|---------|-------|----------------|----------------------|----------|----------|
| **Peri- Post-Natal Study In Rats (Segment III) by the Oral Route** | | | | | |
| Rat | Oral | 0<br>10<br>20<br>80 | 20F | | Sertraline hydrochloride was administered by gavage to inseminated rats from day 15 post-insemination until parturition and throughout the whole lactation period. The treatment produced some adverse effects in dams and pups at the two higher dose levels; a dose-related delay in body weight gain of the dams during gestation and lactation in mid-and high-dose groups was observed. In some animals in each of these groups, hyperactivity was observed during the first few days of treatment. Food and water consumption was also affected in these two dose groups. Statistically significant decreases in mean litter size were observed at the high dose level on Day 1 post-partum, at the mid- and high-dose levels on Day 4 post-partum; this effect was dose related on Day 21 post-partum. The mean body weights of pups were lower in both sexes at both of the higher dose level groups when compared to controls on Days 1 post-partum but there were no statistically significant differences between the groups on Day 21 post-partum. No external or visceral anomalies were observed in the pups that died during the lactation phase or were sacrificed at weaning. The post-natal development of pups was also affected by the treatment of dams: fewer pups showed positive responses on the last day when reflexes were tested and the appearance of the incisors was retarded. This was most evident at the high-dose, but also to some extent at the mid-dose. Post-weaning examination revealed no treatment related changes. |

| Experiment (Segment III) to Further Investigate the Effect of Sertraline on Neonates | | | | | |
|---|---|---|---|---|---|
| | | | | | A second Segment III Study was carried out to further investigate the effects of sertraline hydrochloride on the neonates. In this study, pups from dams treated at 80 mg base/kg were fostered by untreated dams and, vice versa, pups from untreated dams were fostered by drug treated dams. As observed in previous studies, sertraline hydrochloride affected the weight gain of the dams (body weight difference between control and high dose group: at 20 day of pregnancy = 34 g, at 21 days post-partum = 19 g). The effects observed on the progeny can be separated into two categories: Those directly related to the *in utero* exposure of fetuses: perinatal mortality and pup weight impairment on Day 1; those related to the exposure during lactation: post-natal growth impairment and delay in development. Vision and hearing |
| Rat | Oral (gavage) | 80 | | | evaluated after weaning were not affected. |
| **Experiment to delineate the prenatal period of fetal vulnerability** | | | | | |

| Rat | Oral (gavage) | 80 | 20 20 x 4 | | Sertraline hydrochloride administered to pregnant rats throughout or during late gestation, has been shown to exert deleterious effects on neonatal growth and survival to Day 4 post-partum. Another experiment was done in which sertraline hydrochloride (80 mg base/kg/day) was administered in 0.1% methylcellulose by oral gavage to 4 groups of pregnant dams (20/group) from Day 0 to Days 5, 10, or 15 and throughout gestation, respectively, in order to delineate the prenatal period of fetal vulnerability. Pup survival was unaffected by sertraline hydrochloride treatment during the first 5, 10 or 15 days of gestation. Mortality of live-born pups in these groups during the first 4 days of life ranged from 0.8 % to 3% compared with 2% for the controls whereas 58% of pups born alive to dams treated throughout the gestational period did not survive their first 4 days of life. However, survival of pups from Day 4 to Day 21 (lactation index) was comparable in all treatment and control groups. Pups born to mothers dosed throughout gestation also weighed less than control on Days 1 and 4 post partum, but body weights of pups were comparable to control by Day 14. This experiment demonstrates that the immediate prenatal period, gestation Days 16-21, is the period of vulnerability of the neonatal pup for survival from the *in utero* effects of a high dose (80 mg/kg) of sertraline hydrochloride. |
|---|---|---|---|---|---|

**Genotoxicity**

Genotoxicity studies including Ames Salmonella and mouse lymphoma TK+/TK- assays

for point mutations, tests for cytogenetic aberrations *in vivo* on mouse bone marrow and

on human lymphocytes *in vitro* with and without metabolic activation were uniformly

negative.

Sertraline did not induce mutations at the gene level in the Ames microbial assay with and without metabolic activation against *Salmonella typhimurium* strains TA 1535, TA 1537, TA 98, and TA 100 nor at the chromosomal level in bone marrow of mice treated with 80 mg/kg p.o. (*in vivo* cytogenetic assay) or in human lymphocytes (*in vitro* cytogenetic assay) at 0.5 to 25 mg/mL in culture. Sertraline produced no significant increase in mutant frequency in L5178Y mouse lymphoma (TK+/-) cells either in the presence or absence of exogenous metabolic activation by normal rat liver S9 microsomes.

## REFERENCES

1.  Burrows GD, McIntyre IM, Judd FK, et al. Clinical effects of serotonin reuptake inhibitors in the treatment of depressive illness. J Clin Psychiatry 1988; 49(8Suppl):18- 22.

2.  Butler J, Leonard BE. Acute and chronic effects of the novel antidepressant sertraline on platelet and synaptosomal uptake of 3H-5HT in rat brain. Br Assoc Psychopharmacol; Cambridge, U.K., 6/86.

3.  Heym J, Reynolds LS. Inhibition of serotonergic unit activity by sertraline: a new and highly selective inhibitor of serotonin uptake. Soc Neurosci Abstr 1986; 12: 473.

4.  Koe BK. Preclinical pharmacology of sertraline: a potent and specific inhibitor of serotonin reuptake. J Clin Psychiatry 1990; 51 (12SupplB): 13-7.

5.  Sanders-Bush E, Tsutsumi M. Serotonin 5HT-2 receptor binding and function after chronic sertraline treatment. Fed Proc 1987; 46: 391.

6.  Woolley DW, Shaw E. Some neurophysiological aspects of serotonin. Br Med J 1954;2:122-6.

7.  Butler J, Leonard BE. The platelet serotonergic system in depression and following sertraline treatment. Int Clin Psychopharmacol 1988;3(4):343-7.

8.  Koe BK, Weissman A, Welch WM, et al. Sertraline: 1S,4S-N-methyl-4-(3,4-dichlorophenyl)-1,2,3,4-tetrahydro-1-naphthylamine, a new uptake inhibitor with selectivity for serotonin. J Pharmacol Exp Ther 1983; 226(3): 686-700.

9.  Koe BK, Weissman A, Welch WM, et al. Sertraline: a new selective inhibitor of serotonin uptake. Psychopharmacol Bull 1983; 19(4): 687-91.

10. Byerley WF, McConnell EJ, McCabe RT, et al. Chronic administration of sertraline, a selective serotonin uptake inhibitor, decreased the density of -adrenergic receptors in rat frontoparietal cortex. Brain Res 1987; 421(1-2): 377-81.

11. Koe BK, Koch SW, Lebel LA, et al. Sertraline, a selective inhibitor of serotonin uptake,  induces subsensitivity of beta-adrenoceptor system of rat brain. Eur J Pharmacol 1987; 141(2): 187-94.

12. Heym J, Koe BK. Pharmacology of sertraline: a review. J Clin Psychiatry 1988; 49(8Suppl):40-5.

13.   Cohn CK, Shrivastava R, Mendels J, et al. Double-blind, multicenter comparison of sertraline and amitriptyline in elderly depressed patients. J Clin Psychiatry 1990;51(12Suppl):28-33.

14.   Doogan DP, Caillard V. Sertraline: a new antidepressant. J Clin Psychiatry 1988;49(8Suppl):46-51.

15.   Fontaine R et al. The efficacy and safety of sertraline versus imipramine in outpatients with major depression: a six month double-blind, parallel multicenter study (Abstract). In: Proceedings of the 4th European College of Neuropsychopharmacology Congress, Monaco, 6-9 Oct., 1991. J Eur Coll Neuropsychopharmacology. In press.

16.   Itil TM, Mukherjee 5, Dayican G, et al. Mode of action and dose finding of sertraline, a new antidepressant based on CEEG-brain mapping technology (abstract). Psychopharmacology 1988;96(Suppl):281.

17.   Reimherr FS, Byerley WF, Ward MF, et al. Sertraline, a selective inhibitor of serotonin uptake, for the treatment of outpatients with major depressive disorder. Psychopharmacol Bull 1988;24(1):200-5.

18.   Reimherr FW, Chouinard G, Cohn CK, et al. Antidepressant efficacy of sertraline: a double-blind, placebo- and amitriptyline-controlled, multicenter comparison study in outpatients with major depression. J Clin Psychiatry 1990; 51(12SupplB):18-27.

19.   Doogan DP. Sertraline in the prevention of depression. Br J Psychiatry. In press.

20.   Doogan DP, Caillard V. Sertraline in the prevention of relapse in major depression. (abstract). Psychopharmacology 1988;96(Suppl) :271 (abstract #31.02.16).

21.   Hindmarch I, Shillingford J, Shillingford C. The effects of sertraline on psychomotor performance in elderly volunteers. J Clin Psychiatry 1990;51 (12SupplB):34-6.

22.   Cohn J, Katon W, Richelson E. Choosing the right antidepressant. Patient Care 1990;15:88-116.

23.   Rickels K, Schweizer E. Clinical overview of serotonin reuptake inhibitors. J Clin Psychiatry 1990;51 (12SupplB):9-12.

24.   Guy W, Manov G, Wilson WH. Double-blind dose determination study of a new antidepressant-sertraline. Drug Dev Res 1986; 9(4): 267-72.

25.   Welch WM, Vivieros DM. Synthesis of 1-$^{14}$C-(1S,4S)-N-methyl-4-(3,4-dichlorophenyl)-1,2,3,4-tetrahydro-1-naphthalenamine L- mandelate (1$^{14}$- C-sertraline mandelate). J Label Compounds Radiopharm 1987; 24(8): 987-93.

26.    Welch WM, Harbert CA, Koe BK, et al. Antidepressant derivatives of cis-4-phenyl-1,2,3,4-tetrahydro-1-naphthalenamine and pharmaceutical compositions thereof. Eur Pat Appl EP 30081, 6/10/81, 54 pp.

27.    Welch WM, Kraska AR, Sarges R, et al. Nontricyclic antidepressant agents derived from cis- and trans-1-amino-4- aryltetralins. J Med Chem 1984; 27(11): 1508-15.

28.    Anonymous. Sertraline. Drugs Future 1986; 11: 345.

29.    Anonymous. Sertraline. Drugs Future 1985; 10: 349.

30.    Anonymous. Sertraline. Drugs Future 1984; 9(4): 277-8.

31.    Kennett GA, Dourish CT, Curzon G. Antidepressant-like action of 5-HT1A agonists and conventional antidepressants in an animal model of depression. Eur J Pharmacol 1987; 134(3): 265-74.

32.    Hindmarch I, Ghatti J. Psychopharmacological effects of sertraline in normal healthy volunteers. Eur J Clin Pharmacol 1988;35(2):221-3.

33.    Mattila MJ, Saarialho-Kere U, Attila M. Acute effects of sertraline, amitriptyline, and placebo on the psychomotor performance of healthy subjects over 50 years of age. J Clin Psychiatry 1988;49(8suppl):52-8.

34.    Saletu B, Grunberger J. Drug profiling by computed electroencephalography and brain maps, with special consideration of sertraline and its psychometric effects. J Clin Psychiatry 1988;49(8Suppl):59-71.

35.    Saletu B, Grunberger J, Linzmayer 1. On central effects of serotonin re-uptake inhibitors: quantitative EEG and psychometric studies with sertraline and zimelidine. J Neural Transm 1986;67(3-4): 241-66.

36.    Doogan DP, Caillard V. Sertraline in the prevention of depression. Br J Psychiatry. In press.

37.    Bisserbe JC, Wiseman R, Flament M, Goldberg M, Lane R. A Double-Blind Comparison of Sertraline and Clomipramine in Outpatients with Obsessive-Compulsive Disorder. European Psychiatry 12:82-93,1997.

38.    Greist J, Chouinard G, DuBoff E, Halaris A, Kim SW, Koran L, Liebowitz M, Lydiard RB, Rasmussen S, White K, Sikes C. Double-Blind Parallel Comparison of Three Dosages of Sertraline and Placebo in Outpatients With Obsessive-Compulsive Disorder. Archives of General Psychiatry 52:289-295, 1995.

39. Greist J, Jefferson JW, Kobak KA, Chouinard G, DuBoff E, Halaris A, Kim SW, Koran L, Liebowitz MR. Lydiard B, McElroy S, Mendels J, Rasmussen S, White K, Flicker C. A 1 Year Double-Blind Placebo-Controlled Fixed Dose Study of Sertraline in the Treatment of Obsessive-Compulsive Disorder. International Clinical Psychopharmacology 10:57-65, 1995.

40. March JS, Biederman J, Wolkow R, Safferman A, Mardekian J, Cook EH et al. Sertraline in Children and Adolescents with Obsessive-Compulsive Disorder: A Multicenter Randomized Controlled Trial. JAMA, 1998 Nov. 25; 280 (20): 1752-6.

41. ZOLOFT™ Product Monograph. Pfizer Canada Inc. Control Number 079426, Date of Revision: September 25, 2002.

# PRODUCT MONOGRAPH

[Pr] **pms-SERTRALINE**
Sertraline Hydrochloride Capsules
25 mg, 50 mg and 100 mg
Sertraline (as sertraline hydrochloride)

**Antidepressant / Antipanic / Antiobsessional Agent**

**PHARMASCIENCE INC.**
6111 Royalmount Ave., Suite 100
Montréal, Québec
H4P 2T4

www.pharmascience.com

Submission Control No: 214726

**Date of Revision:**
April 10, 2018

**TABLE 3: SUMMARY OF PHARMACOKINETICS FOR SERTRALINE AND THE PRIMARY AMINE METABOLITE IN THE MOUSE, RAT, DOG AND MAN**

| Species | Sertraline Dose (mg/kg) and Route of Administration | Sertraline* | | | | | | Primary Amine* | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | $t_{1/2}$ (hr) | $V_D$ (L/kg) | Cl (mL/min/kg) | % Oral Bioavail | $C_{max}$ (mcg/mL) | AUC (mg hr/L) | $t_{1/2}$ (hr) | Cmax (mcg/mL) | AUC (mg hr/L) |
| Mouse | 29 (SC and PO) | 2.5 | -- | -- | 70 | 0.31 | 1.6 | 7.4 | 0.41 | 5.3 |
| Rat | 5 (IV and PO) | 4.5 | 23 | 59 | 36 | 0.062 | 0.51 | 14 | 0.051 | 0.71 |
| Rat | 25 (IP and PO) | 6.5 | -- | -- | -- | 0.31 | 4.5 | 10.5 [a] | 0.11 | 1.8 |
| Dog | 5 (IV) and 10 (PO) | 5.2 | 25 | 49 | 22 | 0.15 | 1.4 | 7.1 [a] | 0.16 | 4.6 |
| Dog [b] | 10 (PO) | -- | -- | -- | -- | 0.32 | 2.3 | -- | 0.21 | 3.0 |
| Dog [b] | 30 (PO) | -- | -- | -- | -- | 0.93 | 8.6 | -- | 0.49 | 7.8 |
| Dog [b] | 90 (PO) | -- | -- | -- | -- | 3.1 | 33.6 | -- | 1.8 | 29.5 |
| Man [c] | 3 (PO) | 26 | -- | -- | -- | 0.19 | 2.8 | 65 | 0.14 | 2.3 |

\* $T_{1/2}$ and $V_D$ and Cl in mouse, rat and dog were based on data from parenteral route of sertraline hydrochloride administration, while $C_{max}$ and AUC were based on data following oral administration.

[a] Based on parenteral administration of primary amine metabolite.

[b] Steady-state values (average of days 3 and 36) of toxicology study #82-375-08.

[c] Sertraline t1/2 based on data at doses of 50 to 400 mg/day. $C_{max}$ and AUC for drug and metabolite were steady-state values (day 14) of 200 mg dose subjects.

## TOXICOLOGY

**Acute Toxicity:** mice and rats

### Acute Oral and Intraperitoneal Toxicity Studies in Mice and Rats

| Species | Sex | LD$_{50}$ (mg Sertraline base/kg) | | Max Mortality (hr) | |
|---|---|---|---|---|---|
| | | Oral | IP | Oral | IP |
| Mice | M | 548 (495-612) | 73 (66-79) | 2 1/4 | 1 |
| | F | 419 (371-465) | | 1 3/4 | |
| Rats | M | 1,591 (1,348-1,847) | 79 (70-90) | 24 | 24 |
| | F | 1,327 (1,071-1,562) | | 4.5 | |

Signs of toxicity observed in both mice and rats dosed orally and by intraperitoneal administration included hyperactivity, convulsions, depression, weakness, decreased food consumption, and weight gain inhibition. Oral administration in both mice and rats produced exophthalmia, soft stools, and laboured respiration. Orally dosed rats also showed marked salivation. Acute oral administration produced no gross pathological findings. Acute intraperitoneal administration, on the other hand, caused adhesion of the intestines or pancreas to the liver in 2 of 10 male mice and liver lobe adhesions which were dose-related in rats.

Sertraline was also given in single-doses of 10, 20, 30, and 50 mg base/kg p.o. (in capsules) to two female beagle dogs at each dose. At the lowest level, dogs were mydriatic and anorectic but otherwise asymptomatic. At higher doses, increased salivation, tremors and twitches were observed, along with the mydriasis and anorexia. None of the dogs at any dose level exhibited motor

stimulation, circling or stereotypy. The duration of the anorexia was 12 to 15 hrs, but eating resumed late in the day after treatment and the dogs recovered uneventfully.

## Chronic Toxicity/Oncogenicity

| SPECIES | ROUTE | DOSE mg/kg/day | ANIMAL PER DOSE LEVEL | DURATION | FINDINGS |
|---|---|---|---|---|---|
| **36-Day Diet Study in Mice** | | | | | |
| CD-1 Mice | Diet | 0 10 40 80 | 10/sex | 36 Days | Drug and desmethyl metabolite serum levels drug related. Some degree of alopecia occurred in three mid-dose animals and one high-dose animal. Fatty change occurred in the livers of 8/10 high-dose males compared to 3/10 control males. On the basis of these findings, daily doses of 10, 20 and 40 mg sertraline hydrochloride base/kg were proposed for the 2-year feeding study. |
| **2-Year Diet Study in Mice** | | | | | |
| CD-1 Mice | Diet | 0 0 10 20 40 | 50/Sex | 24 Months | Survival of drug treated females was slightly less than control. Bronchoalveolar adenomas occurred in 9/49, 1/50, and 12/50 low-, mid-, and high-dose females compared to 6/50 and 2/50 in females of the two control groups. Hepatocellular adenomas were observed in 8/50, 8/50 and 12/50 low-, mid-, and high-dose males compared to 3/50 and 4/50 males in the two control groups. These tumors were benign and the type usually occurring spontaneously in this strain of mouse. There were no treatment-related increases in tissue specific or total malignant tumors. |
| **16-Day P.O. Study in Rats** | | | | | |
| Sprague Dawley Rats | Gavage | 0 40 80 160 | 5/sex | 16 Days | Anorexia and transient body weight gain inhibition; latter effect was high in high-dose females. Dose-related increase in liver weights due to microsomal enzyme induction; centrilobular degeneration at all dose levels and slightly elevated SGPT and SGOT at 160 mg/kg only. |
| **6-Week Diet Study in Rats** | | | | | |
| Sprague Dawley Rats | Diet | 0 10 40 80 | 10/sex | 6 Weeks | Minimal effect on body weight gain of males and slight inhibition of body weight (<10%) in mid- and high-dose females. Liver weight increase in mid- and high-dose males and females; hepatocellular hypertrophy and minimal midzonal fatty change in high-dose males and females and mid-dose males accompanied by slight elevations in serum SDH, GOT and 5'NT in some animals. No adverse effect level: 10 mg/kg/day. |

The findings cell for the 36-Day Diet Study in Mice contains the following table:

| Dose (mg/kg/day) | Drug Male | Drug Female | Metabolite Male | Metabolite Female |
|---|---|---|---|---|
| 10 | 22 | 17 | 40 | 23 |
| 40 | 52 | 16 | 181 | <10 |
| 80 | 142 | 63 | 307 | 169 |

Serum Concentration (ng/mL)

| SPECIES | ROUTE | DOSE mg/kg/day | ANIMAL PER DOSE LEVEL | DURATION | FINDINGS |
|---------|-------|----------------|------------------------|----------|----------|
| **3-Month P.O. Study in Rats** | | | | | |

| SPECIES | ROUTE | DOSE mg/kg/day | ANIMAL PER DOSE LEVEL | DURATION | FINDINGS |
|---------|-------|----------------|------------------------|----------|----------|
| Sprague Dawley Rats | Gavage | 0<br>10<br>40<br>80 | 15M<br>10F | 3 Months | Dose-related plasma levels at 10 and 40 mg/kg. |

Plasma Levels (mcg/mL) of Drug 2 hr Post-Dose on Days 1, 5 and 30

| Dose (mg/kg/day) | Sex | | Day 1 | Day 5 | Day 30 |
|---|---|---|---|---|---|
| 80 | M | Mean | 0.63 | 0.31 | 0.46 |
| | | ± SD | 0.19 | 0.05 | 0.20 |
| | F | Mean | 0.75 | 0.37 | 0.84 |
| | | ± SD | 0.19 | 0.10 | 0.48 |
| 40 | M | Mean | 0.70 | 0.20 | 0.32 |
| | | ± SD | 0.11 | 0.06 | 0.18 |
| | F | Mean | 0.42 | 0.33 | 0.92 |
| | | ± SD | 0.14 | 0.05 | 0.28 |
| 10 | M | Mean | 0.25 | 0.10 | 0.10 |
| | | ± SD | 0.10 | 0.03 | 0.03 |
| | F | Mean | 0.19 | 0.14 | 0.27 |
| | | ± SD | 0.06 | 0.03 | 0.08 |

Dose-related increases in absolute and relative liver weights due to induction of microsomal enzymes; increases associated with centrilobular hepatocellular hypertrophy; mild midzonal fatty changes observed in 10/15 males and 1/10 females at 80 mg/kg.

| SPECIES | ROUTE | DOSE mg/kg/day | ANIMAL PER DOSE LEVEL | DURATION | FINDINGS |
|---------|-------|----------------|------------------------|----------|----------|
| **2-Year Diet Study in Rats** | | | | | |
| Long Evans Rats | Diet | 0<br>10<br>20<br>40 | 65/sex | 24 Months | <u>Interim sacrifice (15/sex) at 6 months:</u> Kidney/body weight was increased. Increase in mean absolute and relative liver weights in males and females at high-dose and in females at mid-dose.<br><u>2 years sacrifice:</u> Deaths were dose-related; inhibition of weight gain was dose-related in males and present at high-dose only in females. Slight elevations of serum 5'nucleotidase (5'NT) activity in the high and mid-dose groups occurred throughout the study. Increase of liver and kidney/body weight ratios. These effects are considered to be related to drug-metabolizing enzyme induction. Hepatocytes with large clear fat-containing vacuoles were observed; number of affected animals in groups was dose-related in females but distribution was more erratic in males. In no case was there evidence of necrosis or of an inflammatory response. There were no treatment related effects on the number of tumor bearing animals, total malignant tumors or total benign tumors in either sex. Hence, there was no evidence of oncogenic potential. |
| **Rat (Special Toxicology Study) IV** | | | | | |
| Sprague Dawley Rats | IV | 0<br>0.125<br>0.250<br>0.500 | 10/sex | 15 days<br>16 days<br>17 days<br>18 days | Hemoglobinuria, identifiable only by reagent test strip as early as 5 minutes after injection, the only treatment related clinical pathology finding, was not dose-related. It is analogous to the *in vitro* hemolytic effects of sertraline hydrochloride in the concentrations utilized in this study, i.e., 0.125, 0.25, and 0.5 mg/mL. No hemolysis was detected *in vitro* when red cells were exposed to 0.005 mg/mL sertraline |

| SPECIES | ROUTE | DOSE mg/kg/day | ANIMAL PER DOSE LEVEL | DURATION | FINDINGS |
|---|---|---|---|---|---|
| | | | | | hydrochloride. *In vitro* studies have also demonstrated incompatibility (cloudiness) of plasma exposed to equal volumes of 0.25 and 0.5 mg sertraline hydrochloride/mL. These data suggest that intravenous sertraline hydrochloride solutions should be administered by drip rather than by bolus injections. A total of 3 high-dose and 12 control rats had perivascular hemorrhage and/or chronic perivasculitis at the injection site in the tail. |
| **Rat (juvenile animal study) oral** | | | | | |
| Sprague Dawley Rats | Gavage | 0 10 40 80 | 30/sex | Post-natal day 21 through post-natal day 56 with non-dosing recovery phase up to post-natal day 196 | The administration of 80 mg/kg of sertraline to males and females on post-natal Days 21 to 56 resulted in dehydration, chromorhinorrhea and reduced average body weight gain. In addition, rales, hunched posture, reduced food consumption and two early deaths (plus one early euthanization due to poor condition) also occurred in male rats given 80 mg/kg/day. Decreases in brain weight were seen in treated male animals around post-natal day 140. Delays in sexual maturation occurred in males (80 mg/kg/day) and females ($\geq$10 mg/kg/day), but despite this finding there were no sertraline-related effects on other organ weights, mating and fertility, sperm motility or sperm concentration in males or female reproductive endpoints (estrous cycling, mating and fertility, or ovarian and uterine parameters). There were no sertraline-related effects on any behaviour parameter (learning and memory, auditory startle response, and locomotor activity) in males, while a decrease in auditory startle response occurred in females at 40 and 80 mg/kg/day. There were no sertraline-related effects on female brain weights, male or female femur lengths, gross necropsy or microscopic observations at any dose level. In juvenile males, the no-observed-adverse-effect level (NOAEL) for general toxicity was 40 mg/kg/day (correlating to a $C_{max}$ of 262 ng/mL and an $AUC_{0-t}$ to 3,170 ng·hr/mL on post-natal Day 56). In juvenile females, the NOAEL could not be established based on the delays in sexual maturation that occurred at $\geq$10 mg/kg. All of the aforementioned effects attributed to the administration of sertraline were reversed at some point during the non-dosing recovery phase of the study. |

| SPECIES | ROUTE | DOSE mg/kg/day | ANIMAL PER DOSE LEVEL | DURATION | FINDINGS |
|---|---|---|---|---|---|
| **7-Day Oral Study in Dogs** | | | | | |
| Beagle | Oral (Capsule) | 0 15 45 | 2 Males | 7 Days | Slight anorexia, body weight loss and hind limb weakness at high-dose. Plasma drug levels suggested good oral absorption. |

Plasma Concentrations of Drug 3 hr Post-Dose on Days 1 and 7

| Dose (mg/kg/day) | Dog No. | Plasma Concentration (mcg/mL) | |
|---|---|---|---|
| | | Day 1 | Day 7 |
| 45 | 832255 | 2.28 | 2.48 |
| | 832259 | 2.04 | 0.82 |
| 15 | 832258 | 1.12 | 0.13 |
| | 832260 | 0.42 | 0.68 |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | Apparent losses of small lymphocytes from thymus was observed; lymphoid depletion in spleen, mesenteric lymph nodes and ileum were seen in one high-dose dog. |
| **14-Day Oral Study in Dogs** | | | | | |
| Beagle | Oral (Capsule) | 0 40 80 160 | 1/sex | 14 Days | Dose-related anorexia and body weight loss. Increase of serum alkaline phosphatase at high-dose and of SGPT in the high-dose females. Depletion of small lymphocytes from spleen in the 80 mg male and from spleen and ileum in the high-dose male. |
| **3-Month Oral Study in Dogs** | | | | | |
| Beagle | Oral (Capsule) | 0 10 40 80 | 3/sex | 3 Months | Dose-related CNS stimulation during the first one or two weeks of treatment. One high-dose animal died of convulsions 5.5 hours after drug administration on the first day of treatment. Necropsy of this animal revealed generalized congestion and lymphoid depletion of the thymus, spleen and mesenteric lymph node consistent with the cause of death. Elevated alkaline phosphatase (ALP) values were measured in all dogs of the high-dose group and in 2 males and 2 females of the mid-dose group. The ALP elevation together with a trend toward increased liver weights reflect the ability of sertraline hydrochloride to induce drug metabolizing enzymes at 40 and 80 mg/kg. Slight SGPT elevations in the high-dose animals were not associated with histopathological changes. |
| **6-Month Oral Study in Dogs** | | | | | |
| Beagle | Oral (Capsule) | 0 10 30 90 | 4/sex | 6 Months | Pronounced clinical signs of CNS stimulation were observed at high-dose; they diminished in intensity or completely disappeared after 1 to 2 weeks of dosing. At the 90 mg/kg dose level increase in absolute and relative liver weights, proliferation of smooth endoplasmic reticulum and mild serum alkaline phosphatase elevations were all consistent with sertraline hydrochloride being an enzyme inducer. This was demonstrated by a shortening of the plasma half-life of antipyrine at the high-dose level only (30 min compared to 54 min). A few dogs at 30 mg/kg had slight sporadic alkaline phosphatase elevations. Some dogs at the high-dose level only had SGPT elevations. The mild bile duct hyperplasia detected in two high-dose males could |

| SPECIES | ROUTE | DOSE mg/kg/day | ANIMAL PER DOSE LEVEL | DURATION | FINDINGS |
|---|---|---|---|---|---|
| | | | | | have been drug-related; however, this lesion sometimes is observed in control beagle dogs. |

**1-Year Oral Study in Dogs**

| SPECIES | ROUTE | DOSE mg/kg/day | ANIMAL PER DOSE LEVEL | DURATION | FINDINGS |
|---|---|---|---|---|---|
| Beagle | Oral (Capsule) | 0 10 30 90 | 4/sex | 1 year | Dose-related incidences of central and autonomic nervous system clinical signs during the first few weeks of the study were observed. Slight to moderate elevations in serum alkaline phosphatase activity occurred in 1/8, 4/8 and 7/8 low-, mid- and high-dose dogs, respectively. SGPT levels were increased in 2/8 high-dose animals. Liver/body weight ratios were increased in high-dose males (25%) and females (32%) and in mid-dose females (25%). Sertraline hydrochloride was previously shown to be an inducer of hepatic microsomal drug metabolizing enzymes, a phenomenon often associated with elevated liver weights and serum alkaline phosphatase activity in dogs. There were no gross or microscopic histologic changes in the liver or in other tissues. Plasma levels of sertraline hydrochloride and its desmethyl metabolite, CP-62,508, confirmed dose-related systemic exposure throughout the study: |

$C_{max}$ of drug and 0-24 hour auc of metabolite

| (mg/kg) | | $C_{max}$ CP-51,974 (mcg/mL) | | | AUC CP-62,508 (mg.hr/L) | | |
|---|---|---|---|---|---|---|---|
| | | Day 1 | Day 99 | Dday 274 | Day 1 | Day 99 | Day 274 |
| 10 | Mean | 0.344 | 0.218 | 0.262 | 3.4 | 2.6 | 3.0 |
| | S.D. | 0.165 | 0.142 | 0.190 | 1.7 | 0.8 | 1.0 |
| 30 | Mean | 0.723 | 0.643 | 1.26 | 4.9 | 8.8 | 11.6 |
| | S.D. | 0.454 | 0.299 | 0.90 | 2.3 | 4.4 | 5.0 |
| 90 | Mean | 1.33 | 1.06 | 2.16 | 11.8 | 12.2 | 39.9 |
| | S.D. | 0.81 | 0.61 | 1.24 | 6.2 | 5.0 | 25.1 |

EXHIBIT  3

# PRODUCT MONOGRAPH

## SERTRALINE
(sertraline hydrochloride)
25, 50, and 100 mg Capsules

## Antidepressant / Antipanic / Antiobsessional Agent

SANIS HEALTH INC.                          Date of Preparation:   February 9, 2010
333 Champlain Street, Suite 102
Dieppe, NB E1A 1P2

Control#: 136307

Cardiac and vital signs monitoring are recommended along with general symptomatic and supportive measures. There are no specific antidotes for sertraline hydrochloride.

Due to the large volume of distribution of sertraline hydrochloride, forced diuresis, dialysis, hemoperfusion, and exchange transfusion are unlikely to be of benefit.

In managing overdosage, the possibility of multiple drug involvement must be considered.

## DOSAGE AND ADMINISTRATION

**SERTRALINE (sertraline) is not indicated for use in children under 18 years of age** (see **WARNINGS: POTENTIAL ASSOCIATION WITH BEHAVIORAL AND EMOTIONAL CHANGES, INCLUDING SELF-HARM**).

### GENERAL:

SERTRALINE should be administered with food once daily preferably with the evening meal, or, if administration in the morning is desired, with breakfast.

### INITIAL TREATMENT:

**Depression and Obsessive-Compulsive Disorder:**

As no clear dose-response relationship has been demonstrated over a range of 50-200 mg/day, a dose of 50 mg/day is recommended as the initial dose.

**Panic Disorder:**

SERTRALINE (sertraline hydrochloride) treatment should be initiated with a dose of 25 mg once daily.  After one week, the dose should be increased to 50 mg once daily depending on tolerability and clinical response. No clear dose-response relationship has been demonstrated over a range of 50-200 mg/day.

## TITRATION:

In depression, OCD and panic disorder, a gradual increase in dosage may be considered if no clinical improvement is observed.  Based on pharmacokinetic parameters, steady-state sertraline plasma levels are achieved after approximately 1 week of once daily dosing; accordingly, dose changes, if necessary, should be made at intervals of at least one week.  Doses should not exceed a maximum of 200mg/day.

The full therapeutic response may be delayed until 4 weeks of treatment or longer. Increasing the dosage rapidly does not normally shorten this latent period and may increase the incidence of side effects.

## MAINTENANCE:

During long-term therapy for any indication, the dosage should be maintained at the lowest effective dose and patients should be periodically reassessed to determine the need for continued treatment.

EXHIBIT  4

*FAX 847 747 1531*
*Att: Pharmacy Information 3Coordinator*

Follow up on Prescription issues and complaint

From:  Brian Cokeng (bcokebmw@yahoo.co.uk)

To:  tokofsky@searshc.com

Date:  Friday, 24 February 2017 at 19:46 GMT-8

Dear Mr. Tokofsky,

I was referred to you by the pharmacist (Jessica) at 770 Broadway. This is a matter concerning a complaint I had sent to Kmart in July 2010. See a copy attached to this email. I had not receive a response. I recently discovered some latent injuries as a result of the incorrect dosage of the sertraline, overdose and serotonin syndrome events from the in 2010, and have to be now following up with doctors. In fact, I was just discharged from a hospital few days ago and have to be now getting medical treatment and care for my medical condition and injuries. I am very concern about the turn of events, in that these things occurring and I never heard from Kmart or its Pharmacy. Please advise, thank you.

Best Regards,
Brian Cokeng
Tel: 646.820.9238

Current address:
Church Street Station
P.O. Box 2723
New York, N.Y. 10008

   Prescription issue and complaint.PDF
2.8MB

Brian Cokeng
40 Ann Street
New York, N.Y 10038
Tel: 646.736.2952

July 23, 2010

Kmart Corporation #7777
770 Broadway
New York, N.Y. 10003

COMPLAINT

Dear Sir/Madam,

I am writing to submit a complaint about instructions that was given to me at your pharmacy. This matter is regarding a prescribed medicine (Zoloft/sertraline HC, generic for: zoloft) prescription # 6842949 and the Pharmacist who had fill the prescription on July 16, 2010. Please see attachments to this complaint.

The pharmacist misinterpret directions and/or fills the prescription in a manner other than the way it was ordered by Dr Rania Attia M.D. (prescriber). See attached copy of the prescription.

It is the pharmacist responsibility to dispense the correct amounts of medication to a patient. I believe that if there was a misunderstanding between the pharmacist and prescriber because of handwriting issue, then a phone call could be made to perhaps clear up such situation.

The pharmacist took inappropriate steps and then printed Three (3) separate labels, then placed each of those labels on three (3) separate bottles containing sertraline, the labels indicated that each of the bottles contained "Qty:90" furthermore, the pharmacist had given me clear written instructions on each labels, on each of the bottles to " take three tablets by mouth in the evening". I had also asked the pharmacist so to confirm the dosage, and I was again verbally informed to "take three tablets from each bottle by mouth in the evening" the pharmacist went on to wrote on each bottle with a pen (1 of 3) (2 of 3) (3 of 3) and further advised that my doctor had ordered the dosage in such manner.

I then went home and took the medicine as I was instructed and as stated on each of those labels on the bottles. Later, the next day I was in the hospital emergency room with serotonin syndrome as a result of the dosage overdose and wrong strength of the sertraline.

This is unacceptable. I do not believe that I should accept any medical issues from the above events and therefore requesting that your company advise on the above matter. Thank you.

Best Regards,

Brian Cokeng

EXHIBIT  5

# Possible claim number: L1702245137-0001

Subject: L1702245137-0001
From: Taskov, Bonita J. <Bonita.Taskov@sedgwickcms.com>
To: Brach, Sandra <Sandra.Brach@sedgwickcms.com>

From: Kaba, Sabrina [mailto:Sabrina.Kaba@searshc.com]
Sent: Saturday, February 25, 2017 3:26 PM
To: Tokofsky, Dennis
Subject: #7777 FW: QUALITY RELATED EVENT REPORT (Privileged & Confidential)
Importance: High

From: SHCPortals
Sent: Friday, February 24, 2017 6:23 PM
To: Kaba, Sabrina
Cc: Speares, Jennifer
Subject: QUALITY RELATED EVENT REPORT (Privileged & Confidential)

---------------------------------------------------------------

## ****QUALITY RELATED EVENT REPORT****

---------------------------------------------------------------

| | |
|---|---|
| Store No. | 7777 |
| Pharmacy Phone | 2122539661 |
| Report Date | 02/24/2017 |
| Reported By | Jessica Hom |
| Job Title | Pharmacist |
| Email Address | Jessica.Hom@searshc.com |
| Pharmacy District Manager Name | Dennis Tokofsky |
| Who Discovered Event | Jessica Hom |
| Date Discovered | 02/24/2017 |
| Sedgwick Claim No. (REQUIRED) | L1702245137 |
| Patient's Name | Coke-Ng, Brian |
| Patient's Address | PO Box 23723 |
| Patient's Phone | 6468209238 |
| Patient's Date of Birth | ~~████~~ Redacted |
| Dispensing Pharmacist FULL Name | Jack Hellyer |
| Prescription Number | 6842949 |
| Prescription Date | 07/16/2010 |
| Date Dispensed | 07/19/2010 |
| Was This RX | Refill |
| Prescription By | In-Person |
| If "Transfer" Where From | Kmart 7777 |
| Prescribed Drug Name | Zoloft |
| Prescribed Drug NDC No. | 0004940030 |
| Prescribed Drug Strength | 50 mg |
| Prescribed Drug Quantity | 90 |
| Prescribed Drug Directions | take three tablets by mouth in the evening |

L17022451370001

6020170227009320

| | |
|---|---|
| Dispensed Drug Name | sertraline |
| Dispensed Drug NDC No. | 00378418793 |
| Dispensed Drug Strength | 50 mg |
| Dispensed Drug Quantity | 90 |
| Dispensed Drug Directions | take three tablets by mouth in the evening |
| Nature of Quality Related Event (Click All That Apply) | Other |
| Describe "Other" (Explain) | As per patient, he took the medication incorrectly. He was given 3 full bottles (assuming 3 bottles of 30 tablets each) and took 3 tablets daily from each bottle. This resulted in an overdose and patient was admitted to hospital. |
| Was PHI Disclosed to the Wrong Customer | NO |
| FULL Name of Patient Whose PHI was Disclosed | Coke-Ng, Brian |
| Was Dispensed Medication Ingested/Applied | Yes |
| Was New Medication Dispensed | No |
| Was Dispensed Medication Retrieved | No |
| Was Prescriber Contacted | No |
| If "Yes" Prescriber Name | |
| Did Event Result in Illness/Injury | YES |
| If "YES" Describe Nature of Illness/Injury | Patient was admitted to hospital with serotonin syndrome. |
| Was Hospitalization Required | YES |
| Name of Injured Person | Coke-Ng, Brian |
| Created by | Jessica Hom |
| Created at | 2/24/2017 6:23 PM |
| Changed by | Jessica Hom |
| Changed at | 2/24/2017 6:23 PM |

This message, including any attachments, is the property of Sears Holdings Corporation and/or one of its subsidiaries. It is confidential and may contain proprietary or legally privileged information. If you are not the intended recipient, please delete it without reading the contents. Thank you.

# EXHIBIT  6

**Civil Action: 1:23-cv-2145(MKV)(BCM)**

## TRANSCRIPT

I Brian Coke Ng, hereby sworn, under penalty of perjury, that this is a transcript of a conversation and communication during a telephone call between myself and Ms. Sandra Brach Of Sedgwick Claims Management Services, Inc. on March 14, 2017. I further hereby introduce her statements of March 14, 2017, as **(1)** hearsay statements of a declarant's then-existing state of mind may be admitted to prove that state of mind. United States v. Bishop, 291 F.3d 1100, 1110 (9th Cir. 2002) ("Statements of intent to perform a future act are admissible 'state of mind' testimony under Rule 803(3).") and **(2)** as per Federal Rules of Evidence 801(d)(2)(A) and (D) and per Federal Rules of Evidence, respectively:

| | | |
|---|---|---|
| **1.** | **Sandra:** | ...This is Sandra, how can I help you… |
| **2.** | **Brian:** | Yes, this is Brian I'm trying to return your call… |
| **3.** | **Sandra:** | Yes…yes, thank you for calling me back… |
| **4.** | **Brian:** | Hi, how are you? |
| **5.** | **Sandra:** | I'm good…how are you? |
| **6.** | **Brian:** | I'm hanging on... in there… |
| **7.** | **Sandra:** | Okay…well,…why don't you tell me what happen, because , I'm going over the information, and I wanted to confirm some things with you. |
| **8.** | **Brian:** | Ok, but I'm still not sure, is this Kmart? Or…I don't know who I am talking to… |
| **9.** | **Sandra:** | Right, I work for Sedgwick, we're a third party administrator, that handle claims for Kmart…so when they get notification of a claim, it is reported to us, and we contact the customer regarding the incident, so it was sent to me to investigate the claim.  It was sent to me at the end of last month, so, it was sent at the end of February. |
| **10.** | **Brian:** | Oh, well, actually I had wrote them a long time, and I don't hear from anybody, and it's a situation where I had…I usually picked up my medications from them from my doctor back in |

Civil Action: 1:23-cv-2145(MKV)(BCM)

the days in 2010...I have a pre-existing condition actually...I have a anxiety... I was treated with Zoloft for anxiety matters, and depression and it happen, where I lost my job...I was injured on the job and start to get workers' compensation, and during my pre-existing condition I went to Kmart to pick up my medication and the pharmacist gave me my Zoloft, and at that time, she explained to me... in fact, I still have the bottles that she gave me...she gave me three bottles with Zoloft...well, at that time...I usually got in a different manner and she explained to me...the person at the front, I don't remember if it was a male or a female...but it was given to me at the time, and...more than the usual...and ...the person...if I can...it's in my bag...let me tell you exactly what is...because I still have it...let me tell you what is on the bottle...just a minute...I think it's even better to...is it not better for me to send you a copy of what I have?...because sometimes...

| 11. | Sandra: | You can, if you want... |
| --- | --- | --- |

12.   **Brian:**      But, anyway...ok, but...let me tell you, on the bottle...the instructions there was given to me to take three (3) from each bottle...and...I was concern at the moment, because I usually never have so much at one time, and I asked them and they explained to me, that my doctor had directed that I take it this manner, so, I went home...I believe that was on a weekend...I think that was on a Friday...so, I went home and I didn't take it that day...I take it the Sunday...and then...I take three...she number them, so I take...let me tell you, she put 1 of 3, 2 of 3, and 3 of 3...so from the first bottle I take 3, second bottle I take 3, and the third bottle I take 3, just as it had indicated on the direction... and later that night, that Sunday night...I never feel my usual way...by the next morning I started to vomit, nervous...more than what I usually feel...I never feel myself at all...so I went to my doctor...they have a emergency department on the...my doctor...in fact, I call them, and the doctor told me to come...so the Monday I went to my doctor

**Civil Action: 1:23-cv-2145(MKV)(BCM)**

and he had to...he told me to stop taking it immediately...at first, I believe it was...the medication that I was on for my asthma, because I had asthma medications taking and I...at that point, I thought it was my asthma medications, but my doctor, he specialized in internal medicine and pulmonary...so I went to him and he told me to stop it, and he treated me, and then...months later...a few months later...I would say...I had to change doctor...because at that point the doctor who actually prescribed it works for St. Vincent Hospital and I believe...when I tried to contact St. Vincent at that time they had closed...they closed down the hospital and I had to find another doctor...so the new doctor made some very interesting findings...he actually gave me a report, and my doctor who I saw when I was sick, he told me that I was having...overdosed...and...my serotonin level was very high and he treated me right on the spot, and I went home...but, then from that time on, I continued to get treatments because... my pre-existing conditions at the time wasn't getting better...until this moment I am still under treatment plan because of the various things...but, in December, something happen...out of the blues I started to...have...movements in my legs and in my hands...it started in December...late December going into January of last year...

13.  **Sandra:**     That's last year?

14.  **Brian:**      Yes, December last year, I started to have... movements...very interesting...I had to see a neurologist, and the neurologist told me...he gave me a report, so the report indicating...he checked on my history and everything and...it all goes back to what happen to me...the overdose...and then, I made several calls so to get to the bottom of why the Zoloft would have caused these issues and they said yes...it did...so, I tried to make connections...because my workers' compensation insurance wouldn't cover the medicines...so, I have to get my medicines paid for from a different source and it cost me a co-payment

**Civil Action: 1:23-cv-2145(MKV)(BCM)**

and I'm not happy about it because my situation has been...my pre-existing situation has pretty much aggravated by the events, and cause me pretty much to be in this kind of dilemma now, and so, I had tried to get a follow up to see if I could anything at all from Kmart...I don't know if they wrote me back or replied, because I actually never heard from them, but I reach out...sorry...

**15.  Sandra:**    Go ahead...go ahead...

**16.  Brian:**    So, I made a call to the number that is on the receipt from the pharmacy and I spoke to a woman there, and she told me that she could give me her district manager... she gave me a fax number and I told her that I didn't have a fax...the fax wasn't working at the time, but anyway, she gave me her district manager's...name, the gentleman name Dennis Tokofsky, and I email him...until this day, I don't hear anything from him. So I just figured out then, that most likely it's another...brush-off, nobody really cares...you know...so...In fact, two times I wrote and put it in the mail and I never heard from Kmart over the events that happen...

**17.  Sandra:**    Have you ever call them?

**18.  Brian:**    The pharmacy?

**19.  Sandra:**    Yeah, anyone?

**20.  Brian:**    Well, I had called the pharmacy, but nobody told me anything...In fact, I had called...I had tried to make contact by an 800 number, they told me that...I called several times...either that they don't handle those matters or if I had ever had any sort of response... in fact, they are asking me, and I don't get any response, so...nobody was able to...

**21.  Sandra:**    They asked you what?

**Civil Action: 1:23-cv-2145(MKV)(BCM)**

| | | |
|---|---|---|
| 22. | **Brian:** | They had asked me, if I had ever receive any…response from Kmart, and I said, I did not…and they gave me several numbers, I have them written down somewhere, but I would have to look for those several numbers for Kmart…and everyone of those numbers that I called, nobody knows anything about what happen…the only person I was able to get help from, was the girl…the pharmacist her name is Jessica…and Jessica told me she could assist by giving me her…an email address for Mr. Tokofsky, well, I don't hear from him, I had faxed also, and I still don't hear anything, except from you now, I got a call from you…and at the time when you called, I was on my medications, it knocked me out, because currently I am taking medications for the movements that developed recently out of the blues…my current injury, the doctor gave me…I have to be taking it twice a day, so…that's where my troubles are…but, I would be happy if you able to send me some sort of response, if that's what you do… |
| 23. | **Sandra:** | Well, I want to confirm some things, so this was a prescription that was filled in July 2010, is that right?… |
| 24. | **Brian:** | Yes… |
| 25. | **Sandra:** | Ok… |
| 26. | **Brian:** | I think it was July…let me look on the bottle, the bottle says… |
| 27. | **Sandra:** | But, it was 2010 |
| 28. | **Brian:** | Yes… |
| 29. | **Sandra:** | Ok, so I had looked to see if there's anything else on file, and we don't have, we don't show anything else been reported, and I don't know how familiar you are with the way claims work, but there is something call a statue of limitation, and if you go beyond that date, and it based on the day of an injury or the day an incident happen…so, in your case it would be the day that you have gone into the hospital after you took the medication or |

**Civil Action: 1:23-cv-2145(MKV)(BCM)**

you went to the doctor, you said...so, that would be that Sunday, I don't think you say a specific day, but that Sunday after you...

| 30. | **Brian:** | It was a Monday that I went to...and saw the doctor... |

| 31. | **Sandra:** | It's a Monday, ok, it would be from that day in 2010, and in New York, the statute is three (3) years, now what that means is, if there aren't any legal thing file, so if there isn't anything file by the end of three (3) years, there's no...there's nothing further we can do, because the statute has run, and we don't have any record that there was any claim filed back in 2010 or anytime until those claims... until just in February of this year...does that make sense? |

| 32. | **Brian:** | Well, that sounds very strange...well, the injury that I am suffering now is what I am claiming about...my injury now occurred in December, so... |

| 33. | **Sandra:** | But you said they directly related that to the...when you went to the hospital before...the first time... |

| 34. | **Brian:** | No, no...when I saw the doctor...the first events that happen was that I take the medication and then, in the late hours later I started to vomit and those were pretty much symptoms...I never developed anything like what I am going through now...this is the first time I started to have these type of illness, this injury that I have now... |

| 35. | **Sandra:** | And what is it specifically? |

| 36. | **Brian:** | It's...involuntary movements,...let me tell you what the doctor have...the diagnosis...Drug Induced Movement Disorder...I never have this before... |

| 37. | **Sandra:** | Drug Induced Movement Disorder... |

| 38. | **Brian:** | I was told that it's also called Tardive...let me look on my papers here, just a minute...Tardive Akathisia...so, |

Civil Action: 1:23-cv-2145(MKV)(BCM)

| | | |
|---|---|---|
| **39.** | **Sandra:** | Ok, and they are related that to...? |
| **40.** | **Brian:** | The drug...the overdosed that I had...because it was pointed out to me...because I tried to get an explanation as to where this coming from and they said that the drug...leaded on this late...late, late...effects...late...late...late injury... |
| **41.** | **Sandra:** | Latent...a latent effects? |
| **42.** | **Brian:** | Yes, so...because the...one of the doctor, had advised me of the effect of the...latent effect from the drug...and the doctor...the neurologist advised me, the same...I have a psychiatrist, I have a neurologist...and they've advised me of the same...so...I called up...I called...I forgot the name of the company that I called and they advised me also that the Zoloft does caused the problem that I have and it could happen years later...so, I am very curious as to...but I am advised that this...even though its such a long time...I don't believe I should have to be suffering this type of thing all of a sudden, and this is something I never have before, and the medicine that I am taking now, I don't know if I am going to get better by it or what, I'm just taking it pretty much. |
| **43.** | **Sandra:** | Ok. Well, you've said you got something that you were looking at that says your diagnosis, can you send me a copy of that? |
| **44.** | **Brian:** | Ok, yes...so, how do...would you like to email me or something? |
| **45.** | **Sandra:** | Sure! Sure! Yeah, whatever you have, send me any whatever documents you have, send me a copy of it so that I can look it over. Do you want me to send you an email? |
| **46.** | **Brian:** | Yes...I think...I sent it in the papers, I had sent Mr. Tokofsky, Dennis Tokofsky... |
| **47.** | **Sandra:** | Ok, I'll see if I can find that...but, it wouldn't come to me directly, because I worked with Sedgwick, not Sears, so if I get |

Civil Action: 1:23-cv-2145(MKV)(BCM)

it, I'll just send you a quick message, and then you send me whatever information you have, especially anything from the doctor saying what you have, what your conditions is now, so I can review it, okay?

| | | |
|---|---|---|
| 48. | **Brian:** | Ok, so, what is your email address? |
| 49. | **Sandra:** | Sure, its Sandra...sandra.brach@sedgwickcms.com |
| 50. | **Brian:** | So,...sandra.brach@sedgwickcms.com |
| 51. | **Sandra:** | Perfect...and I have a claim number for your file, you want that right now? |
| 52. | **Brian:** | Yes...yes... |
| 53. | **Sandra:** | It's L1702245137 |
| 54. | **Brian:** | Ok, I'm a bit slow, so that's why I...sorry for the... |
| 55. | **Sandra:** | That's ok... |
| 56. | **Brian:** | So......yeah...and...so...so... |
| 57. | **Sandra:** | So, you are concerned with... |
| 58. | **Brian:** | I...my concern is that, I don't hear from Kmart, and you know... |
| 59. | **Sandra:** | Well, that's what I'm doing now, so I'm following-up with you, so I'll be your contact now, going forward, but I want to confirm what your injuries are, so I'll know what I'm addressing for your claim... |
| 60. | **Brian:** | So, my injuries is what I had just tell you...my...the fact is...I am disturb by the fact that, I have a pre-existing condition, and that has been disturb by this overdose, and...so...the fact that...everybody has been telling me to find an attorney to handle this, but, I'm doing this with good faith. I'm not into attorneys yet with this because, I...I was...I'm actually waiting to hear from Kmart first because...you know...I don't have |

**Civil Action: 1:23-cv-2145(MKV)(BCM)**

money to pay an attorney right now but…the right thing is to hear from somebody about it…like I told you…should I take a picture of the medicine bottles that…I…

| | | |
|---|---|---|
| 61. | **Sandra:** | Yes…yes, if you got them, please do, I would love to see those. |
| 62. | **Brian:** | Ok…so…I'll tell my wife to help me with this…but…I still have them here…all my doctors, I brought it to their attention, and they said that I should not have…been instructed in this way…so…everybody I had mentioned it to…indicating that…this is what it is…I'm just troubled over the fact that…it's years that, I have been on treatments…when…a depression or anxiety…shouldn't lengthen out to these types of damages, because of some sort of wrong instruction or wrong direction, or wrong labeling or something…I am not happy about that actually. |
| 63. | **Sandra:** | Ok. All right, well send me whatever you have, and I'll go over it all, and I'll see…and I'll be in contact with you, once I get that from you…ok? |
| 64. | **Brian:** | I appreciate it…any document that I am going to send you from the neurologist that I saw…it began…I should also added…to let you know that this neurologist was referred through the hospital that I have been to…because I started to have these pain in my muscles and…very rigidity…pain and spasm and movement in my muscles and I saw the doctor at the hospital, in the emergency room, and they treated me there, and then sent me to…they referred me to this doctor, so this doctor… is pretty new… and he evaluated me and made his findings, so, I am going to send you a copy…I going to get my wife…or get somebody to help me scan this…and I will get it out to you. |
| 65. | **Sandra:** | Perfect, thank you… |
| 66. | **Brian:** | All right…looking forward… |
| 67. | **Sandra:** | Thank you very much |

**Civil Action: 1:23-cv-2145(MKV)(BCM)**

68.  **Brian:**    Please confirmed when you received it…

69.  **Sandra:**    Ok, I can do that for you…

70.  **Brian:**    All right…all right…

71.  **Sandra:**    Thank you so much…

72.  **Brian:**    Nice talking to you…bye…bye…

73.  **Sandra:**    Yes…bye, bye.

74.  **Brian:**    Bye, bye.


STATE OF NEW YORK        )
                                                    )ss:
COUNTY OF NEW YORK    )

      I, Brian Coke Ng, being duly sworn, deposes, says and declare under penalty of perjury that the statements, reference and stated above in this transcript, to the best of my personal knowledge, are truthfully transcribed, written out and copied, and therefore represents the facts currently resides on the digital audio recordings device/media.


Dated: November 8, 2023

Brian Coke Ng

Sworn to before me this
9th day of November 2023

Notary Public

LUZ M. FELIPE
Notary Public, State of New York
Reg. No. 01FE6446625
Qualified in Kings County
Commission Expires January 23rd, 2027

**Page 10 of 10**

EXHIBIT  7

Sedgwick Claims Management Services, Inc.
P O Box 14448
Lexington, KY 40512-4448



sedgwick®

Phone: (866)352-1521
Fax: (866)876-7050

March 21, 2017

Brian Coke-Ng
Po Box 23723
New York, NY 10008

RE:    File Number:          L1702245137-0001
       Date of Incident:     07/30/2010
       Store Number:         07777-NEW YORK

Dear Mr. Coke-Ng:

We have carefully investigated the facts and circumstances surrounding the above incident.

I have reviewed the document provided and determined it does not apply to your specific situation.  The document indicates the statute of limitation can be extended for claims involving property on a list of Superfund Sites requiring environmental clean-up as identified by the Environmental Protection Agency because the land had been contaminated by hazardous waste that could pose a health risk.  This is not the case with your claim.

The statute for your claim ran 3 years from the date the prescription was filled, or 7/16/2013.  Because no legal action was taken prior to the statute extinguishing, we must respectfully deny any claim presented against Kmart Corporation relating to this incident.

However, should you have additional information that has not been presented for review and could impact our denial decision, we ask that you provide that information at this time.

Sincerely,
Sandra L. Brach
Claims Representative
Sandra.Brach@sedgwickcms.com
Sedgwick
866-352-1521 ext. 50951



*C 2 2 3 8 8 6 9 6 . 3 3 8 - 1 8 4 5 *

Subject:   RE: Claim#L1702245137 Notice

From:      Brach, Sandra (Sandra.Brach@sedgwickcms.com)

To:        bcokebmw@yahoo.co.uk;

Date:      Thursday, 23 March 2017, 10:01


Good afternoon Mr. Ng,


I have been able to review your file and the information you provided.


Your claim is being denied based on the statute of limitations expiring 7/16/2013. The article you provided pertains to cases involving Superfund Sites requiring environmental clean-up as identified by the Environmental Protection Agency. This does not pertain to your claim.


I have attached a copy of the letter mailed to the PO Box listed as your mailing address for your records. I am not certain it will reach you as my first letter sent to you was returned to sender.


Thank you,


Sandra Brach | Claims Representative-Liab
Sedgwick Claims Management Services, Inc.
DIRECT 847.645.0951

FAX 866.876.7050
EMAIL Sandra.Brach@sedgwick.com
www.sedgwick.com | Caring counts℠


*Please include the CLAIM NUMBER with any communication sent. *

RE: Claim#L1702245137

From: Brach, Sandra (sandra.brach@sedgwickcms.com)

To:    bcokebmw@yahoo.co.uk

Date: Friday, 7 April 2017 at 06:36 GMT-7

Good morning Mr. Ng,

As requested, attached is a copy of the first letter that was unsuccessful in reaching you.

In regards to your Worker's Compensation claim question, I cannot provide any input as I can only speak to the claim I am handling.

Thank you,

**Sandra Brach** | Claims Representative-Liab
**Sedgwick Claims Management Services, Inc.**
DIRECT 847.645.0951
FAX 866.876.7050
EMAIL Sandra.Brach@sedgwick.com
www.sedgwick.com | **Caring counts**ˢᴹ

*Please include the CLAIM NUMBER with any communication sent. *

**From:** Brian Cokeng [mailto:bcokebmw@yahoo.co.uk]
**Sent:** Friday, March 31, 2017 7:31 AM
**To:** Brach, Sandra
**Subject:** Re: Claim#L1702245137

Dear Ms. Brach,

Please see attached Letter. Thanks.

Best Regards,

Brian Ng

On Thursday, 30 March 2017, 12:29, "Brach, Sandra" <Sandra.Brach@sedgwickcms.com> wrote:

Good afternoon Mr. Ng,

I have received and reviewed your recent communication.

However, review of this information does not change our denial decision as your statute of limitations has still expired on 7/16/13.

Thank you,

**Sandra Brach** | Claims Representative-Liab
**Sedgwick Claims Management Services, Inc.**
DIRECT 847.645.0951
FAX 866.876.7050
EMAIL Sandra.Brach@sedgwick.com
www.sedgwick.com | **Caring counts**SM

**\*Please include the CLAIM NUMBER with any communication sent. \***

---

**From:** Brian AC Ng [mailto:bcokebmw@yahoo.co.uk]
**Sent:** Wednesday, March 29, 2017 12:25 PM
**To:** Brach, Sandra
**Subject:** Claim#L1702245137

Good afternoon Ms. Brach,

I am making contact with you to know if I may get a response to the latest development in the pending matter under Claim#L1702245137?. Please advise. Thanks

Regards,
Brian Ng

---

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer.

---

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer.

Coke-Ng initial contact letter.PDF
107.2kB

EXHIBIT 8

Civil Action: 1:23-cv-2145(MKV)(BCM)

# TRANSCRIPT

I Brian Coke Ng, hereby sworn, under penalty of perjury, that this is a transcript of the face to face/in-person conversations and communication between myself and Ms. Jessica Hom (a Kmart authorized Pharmacist and Participant in the claim process and pertaining to the remarkable/unusual events and medical circumstances in February 2017), and I further hereby introduce her statements of March 24, 2017, that was made under the stressful events/circumstances described herein, as **(1)** Excited Utterances, and **(2)** an Admission by Party as per Rule 803, and (3) as exclusion from hearsay as per Federal Rules of Evidence 801(d)(2)(D):

| | | |
|---|---|---|
| **1.** | **Jessica Hom:** | Hi |
| **2.** | **Brian Coke Ng:** | Hi.., I was... I am here...I was told that I could come here to get a copy of my prescriptions records... and I have to fill out a form, they told me... |
| **3.** | **Jessica Hom:** | What's your last name? |
| **4.** | **Brian Coke Ng:** | Coke Ng |
| **5.** | **Jessica Hom:** | Can you spell the last name? |
| **6.** | **Brian Coke Ng:** | **C.O.K.E.  N.G** |
| **7.** | **Jessica Hom:** | And your first name? |

Civil Action: 1:23-cv-2145(MKV)(BCM)

8.     **Brian Coke Ng:**    Brian...I spoke with you before...

9.     **Jessica Hom:**    Yeah!...umm...Did you get that matter resolved?

10.    **Brian Coke Ng:**    No...Not yet...they told me that I could come here to get a copy because there are some billing issues and so forth, and reimbursement, and I want to review....so they told me I could...when I call, they told me that I could come here...

11.    **Jessica Hom:**    Okay...Do you know when the date is...?

12.    **Brian Coke Ng:**    The entire history...

13.    **Jessica Hom:**    The entire history...ok...

14.    **Brian Coke Ng:**    Yeah, yeah...There was one issue in question...In August...August 2010...I did...I had dropped off a copy of my complaint, related to what I was telling you about..nobody had ever respond, and that was in August, August 2010...I mailed one and I hand delivered one...But, I think you weren't working here at that time...

15.    **Jessica Hom:**    Oh...Did you get a...Ok, but did you...oh no, but did you get a call recently from another Pharmacist?

Civil Action: 1:23-cv-2145(MKV)(BCM)

| | | |
|---|---|---|
| **16.** | **Brian Coke Ng:** | I did not... I got a call from somebody, but they...I don't know where they're at with it... |
| **17.** | **Jessica Hom:** | Oh, Ok...Did they...do you know what they...or what you talk about? |
| **18.** | **Brian Coke Ng:** | Well, they talk about...the claim that I submitted, but they did not say when they received it, or anything... |
| **19.** | **Jessica Hom:** | Oh...Ok... |
| **20.** | **Brian Coke Ng:** | Yeah... |
| **21.** | **Jessica Hom:** | Did they give you a number...the reference number? |
| **22.** | **Brian Coke Ng:** | Yes...I think they did... |
| **23.** | **Jessica Hom:** | Ok....So, from 2010 you want? |
| **24.** | **Brian Coke Ng:** | Yes... |
| **25.** | **Jessica Hom:** | I'll just put from... |
| **26.** | **Brian Coke Ng:** | You have before?...If you have before it's fine.. |
| **27.** | **Jessica Hom:** | I'll get it from 2009, just in case... |
| **28.** | **Brian Coke Ng:** | Yes, yes...all the way to the last...You have before 2009? |

Civil Action: 1:23-cv-2145(MKV)(BCM)

29.  **Jessica Hom:**      Yeah...I think...yeah we have back in 2009...

30.  **Brian Coke Ng:**    Ok, so give me everything, so that I can...because that's

what the girl told me when I...you weren't here...and they

told me that I could come here and get it, no problem...

31.  **Jessica Hom:**      Okay...

32.  **Brian Coke Ng:**    Yeah...and she told me that it will have....the transactions

and everything...

33.  **Jessica Hom:**      Okay...

34.  **Brian Coke Ng:**    I wish the hold thing can just resolved without any

problem...you know....

35.  **Jessica Hom:**      Yeah, I hope so also...Ok, so...

36.  **Brian Coke Ng:**    So, you did call another Pharmacist?

37.  **Jessica Hom:**      Ammm...I just called and...Well I called and...and...I...I

put the claim through...and I put it as like...like a

report....and I dont know about the...now its up to the

claims portion of Kmart to deal with it...So...I don't...I

haven't...a mean, I haven't heard anything back

from...from corporate yet...

Civil Action: 1:23-cv-2145(MKV)(BCM)

38.  **Brian Coke Ng:**    Well, they did call me and left a claim number...and I submitted some documents to them, so...but...

39.  **Jessica Hom:**    Ok, so this is your history...this is the history...this is all your prescriptions that you filled here...so from 2010...These are the only prescriptions that you fill at this store...and this is like the name of the medication, the prescription number, the doctor's name, the price you paid...

40.  **Brian Coke Ng:**    But...it didn't say anything about the actual...there were some numbers that is in question...the NDC numbers that came with it and...there was some questions about the...the number of tablets that I received...because...

41.  **Jessica Hom:**    Oh, this is the number of tablets, like 90, 30... yeah, like that...

42.  **Brian Coke Ng:**    Amm...So, this is all in there, and it actually said...but in August...when I came here...this...well, I will have them review it...

43.  **Jessica Hom:**    Ok...

Civil Action: 1:23-cv-2145(MKV)(BCM)

**44.    Brian Coke Ng:**    Do you want me to sign...?

**45.    Jessica Hom:**    Yeah, this is just that, we are releasing information to you, so you could sign for...Oh, do you have your I.D. with you?

**46.    Brian Coke Ng:**    Yes, yes....yes...So, do you want me to...and...

**47.    Jessica Hom:**    Amm...I remember when I was talking to you, you said that you took...like you overdosed on the medication?

**48.    Brian Coke Ng:**    Yes...yes...the one in July...Am I taking up too much space?

**49.    Jessica Hom:**    No...no...no...you can use another pen...

**50.    Brian Coke Ng:**    Okay...Today...March...

**51.    Jessica Hom:**    24th...2017...I could fill that out for you...just place your name, and...

**52.    Brian Coke Ng:**    Yeah, and what else did you ask for?

**53.    Jessica Hom:**    Od, I just need to see your I.D...

**54.    Brian Coke Ng:**    Can I have a copy of it?

**55.    Jessica Hom:**    A copy of this?

Civil Action: 1:23-cv-2145(MKV)(BCM)

56.   **Brian Coke Ng:**    Yes...

57.   **Jessica Hom:**    Oh, yes...sure...

58.   **Brian Coke Ng:**    This same day when I came here in August...I did gave and had delivered...but....I don't know...I guess you guys changed people all the time, and...

59.   **Jessica Hom:**    I just started with Kmart...like for two years now...so this is the first time...I am hearing about this...

60.   **Brian Coke Ng:**    Oh, ok...yeah, yeah...I remembered you told me but, it was nice of you to gave them a report, you said that you've called them and gave them a report...

61.   **Jessica Hom:**    Yeah...Amm,...

62.   **Brian Coke Ng:**    But, somebody did called me and left a message, and I did respond by sending whatever documents that was requested and recently, they asked me if I have anymore that I can send, and I think I have more that I can send...So, I think it's not resolve yet, but I think this thing should resolve in a peaceful manner because I don't know where they're going with it, but thanks a lot for your help.

**Civil Action: 1:23-cv-2145(MKV)(BCM)**

63.    **Jessica Hom:**    No problem...I just hope that its...its resolved as soon as possible...

64.    **Brian Coke Ng:**    Yes, yes, because it costing me a lot of money for medical care now...Do you want my address on it? Or...

65.    **Jessica Hom:**    Oh no, that's fine...I just writing this...

66.    **Brian Coke Ng:**    But, do you remember...that guy...that gentleman who you had gave me his email address...? He never respond at all...

67.    **Jessica Hom:**    Oh, noo!...oh ok...

68.    **Brian Coke Ng:**    So, I just felt neglected...that I email him, I sent him a copy of everything...but he never responded...That's Tokofsky, I think...

69.    **Jessica Hom:**    But... I think the Pharmacist...let me see which date was that prescription?

70.    **Brian Coke Ng:**    The one that is in question, is this date...

71.    **Jessica Hom:**    July?...

Civil Action: 1:23-cv-2145(MKV)(BCM)

72.  **Brian Coke Ng:**    July...but, also...this date, because this is the date, that I came here and I hand delivered a copy of the complaint too...So, I don't know where it could have gone to...

73.  **Jessica Hom:**    Oh, ok...What I am trying to understand is...is...this was the first time you fill the prescription in August, right?

74.  **Brian Coke Ng:**    No, this...No, it wasn't the first time I fill this Zoloft...this other one was the first time, then, this is the original prescription...This was good...this was good, but this day they gave me 3 bottles...

75.  **Jessica Hom:**    Oh, 3 bottles..?

76.  **Brian Coke Ng:**    Yes...

77.  **Jessica Hom:**    But, were you taking it correctly in...in May...did you take it correctly?

78.  **Brian Coke Ng:**    Let me show you...I have a copy, I have a copy here, let me show you what happen...

79.  **Jessica Hom:**    Let me make a copy for you...Oh, I am sorry, our copy machine not working..

80.  **Brian Coke Ng:**    Oh really?...

Civil Action: 1:23-cv-2145(MKV)(BCM)

**81.**  **Jessica Hom:**      Yeah, but you can take a picture of it...

**82.**  **Brian Coke Ng:**    Ok, so let me show you first what happen...

**83.**  **Jessica Hom:**      Yep...Amm...

**84.**  **Brian Coke Ng:**    So, this is what I received when I came here, so...he says

that, 90 was in this, 90 was in this, 90 was in this and

then he numbered it...And I had asked him if he's certain,

and he says yes, that's what the doctor told...

**85.**  **Jessica Hom:**      Who was talking to you...the Pharmacist?

**86.**  **Brian Coke Ng:**    Yes...and then, he told me to take...he numbered it like

this...and told me to take 3 from this, 3 from this, and 3

from this...

**87.**  **Jessica Hom:**      Oh...

**88.**  **Brian Coke Ng:**    This is the instructions that I got...then when I took

it...and this is the bottom part, this is...What does this 93

means?

**89.**  **Jessica Hom:**      Oh, that's the NDC number...

**Civil Action: 1:23-cv-2145(MKV)(BCM)**

90. **Brian Coke Ng:**   Yeah, which is...this... because when I had asked

somebody else, they said that this represent the number

of tablets in there...

91. **Jessica Hom:**   Yeah, it could...it could, yeah, it could...Most of the time

it represent the number of tablets that goes by represent

like 90...or...but since it's like one...Usually when...In

our...like our part of procedure, is like whenever,

whenever a patient has like 90 tablets, we always...and it

comes in bottles of 30, we always write like 1 of 2, 2 of

3, so that way they know that it comes as a set...like it

comes together, but each bottle have 30 in it...

92. **Brian Coke Ng:**   But he told me to take 3...3 from...but why would he

put take 3, take 3, take 3 from this, that's what he told me

93. **Jessica Hom:**   So, it would be like...oh...I don't know what the

Pharmacist told you, but it suppose to be like one tablet

from each...

94. **Brian Coke Ng:**   Yes, it was suppose to...but later, that's what everybody

told me...I went to another Pharmacy and they told me

that I was supposed to be taking one from each...bottle...

**Civil Action: 1:23-cv-2145(MKV)(BCM)**

95.  **Jessica Hom:**      Yeah, that's why we labeled it the same, so that way to

make it seems it all comes together...

96.  **Brian Coke Ng:**    Yeah, but nobody explain to me, other than tell me to

take 3 from each, so that's why...that's why the problem

developed...

97.  **Jessica Hom:**      Oh, oh, I see...I don't...a mean...I don't...I don't

understand why the Pharmacist would tell you...would

tell you take 3 from each when...it's...

98.  **Brian Coke Ng:**    But, that's what he wrote there...

99.  **Jessica Hom:**      Yes, it written that way, but...it's supposed...it's like 1of

3, 2 of 3, 3of 3...

100. **Brian Coke Ng:**    Because the doctor gave me 150.....

101. **Jessica Hom:**      Yeah, but I think...I think your...You have insurance,

right? like medical insurance?

102. **Brian Coke Ng:**    At the time, I paid 15

103. **Jessica Hom:**      Out-of-pocket, was it out-of-pocket?

**Civil Action: 1:23-cv-2145(MKV)(BCM)**

**104.  Brian Coke Ng:**   Yeah...but, I don't know if there was a...I don't have

insurance at the time, so they told me to pay this much

**105.  Jessica Hom:**   Okay...ok

**106.  Brian Coke Ng:**   One time, I paid 33 something, but it was

**107.  Jessica Hom:**   That was another medication

**108.  Brian Coke Ng:**   Yes

**109.  Jessica Hom:**   Ok...Oh, I see...so yes it supposed to be like...because

each bottles supposed to have 30 and it adds up to 90.. 90

is the total quantity.

**110.  Brian Coke Ng:**   Yeah, but he...he put...The way it written here, and the

way how it was instructed to me...that's what caused the

misleading...everything....behind it

**111.  Jessica Hom:**   Oh, I see... Oh, I see...ok

**112.  Brian Coke Ng:**   Let me just...

**113.  Jessica Hom:**   Yes, sure...ok

**114.  Brian Coke Ng:**   I appreciate it...

**115.  Jessica Hom:**   No problem

Civil Action: 1:23-cv-2145(MKV)(BCM)

**116.  Brian Coke Ng:**    Sorry to get you into...

**117.  Jessica Hom:**    No, its ok...I wanna...like...

**118.  Brian Coke Ng:**    I know, I appreciated your help too...you have help me very much...Otherwise, nobody would have contact me...it was after you reached out to somebody, then somebody contact me, and that's very disappointing.

**119.  Jessica Hom:**    Yeah, I know that, we should've follow up definitely, and I agreed with you that we should have follow up, because this is a very serious matter, you know, like...

**120.  Brian Coke Ng:**    Yes.

**121.  Jessica Hom:**    So, if you need anything...like...I am here, so if you need anything, give me a call and I can follow up with my supervisor.

**122.  Brian Coke Ng:**    Yeah, I just saw your card...so...now I have to be taking all these various medications...it's not easy. And I am, and I have developed this problem...medical problem...it's...it's...

**123.  Jessica Hom:**    Neurological?

Civil Action: 1:23-cv-2145(MKV)(BCM)

**124.  Brian Coke Ng:**  Yeah, neurological issues...so yeah, and t night, I cant even sleep well, because I am jumping out of my sleep and they says its...drug induced movement disorder.

**125.  Jessica Hom:**  Oh, ok

**126.  Brian Coke Ng:**  And my legs at times, mostly at nights when I am at rest.

**127.  Jessica Hom:**  Oh, I see.

**128.  Brian Coke Ng:**  Yeah, yeah...and like, actually walking with...

**129.  Jessica Hom:**  Are you seeing a doctor?

**130.  Brian Coke Ng:**  Yeah, yeah...I have a neurologist, I have a Psychiatrist, and I have my asthma doctor, which is my pulmonologist

**131.  Jessica Hom:**  Oh, ok

**132.  Brian Coke Ng:**  But, I am trying to work with them for this to resolve peacefully, because I really don't want to go to court with it...In fact, the truth about it is, when I submitted the complaint, I never have it in....it wasn't my intention to bring anybody to court.

**133.  Jessica Hom:**  I understand...

**134.  Brian Coke Ng:**  At that point, when I sent in the complaint, I was thinking that maybe it will resolve peacefully and....resolved...But, it reached a point now, where...there's some conflict...

Civil Action: 1:23-cv-2145(MKV)(BCM)

**135. Jessica Hom:** Yeah, it has been...its more than...it is almost...its more than 5 years and you haven't got any... any straight answers.

**136. Brian Coke Ng:** That's right...So, that's why I am on it now...

**137. Jessica Hom:** Ok

**138. Brian Coke Ng:** But, thanks a lot for your help...

**139. Jessica Hom:** You're welcome...I hope everything goes well...ok

**140. Brian Coke Ng:** Yes, I'll keep in touch with you.

**141. Jessica Hom:** Alright, ok.


STATE OF NEW YORK    )
                     )ss:
COUNTY OF NEW YORK   )

I, Brian Coke Ng, being duly sworn, deposes, says and declare under penalty of perjury that the statements, reference and stated above in this transcript, to the best of my personal knowledge, are truthfully transcribed, written out and copied, and therefore represents the facts currently resides on the digital audio recordings device/media.

Dated: November 8, 2023

Brian Coke Ng

Sworn to before me this
8th day of November 2023

Notary Public

LUZ M. FELIPE
Notary Public. State of New York
Reg. No. 01FE6446625
Qualified in Kings County
Commission Expires January 23rd, 2027

16

EXHIBIT  9

SUPREME COURT OF THE STATE OF NEW YORK     Index No.: 100386/18
COUNTY OF NEW YORK     Date Purchased: 03/19/2018

-------------------------------------------------------------------x

BRIAN COKE NG,     **Plaintiffs designate New York**
**County as the place of trial**

Plaintiffs, **F I L E D**

-against-     MAR 2 8 2018     **The basis of venue is the Residence of plaintiff**

KMART PHARMACY
KMART HOLDING CORPORATION    COUNTY CLERK'S OFFICE NEW YORK
SEARS HOLDINGS CORPORATION     **AMENDED SUMMONS**
SEDGWICK CLAIMS MANAGEMENT SERVICES, INC.
Defendants.

-------------------------------------------------------------------x

To The Above Named Defendants:

     **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy

of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on

the plaintiffs' or their attorney(s) within 20 days after the service of this summons, exclusive of the day

of service (or within 30 days after the service is complete if this summons is not personally delivered to

you within the State of New York); and in case of your failure to appear or answer, judgment will be

taken against you by default for the relief demanded in the complaint.

Dated: New York, New York      All Prepare for, upon request of
     March 28, 2018      BRIAN COKE NG
     40 Ann Street
     New York, NY 10038

TO: **KMART PHARMACY**
    **KMART HOLDING CORPORATION**      **Mailing Address:**
    **SEARS HOLDINGS CORPORATION**      Church Street Station, P.O. Box 2723
    **770 Broadway**      New York, New York, 10008
    **New York, N.Y. 10003**      Tel: (646) 318-5571
    **(212) 253-0347**
TO: **SEDGWICK CLAIMS MANAGEMENT**
    **SERVICES, INC.**
    **1100 RIDGEWAY LOOP ROAD**
    **MEMPHIS, TN 38120**
    **(901) 415-7400**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK                    Index No.: 100386/18
----------------------------------------------------------------x
BRIAN COKE NG                                      **AMENDED**
                        Plaintiffs,            **VERIFIED COMPLAINT**

                   -against-
KMART PHARMACY
KMART HOLDING CORPORATION
SEARS HOLDINGS CORPORATION
SEDGWICK CLAIMS MANAGEMENT SERVICES, INC.
                        **Defendants.**
----------------------------------------------------------------x
TO THE SUPREME COURT OF THE STATE OF NEW YORK

    Plaintiffs, Brian Coke Ng respectfully shows, alleges and says as follows:

## INTRODUCTION

1.        This is an action for relief to settle ongoing disputes concerning, **(1)** neglect, failure and

refusal by Defendant Sedgwick Claims Management Services, Inc. to investigate a latent injury claim,

which was filed with them as a result of an exposure to toxic substances in July 2010; **(2)** and the neglect

and failure by Defendant Kmart to safeguard the Plaintiff's Medical Records and Confidential Health

Information which the Defendants had promised with a pledge to safeguard and protect. Defendants

Kmart instead had negligently failed to safeguard Plaintiff's Medical Records and confidential health

information given to them. According to Defendants' Kmart security experts, the Kmart data systems

were infected with a form of malware that its antivirus systems failed to detect. As such, the volume of

data stolen/destroyed was much greater than it would have been had Defendants Kmart maintained

adequate antivirus software systems to identify and eliminate the breach at the time it occurred. Kmart

data systems was breached several times between January 2013 and May 2017. Kmart data breach

includes THEFT, UNAUTHORIZED ACCESS/DISCLOSURE and IMPROPER DISPOSAL. The location of the

breach includes ELECTRONIC MEDICAL RECORDS and PAPERS/FLIMS. Individuals affected total **47,842.**

2.      On January 13, 2015, the Plaintiff had respectfully requested a copy of all his medical records, including important and confidential health information, and Defendants Kmart had only provided a single one (1) page document containing a partial and incomplete medical record. There are **(a)** missing medical information and reports of medicine repackaging, **(b)** missing correct dates medical item(s) actually was purchased, **(c)** missing journal entry notes of Plaintiffs' medical conditions that was also reported on September 22, 2010, concerning an incident that involved a Kmart Pharmacist on July 15, 2010, **(d)** missing papers with confidential health information all of which Plaintiff had personally hand delivered and given to the Kmart Pharmacy, **(e)** missing accurate detail of quantity and dosage amounts, **(f)** missing billing information of third party and name of third party who pays certain amounts for Plaintiff medicines, **(g)** missing National Drug Code (NDC) information. On March 24, 2017, the Plaintiff return to Kmart Pharmacy and requested a copy of all his medical records again. Kmart Pharmacy had again provided only a single one (1) page document containing a partial and incomplete medical record. Notably, in latest copy, someone had falsify the Plaintiff medical records and altered and changed the Plaintiff address to something similar to unknown.

3.      On May 26, 2017, the Plaintiff had filed a complaint with THE STATE EDUCATION DEPARTMENT; THE UNIVERSITY OF THE STATE OF NEW YORK; OFFICE OF PROFESSIONAL DISCIPLINE. Plaintiff then received an acknowledgement letter and was advised in separate parts, that the complaint was forwarded for *"proper investigation"* to *"Director of Pharmacy, Kmart Corporation, 3333 Beverly Road, Suite 389, Hoffman Estates, Illinois 60179"*.

4.      By Fax, Email and by USPS Priority mail the Plaintiff sent a letter dated February 28, 2018, to the Defendants Kmart for a status update. The Defendants had received it on February 28, 2018 and on March 2, 2018, respectively, but sent an email reply to only say, that, the email file was too large and never received via email. To the date of this lawsuit, the Plaintiff have not receive any status update.

## THE PARTIES

5.     At all times hereinafter mentioned, plaintiff Brian Coke Ng was and still is a resident of the State of New York, and presently having an address at 40 Ann Street, New York, N.Y. 10038, County of New York. Plaintiff is disabled and getting ongoing medical treatments and medical care, and still in need of a copy of all his medical records, that was requested from Defendants Kmart Pharmacy.

6.     Upon information and belief, the Defendants Sears Holdings Corporation ("Holdings") is the parent company of Kmart Holding Corporation ("Kmart and/or Kmart Pharmacy") and was formed in 2004 in connection with the merger of Kmart and Sears, Roebuck & Co. Defendants Sears Holdings Corporation is a Delaware corporation with its principal place of business located at 3333 Beverly Road, Hoffman Estates, Illinois 60179.

7.     Upon information and belief Defendants Kmart Holding Corporation is a Michigan corporation with its principal place of business located at 3333 Beverly Road, Hoffman Estates, Illinois 60179. Kmart operates a chain of retail stores that sell a wide variety of merchandise, including home appliances, consumer electronics, home goods, apparel, grocery and household, pharmacy and drugstore items. Kmart operates approximately 1,077 stores in the United States, and transacts business at 770 Broadway, New York, N.Y. 10003.

8.     Upon information and belief Defendants, Sedgwick Claims Management Services, Inc. hereinafter, ("Sedgwick") handles claims management services and is headquartered in Memphis Tennessee, and have offices in Lexington, KY. 40512-4448. Sedgwick Claims Management Services, Inc. is the Third Party claims administrators for Kmart Corporation.

## FACTUAL BACKGROUND

9.     Upon information and belief, IBM in their news release on February 15, 2001, had indicated in separate parts of their news release, that IBM (NYSE: IBM) and Kmart Corporation (NYSE: KM) had announced a purchase agreement worth in excess of $200 million for new Internet-enabled IBM point-of sale systems to be used in more than 2, 100 Kmart stores. Featuring advanced technology, multimedia and internet capabilities. And that, Kmart's new IBM SurePOS 700 systems are designed to dramatically improve the customer checkout experience.

10.     Based upon information and belief, IBM had further stated in separate parts of their news release, that Kmart selected IBM's new SurePOS 700 units as its new POS system due to the system's Universal Serial Bus (USB) connectivity, Internet capabilities and IMB's implementation services and support, as well as IBM's depth and breadth of experience in the retail industry.

11.     Based upon information and belief, IBM had continued by stating in separate parts of their news release  that, the IBM SurePOS 700 units will be installed at all Kmart locations, and that, the new units have already been installed in the highest volume Kmart stores, and the remainder to be completed by 2002.

12.     Based upon information and belief, IBM had further stated in separate parts of their news release, that Kmart's overall IT system includes a back-end of more than 8,000 IBM Netfinity servers running both the Windows NT and SCO operating systems, which ran all the technology and applications in the stores environment.

13.     Between May 15, 2010 and September 22, 2010, Plaintiff was a patient  at Kmart Pharmacy 770 and Medical Records was established and was supposed to be properly maintained and protected by Kmart pharmacy for at least six (6) years.

14.    An incident had occurred on July 15, 2010, at Kmart Pharmacy (Kmart Corporation #7777) located at 770 Broadway, New York, N.Y. 10003, which involved one of Kmart's Pharmacist. Plaintiff wrote a detail letter/complaint dated July 23, 2010, and sent it by regular USPS mail to Kmart Corporation #7777 located at 770 Broadway, New York, N.Y. 10003. The letter/complaint dated July 23, 2010 bears Plaintiff medical and confidential health information. Plaintiff made a follow-up on the status of the matter on August 16, 2010 during the Plaintiff return to the Kmart Pharmacy to pick up medicines. Plaintiff was advised there is no records of the letter/complaint dated July 23, 2010, Plaintiff then personally hand delivered to the Pharmacist a copy of the letter/complaint dated July 23, 2010.

15.    Upon not hearing from anyone at Kmart Corporation #7777 or Kmart Pharmacy, the Plaintiff made one more visit to the Kmart Pharmacy on September 22, 2010, to pick medicines and was determined to see what was happening. Plaintiff spoke to the Pharmacist directly about the issues he was experiencing, Plaintiff was again told, that no record of the complaint dated July 23, 2010. Plaintiff was left with no choice, but to hand delivered one more copy of the same letter dated July 23, 2010, to the Pharmacist. The Pharmacist took the plaintiff complaint and walk over to a POS system computer and Plaintiff was told to wait for a moment. When the Pharmacist return, the Plaintiff was advised among other things, that a journal note entry was just made into the system about the complaint dated July 23, 2010, and was further advised that all other fillings would made for the Plaintiff by higher-ups, and that Plaintiff needed to take no further action on his claim. The plaintiff never receive any response or update

16.    On January 13, 2015, the Plaintiff had respectfully requested a copy of all his medical records, including all important and confidential health information that was delivered to Kmart. Plaintiff was expecting all his medical records because it was needed for review, instead, Kmart had only provided a single one (1) page document containing a partial and incomplete medical record, Plaintiff was further advised that is the only record Kmart had maintained and have in their position.

17.    Plaintiff had discovered a latent injury which never manifested upon him until February 2017, during which time a neurologist diagnosed and advised of such latent injury. Shortly thereafter, the Plaintiff had also discovered the cause of the latent injury, and learned that the cause of the latent injury is a result of the toxic exposure from substances ingested during Zoloft overdosed in July 2010 that the Plaintiff received from Kmart Pharmacy.

18.    On February 24, 2017, few days after Plaintiff had left a hospital, the Plaintiff made a telephone contact with Kmart pharmacy (Pharmacist Ms. Jessica Hon) and reported the latent injury claim based on the exposure to toxic substances from the Zoloft overdosed received in 2010. The pharmacist took the information over the phone, and had advised that she will file a claim with the appropriate department. Plaintiff understand from that conversation with the pharmacist, that no further action needed by plaintiff on the latent injury claims, since everything will filed by her on 02/24/2017.

19.    On or about March 3, 2017 or March 9, 2017 a woman called Plaintiff telephone and left a voicemail message, and had identified herself as Sandra Brach from Sedgwick claims management services, Inc. indicating that Plaintiff should give her a call to discuss the claim she had just received, and she had also left a claim number.

20.    A copy of Sedgwick first letter dated March 3, 2017, was emailed to the plaintiff because it was never received due to the fact that Plaintiff medical records was altered and falsified and reflected an incorrect and false and unknown address. At some point, Someone got into the plaintiff medical records at Kmart and change the plaintiff address to something unknown.

21.    To date of this lawsuit, Sedgwick had failed to deny or pay the latent injury claim within a reasonable period of time, or come to a fair and reasonable settlement of the matter.

22.   On March 24, 2017, the Plaintiff return to Kmart Pharmacy and requested a copy of all his medical records again. Plaintiff was given an authorization and was advised by the Pharmacist to "only sign it" and return the empty form. The Pharmacist wrote "resolving claim". Shortly thereafter, Kmart Pharmacy had again provided only a single one (1) page document containing a partial and incomplete medical record. Notably, in the latest copy, someone had falsify the Plaintiff medical records by altered it, and completely changed the Plaintiff address to something similar to unknown.

23.   On May 26, 2017, the Plaintiff filed a complaint with THE STATE EDUCATION DEPARTMENT; THE UNIVERSITY OF THE STATE OF NEW YORK; OFFICE OF PROFESSIONAL DISCIPLINE. Plaintiff then received an acknowledgement letter and was advised in separate parts, that the complaint was forwarded for *"proper investigation"* to ***"Director of Pharmacy, Kmart Corporation, 3333 Beverly Road, Suite 389, Hoffman Estates, Illinois 60179"***.

24.   By Fax, Email and by USPS Priority mail the Plaintiff sent a letter dated February 28, 2018, to the Defendants Kmart for a status update. Kmart had received it on February 28, 2018 and on March 2, 2018, respectively, but sent an email reply to only say, that, the email file was too large and never received via email. To the date of this lawsuit, the Plaintiff have not receive any status update.

### SEVERAL DATA BREACHES

25.   On information and belief, Kmart's information technology hardware and personnel are headquartered in Huffman Estates, Illinois. On information and belief, the physical servers on which the malware was inserted are located there, as well as the technologies employed to prevent such attacks. Additionally, on information and belief, the key officers and employees responsible for developing and implementing Kmart's information technology security are located in Huffman Estates, Illinois.

26.    On information and belief, Kmart had a breach submission date of **01/31/2013**. Type of breach was improper disposal. The location of the breached information was **PAPER/FILMS**. Individuals affected **16,988**.

27.    On information and belief, Kmart had a breach submission date of **04/03/2013**. Type of breach was THEFT. The location of the breached information was **ELECTRONIC MEDICAL RECORDS**. Individuals affected **12,542.**

28.    On information and belief, Kmart had a breach submission date of **02/10/2014**. Type of breach was **THEFT**. The location of the breached information was **ELECTRONIC MEDICAL RECORDS**. Individuals affected **16,446.**

29.    On information and belief, Kmart had a breach submission date of **09/10/2014**. Type of breach was **UNAUTHORIZED ACCESS/DISCLOSURE**. The location of the breached information was **PAPER/FILMS**. Individuals affected **1,866**.

30.    On October 10, 2014, Kmart had advised members, that there was a Payment System breached.

31.    On May 31, 2017, Kmart had again advised members, that there was a payment Security incident.

## THE KMART DATA BREACHES:
## THE RESULT OF LAX ANTI-VIRUS STANDARDS

32.    As stated before on information, Kmart's information technology hardware and personnel are headquartered in Huffman Estates, Illinois. On information and belief, the physical servers on which the malware was inserted are located there, as well as the technologies employed to prevent such attacks. Additionally, on information and belief, the key officers and employees responsible for developing and implementing Kmart's information technology security are located in Huffman Estates, Illinois.

33.    Hackers infiltrated Kmart's Electronic Medical Records systems, payment data systems with malware that its systems could not detect because its anti-virus system had not been updated to include such threats. Electronic Medical Records systems and POS registers systems at its stores were infected with software that stole the Patients Medical Records, and stole customers credit and debit cards information from the registers. Kmart reported that credit and debit card numbers were compromised in the breach, and it was reported that there were theft of electronic medical records, and papers/films.

34.    The failure to utilize adequate updated anti-virus and anti-malware systems allowed hackers to infiltrate the electronic medical records systems and the POS systems such that Patients electronic medical records, papers, and other confidential health information could be subjected to the theft, and further that customer credit and debit card information could be captured.

35.    Plaintiff believes that Kmart's IT department and executives were aware that the company was vulnerable to the several breach of its Patients electronic medical records, papers/films, and other confidential health information and customers financial information, and they were aware of countermeasures on the market which could reduce or eliminate the ability of hackers to steal Patients electronic medical records, papers, and other confidential health information and customers card data from POS systems. Nevertheless, Defendants Kmart were negligent in that they failed to adequately protect and safeguard Patients electronic medical records, papers, and other confidential health information and customers card data from POS systems and prevent the several Kmart Data Breach.

36.    Defendants Kmart were not only aware of the threat of data breaches generally, but were aware of the specific danger of malware infiltration. Malware has been used to access electronic medical records systems and POS terminal systems since at least 2011, and specific types of malware, including RAM scraper malware, have been used recently to infiltrate several large retailers. As a result, Defendants were aware that malware is a real threat and is a primary tool of infiltration used by hackers.

37.    Defendants Kmart received additional warnings regarding malware infiltrations from the U.S. Computer Emergency Readiness Team, a government unit within the Department of Homeland Security, which alerted retailers to the threats of POS malware on July 31, 2014, and issued a guide for retailers on protecting against the treat of POS malware, which was updated on August 27, 2014.

38.    Additionally, the Homeland Security Department and the Secret Service issued a report warning retailers to check their in-store cash register systems for a set of malware that could evade detection of antivirus products. Kmart should have taken action to protect and safeguard and to ensure that its Patients and its customers information would not continue to be available to hackers and thieves, but Kmart chose not to do so.

39.    Despite the fact that Defendants Kmart were put on notice of the very real possibility of data theft associated with their security practices and despite the fact that Defendants knew or, at the very least should have known about the basic infirmities associated with the Kmart security systems, they still failed to make necessary changes to their security practices and protocols.

## AS AND FOR A FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS

BRIAN COKE NG, the Plaintiff, repeats and realleges all allegations of the complaint as if set forth at length herein.

40.    Defendants Sedgwick had neglect their investigation and had further failed to deny or pay the latent injury claim within a reasonable period of time, or come to a fair and reasonable settlement.

41.    Defendants Kmart negligently allowed Plaintiff electronic medical records, papers/films, and other confidential health information to be compromised by failing to take reasonable and prudent steps against an obvious threat. Then, neglect and failed to perform a proper investigation, as that has been recommended and called for by THE STATE EDUCATION DEPARTMENT; THE UNIVERSITY OF THE STATE OF NEW YORK; OFFICE OF PROFESSIONAL DISCIPLINE.

42.    As a direct and proximate result of the events detailed herein, Plaintiff rights are denied. Defendants Kmart had failed and refused to respond to several of Plaintiff good faith requests for needed medical records and for explanation of several missing confidential health information, journal notes, medicine repackaging records, third party billing information for the prescriptions filled, complete details of accurate dates of services are not in the Plaintiffs Medical records and for Kmart to further explain the fake or false address that resides in the Plaintiff medical records. Defendants Kmart unable to provide the Plaintiff with a truthful and complete medical records, due to the several breaches.

## DEFENDANTS KMART HAD A DUTY TO PLAINTIFF

43.    Defendants Kmart, at all times relevant to this action, had a duty to Plaintiff, that reads in separate parts, as follows: (a)"**Your health information-- which means any written or oral information that we create or receive that describes your health condition, treatments or payments-- is personal. Therefore, the Practice pledges to protect your health information as required by law. We give you this Privacy Notice to tell you (1) how we will use and disclose your "protected" health information, or "PHI" and (2) how you can exercise certain individual rights related to your PHI as a Patient of Kmart Pharmacy. Please note that if any of your PHI qualifies as mental heal records, alcohol and drug treatment records, communicable disease records or genetic test records, we will safeguard these records as "Special PHI" which will be disclosed only with your prior express written authorization, pursuant to a valid court order or as otherwise required by law. We required by law to maintain the privacy of your PHI and to provide you with this notice of our legal duties and privacy practices. HIPAA may preempt certain state laws relating to the privacy of PHI. Therefore, please see additional information at the end of this notice relating to your specific state.".**

## PLAINTIFF HAVE BEEN DAMAGED AS A RESULT OF DEFENDANTS WRONGDOINGS

44.  Due to Defendants Kmart failure to safeguard and protect Plaintiffs' electronic medical records and confidential health information, Plaintiff suffered damages as follows:

(a)  The medical records is not in total and completed for any good purpose;

(b)  The little that is left after all the various data breaches and theft at Kmart, is now not worthy, praiseworthy, admirable, creditable, precious, or valuable.

(c)  The remains of the Plaintiff Medical records located at Defendants Kmart Pharmacy is missing important information and not truthful. The records bears a wrong address.

(d)  Furthermore, Sedgwick neglect and fail to investigate, deny or pay the latent injury claim within a reasonable period of time, or come to a fair and reasonable settlement of the matter.

As a result of defendants negligence, the plaintiff have been damaged in an amount which exceeds the jurisdictional limits of all lower courts, the damages to be determined at trial.

### CONCLUSION

WHEREFORE, plaintiffs demand judgment against all defendants in an amounts to be determined at trial, jurisdictional limits of all lower courts which would otherwise have jurisdiction, together with the cost and disbursement of this action.

Dated:  New York, New York
      March 28, 2018

_____
BRIAN COKE NG
40 Ann Street
New York, NY 10038
Tel: (646) 318-5571

**Mailing Address:**
Church Street Station,
P.O. Box 2723
New York, NY 10008

Sworn to before me 28th of March 2018

_____
Notary Public

JOSE L FELIPE
NOTARY PUBLIC-STATE OF NEW YORK
No. 01FE6152567
Qualified in Queens County
My Commission Expires September 18, 2018

EXHIBIT  10

Mr. Coke,

Hope all is well. I was out of the office due to the holiday. We have spoken with the custodian of records for Kmart Pharmacy and have been advised that you have been previously provided the documents sought in the Subpoena Duces Tecum from the pharmacist at the Kmart location multiple times in the past. Therefore, the subpoena request has been complied with.

Additionally, as there is a pending motion to amend the Complaint to add additional parties and additional new claims against my client, we suggest amicably working out any issues at the upcoming Preliminary Conference scheduled for September 20, 2018. Lastly, as previously stated our client is open to alternative dispute resolution, however we have yet to receive a proper numerical settlement demand from you. Please provide a numerical settlement demand after which we will be in a position to discuss same with our client and engage in settlement discussions with you.

Best,
Harshal

**Harshal Y. Jani, ESQ.**
SOBEL PEVZNER, LLC.
Attorneys at Law
30 Vesey Street, 8th Floor
New York, New York 10007
P. 212.216.0020
F. 646.688.3646
HJani@sobelpevzner.com

1 of 2

**Subject:**                                     FW: Brian Coke Ng v. Kmart Pharmacy et. al Index No. 100386/2018

**From:** Brian AC Ng < _____ >
**Sent:** Wednesday, September 12, 2018 3:08 PM
**To:** Harshal Y. Jani <hjani@sobelpevzner.com>
**Subject:** Re: Brian Coke Ng v. Kmart Pharmacy et. al Index No. 100386/2018

Mr. Jani,

With all due respect, and as you should know, the Judicial Subpoena Duces Tecum dated June 29, 2018 has not been complied with one way or the other. Whether it's you or the custodian of records for Kmart Pharmacy making such statements that "the documents sought in the Subpoena Duces Tecum" "have been previously provided" by "pharmacist at the Kmart location multiple times in the past." is careless, reckless, dangerous and a complete disregard of the Court issued Ordered Judicial Subpoena Duces Tecum. That's very disrespectful, and you should know better.

You had served an unsworn response to the Notice to Admit, which presented to you the documents from Kmart Pharmacy, which included the altered and falsified medication profile/records that was created on January 13, 2015, and the Kmart Notice of Privacy Practices with effective date September 2, 2014. No one admit to anything.

To be clear, The Court Ordered Judicial Subpoena Duces Tecum dated June 29, 2018, stated that the certified copy of every part of the medication profile/records with the accompanying certification of business records sworn and signed to must be forwarded to the New York County Supreme Court Subpoenaed Records Room 60 Centre Street, Room 145-M, New York, New York 10007. The Kmart Custodian, if any, was careless and reckless and you should have known better not to tell me the things Kmart Custodian had advised your law firm.

With respect to reaching a mutual settlement of all matters and put everything to rest, I previously requested to let us stipulate and invite the Supreme Court office of alternative dispute resolution (ADR) to help us reach a reasonable settlement resolution, that means we would hold off on any and all proceedings or any activities currently pending before the Court in the lawsuit until the end of the ADR. I do not agree for us to first meet with the judge in an initial conference. Certainly, that is not wise to use up Court room time, and the judge very important time, and court room reporters time, and court resources to discuss settlement.

You have insisted that I provide a numerical settlement demand. As we do not engage the ADR yet to help us determine the value of this case, I would like to set forth for a consideration of settlement, and I respectfully says $3.8 million dollars. If this is not acceptable or if you have another offer for settlement please provide such counter offer for consideration as I am still open to a reasonable settlement and alternative dispute resolution. Thank you.

Best Regards,
Brian Coke Ng

On Sep 12, 2018, at 9:43 AM, Harshal Y. Jani <hjani@sobelpevzner.com> wrote:

1

EXHIBIT  11

**Weil, Gotshal & Manges LLP**

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

Garrett Fail
+1 (212) 310-8451
Garrett.Fail@weil.com

PRIVILEGED
SUBJECT TO FRE 408 AND OTHER RULES OF SIMILAR IMPORT
BY E-MAIL AND FEDEX

February 6, 2019

Brian Coke Ng
40 Ann Street
New York, New York 10038
Briancng38@gmail.com

Re: *In re Sears Holdings Corporation, et. al.*, Case No. 18-23538 (RDD)

Dear Mr. Ng:

Reference is made to your motion for relief from the automatic stay in the above-referenced cases [ECF No. 1006].

At the hearing held on January 18, 2018, Judge Drain stated on the record that if insurance is not available for your claims, "the motion should be denied because clearly, this is just a claim that would otherwise be dealt with in the process of doing the pre-bankruptcy claims." *See* Transcript, page 51. The Court further stated that, "if the Debtors show you that [the] insurance [you allege covers your claim] doesn't really cover your claim… then you should withdraw the motion," because Judge Drain would not grant it otherwise. *See* Transcript, page 52.

As part of your most recent filing, ECF No. 1721, you assert that the Debtors have a number of insurance policies relevant to your claims. As described below, each policy is either exhausted, not applicable for the location where your alleged claim asserted arose, or has a deductible that would require the Debtors to pay any claim covered thereunder.

1. HDO G2433398 (General Liability; 8/1/2009-8/1/2010): the Debtors believe you may be referring to Policy #HDOG24933398. This is the Debtors' General Liability policy, which is exhausted.

2. HDO G71097651 (General Liability; 8/1/2018-1/1/2019): This is a location–specific policy that does not apply to the location at 770 Broadway, New York, New York.

3. HDO G71097699 (General Liability; 8/1/2018-1/1/2019): This is a location–specific policy that does not apply to the location at 770 Broadway, New York, New York.

**Weil, Gotshal & Manges LLP**

Brian Coke Ng
February 6, 2019
Page 2

4.  HDO G71097730 (General Liability; 8/1/2018-1/1/2019): This is a location–specific policy that does not apply to the location at 770 Broadway, New York, New York.

5.  CGO G71097778 (General Liability; 8/1/2018-1/1/2019): This is a location–specific policy that does not apply to the location at 770 Broadway, New York, New York.

6.  HDO G71097614 (General Liability; 8/1/2018-1/1/2019): This is a $5 million policy with a $5 million deductible.  As a result, the Debtors would be responsible for all costs and any damages, if this policy applied, up to $5,000,000. For that reason, the Debtors would not consent to lift the automatic stay with respect to proceeds under this policy, and don't believe the Bankruptcy Court would permit litigation to proceed based on this policy alone.

Given that the Debtors would be required to pay for any defense costs and damages if your actions were to proceed, we ask that you withdraw your motion, without prejudice to refile at a later date.

Please confirm by the close of business on Thursday, February 8, 2018, so that we can advise the Court.

Regards,

Garrett Fail

**Exhibit A**



ACE North America
ARM Claims
9200 Oakdale Ave. 8th Floor
Chatsworth, CA 91311

818-428-3751 tel
866-635-5687 fax

Alma.Magana@acegroup.com
www.ace-ina.com

Alma B. Magana
Assistant Vice President

October 5, 2011

David Hallfield
Vice President – Risk Management
Sears Holdings Management Corporation
3333 Beverly Rd.
Hoffman Estates, IL 60179

Re:   Policy #:    HDO G25519826
      Policy Period:  8-1-10 to 08-01-11
      Insurer:     ACE American Insurance Co. (ACE)

Dear Mr. Hallfield;

ACE American Insurance Company ("ACE") insured Sears Holdings Corp under policy # HDO G25519826 for the period of 8-1-10 to 8-1-11. The policy was written with a Combined General Aggregate Limit of $5 million. It has been determined that paid losses falling within this Aggregate are in excess of the $5 million limit.

ACE writes this letter to inform you that with the exhaustion of the Combined General Aggregate limit; no coverage exists under this policy. Any additional loss in this policy period falls outside the scope of coverage granted under this policy. ACE has no obligation to pay for any loss within this policy period in excess of the Combined General Aggregate Limit. We hope the references below will more fully illustrate ACE's position.

The Declarations of the above cited policy states:

   In return for the payment of the premium indicated above, we agree with you to provide the following coverage(s) at the limits show, subject to all of the terms and conditions of this policy.

| Coverage Form: | Limits of Insurance |
|---|---|
| COMMERCIAL GENERAL LIABILITY | |
| General Aggregate Limit (other than Products / Completed Operations) | $5,000,000 |
| Products / Completed Operations Aggregate Limit | $5,000,000 |



The Insuring Agreement within the COMMERCIAL GENERAL LIABILITY COVERAGE FORM states that there is no duty to defend or indemnify an Insured once the limits have been paid in settlement or judgment of claims.  With the payment of losses in excess of $5million there is no longer a duty for ACE to provide coverage under this policy.

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V –Definitions.

## SECTION I – COVERAGES

1.  **Insuring Agreement**

    a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

        (1)  The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

        (2)  Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

        No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

Additionally, the policy contains the **COMBINED POLICY AGGREGATE** endorsement.  The endorsement states:

### Section III – LIMITS OF INSURANCE

2.  The General Aggregate Limit is the most we will pay for the sum of:

    a.  Medical expenses under Coverage C.

    b.  Damages under Coverage A, and

    c.  Damages under Coverage B

With the payment of losses in excess of the Combined General Aggregate Limit, the policy is exhausted and Coverage is no longer available to you under this policy.

Page 2/3



Should you have questions, please contact this writer. The above recitation of ACE' position regarding coverage is neither expected nor intended to be a waiver of ACE American's right to assert any other rights or defenses it may have under the Policy, legally, equitably or otherwise, and ACE American shall not be estopped from asserting said rights.

The language of the policies quoted herein is provided for ease of reference only and is not intended to change, alter or amend the Policy in any way.

ACE American expressly reserves its rights and defenses at law, in equity and under the Policy at issue. ACE American reserves its right to assert new, additional or different coverage defenses should new, additional or different information and/or documents be received that warrant such action. ACE American reserves its right to supplement this letter. ACE American also reserve its right to assert additional terms and conditions of the Policy at issue to its current coverage determination should new, additional or different information and/or documents warrant such action.

Sincerely,

ACE American Insurance Company
Alma Magana

Copies:

AON -  Tim Rothieux
           Carol Murphy

ACE -  Ruth Ahlman

Page 3/3

Exhibit B

WEIL:\96861059\1\73217.0004

ACE North American
Claims
P.O. Box 5113
Scranton, PA 18505
USA

818-428-3763 *tel*

keri.lefferts@acegroup.com
www.acegroup.com

**Keri Lefferts**
*Senior Claims Specialist*

July 29, 2013

**VIA EMAIL AND REGULAR MAIL**
David Halffield
Vice President – Risk Management
Sears Holdings Management Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

Pg 17 of 35

|       |                 |                                        |
|-------|-----------------|----------------------------------------|
| Re:   | Policy #:       | HDOG27011871                           |
|       | Policy Period:  | 8/1/12 to 8/1/13                       |
|       | Insurer:        | ACE American Insurance Company ("ACE") |

Dear Mr. Halffield:

ACE American Insurance Company ("ACE") insured Sears Holding Corp. under policy # HDOG27011871, for the period of 8-1-12 to 8-1-13. The policy was written with a Combined General Aggregate Limit of $5 million. It has been determined that paid losses falling within this Aggregate are in excess of the $5 million limit.

ACE writes this letter to inform you that with the exhaustion of the Combined General Aggregate limit, no coverage exists under this policy. Any additional loss in this policy period falls outside the scope of coverage granted under this policy. ACE has no obligation to pay for any loss within this policy period in excess of the Combined Aggregate Limit. We hope the references below will more fully illustrate ACE's position.

The Declarations of the above cited policy states:

In return for the payment of the premium indicated above, we agree with you to provide the following coverage(s) at the limits shown, subject to all the terms and conditions of this policy.

| Coverage Form:                                                    | Limits of Insurance |
|-------------------------------------------------------------------|---------------------|
| COMMERCIAL GENERAL LIABILITY                                      |                     |
| General Aggregate Limit (other than Products/Completed/Operations) | $5,000,000          |
| Products/Completed/Operations Aggregate Limit                     | $5,000,000          |

The Insuring Agreement within the COMMERCIAL GENERAL LIABILITY COVERAGE FORM states that there is no duty to defend or indemnify an Insured once the limits have been falls outside the scope of coverage granted under this policy. ACE has no obligation to pay for

paid in settlement or judgment of claims. With the payment of losses in excess of $5 million, there is no longer a duty for ACE to provide coverage under this policy.

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we," "us," and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured. Other words and phrases that appear in quotation marks have special meaning. Refer to Section V – Definitions.

**Section I – COVERAGES**

1.    **Insuring Agreement**

   a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1)    The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

      (2)    Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

Additionally, the policy contains the COMBINED POLICY AGGREGATE endorsement. The endorsement states:

**Section III – LIMITS OF INSURANCE**

2.    The General Aggregate Limit is the most we will pay for the sum of:

   a.    Medical expenses under Coverage C.

   b.    Damages under Coverage A, and

   c.    Damages under Coverage B

With the payment of losses in excess of the Combined General Aggregate Limit, the policy is exhausted and Coverage is no longer available to you under this policy.

Should you have questions, please contact this writer. The above recitation of ACE's position regarding coverage is neither expected nor intended to be a waiver of ACE's right to assert any other rights or defenses it may have under the Policy, legally, equitably or otherwise, and ACE shall not be estopped from asserting said rights.

Page 2/3

The language of the policies quoted herein is provided for ease of reference only and is not intended to change, alter or amend the Policy in any way.

ACE expressly reserves its rights and defenses at law, in equity and under the Policy at issue. ACE reserves its right to assert new, additional or different coverage defenses should new, additional or different information and/or documents be received that warrant such action. ACE reserves its right to supplement this letter. ACE also reserves its right to assert additional terms and conditions of the Policy at issue to its current coverage determination should new, additional or different information and/or documents warrant such action.

If you have any questions or would like to discuss, please feel free to contact me at (818) 428-3763.

Sincerely,

Keri Lefferts

cc:  AON:    Tim Routhieaux, Tim.Routhieaux@aon.com

           Carol Murphy, Carol.Murphy@aon.com

     ACE:    Ruth Ahlman, Ruth.Ahlman@acegroup.com

Page 3/3

**Exhibit C**

WEIL:\96861059\1\73217.0004



818-428-3763 *tel*

ACE North American
Claims
P.O. Box 5113
Scranton, PA 18505
USA

keri.lefferts@acegroup.c
om
www.acegroup.com

**Keri Lefferts**
*Claims Director*

August 21, 2014

**VIA CERTIFIED MAIL & EMAIL**
Mr. David Halffield
Vice President – Risk Management
Sears Holdings Management Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

| | | |
|---|---|---|
| Re: | Policy #: | HDOG27022327 |
| | Policy Period: | 8/1/13 to 8/1/14 |
| | Insurer: | ACE American Insurance Company ("ACE") |

Dear Mr. Halffield:

ACE American Insurance Company ("ACE") insured Sears Holding Corp. under policy # HDOG27022327, for the period of 8-1-13 to 8-1-14. The policy was written with a Combined General Aggregate Limit of $5 million. It has been determined that paid losses falling within this Aggregate are in excess of the $5 million limit.

ACE writes this letter to inform you that with the exhaustion of the Combined General Aggregate limit, no coverage exists under this policy. Any additional loss in this policy period falls outside the scope of coverage granted under this policy. ACE has no obligation to pay for any loss within this policy period in excess of the Combined Aggregate Limit. We hope the references below will more fully illustrate ACE's position.

The Declarations of the above cited policy states:

In return for the payment of the premium indicated above, we agree with you to provide the following coverage(s) at the limits shown, subject to all the terms and conditions of this policy.

| Coverage Form: | Limits of Insurance |
|---|---|
| COMMERCIAL GENERAL LIABILITY | |
| General Aggregate Limit (other than Products/Completed/Operations) | $5,000,000 |
| Products/Completed/Operations Aggregate Limit | $5,000,000 |

The Insuring Agreement within the COMMERCIAL GENERAL LIABILITY COVERAGE FORM states that there is no duty to defend or indemnify an Insured once the limits have been paid in settlement or judgment of claims. With the payment of losses in excess of $5 million, there is no longer a duty for ACE to provide coverage under this policy.

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights,



duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we," "us," and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V – Definitions.

**Section I – COVERAGES**

1.  **Insuring Agreement**

    a.   We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

    (1)   The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

    (2)   Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

    No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

Additionally, the policy contains the COMBINED POLICY AGGREGATE endorsement. The endorsement states:

**Section III – LIMITS OF INSURANCE**

2.   The General Aggregate Limit is the most we will pay for the sum of:

    a.   Medical expenses under Coverage C.

    b.   Damages under Coverage A, and

    c.   Damages under Coverage B

With the payment of losses in excess of the Combined General Aggregate Limit, the policy is exhausted and Coverage is no longer available to you under this policy.

Should you have questions, please contact this writer. The above recitation of ACE's position regarding coverage is neither expected nor intended to be a waiver of ACE's right to assert any other rights or defenses it may have under the Policy, legally, equitably or otherwise, and ACE shall not be estopped from asserting said rights.

The language of the policies quoted herein is provided for ease of reference only and is not intended to change, alter or amend the Policy in any way.

Page 2/3



ACE expressly reserves its rights and defenses at law, in equity and under the Policy at issue. ACE reserves its right to assert new, additional or different coverage defenses should new, additional or different information and/or documents be received that warrant such action. ACE reserves its right to supplement this letter. ACE also reserves its right to assert additional terms and conditions of the Policy at issue to its current coverage determination should new, additional or different information and/or documents warrant such action.

If you have any questions or would like to discuss, please feel free to contact me at (818) 428-3763.

Sincerely,

*Keri Lefferts*

Keri Lefferts

cc: AON:    Tim Routhieaux, Tim.Routhieaux@aon.com

             Carol Murphy, Carol.Murphy@aon.com

  ACE:    Ruth Ahlman, Ruth.Ahlman@acegroup.com

**Exhibit D**

WEIL:\96861059\1\73217.0004

ACE North American
Claims
P.O. Box 5113
Scranton, PA 18505
USA

818-428-3763 *tel*

keri.lefferts@acegroup.com
www.acegroup.com

**Keri Lefferts**
*Claims Director*

August 4, 2015

**VIA CERTIFIED MAIL & EMAIL**
Mr. David Halffield
Vice President – Risk Management
Sears Holdings Management Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

| Re: | Policy #: | HDOG27334143 |
|---|---|---|
| | Policy Period: | 8/1/14 to 8/1/15 |
| | Insurer: | ACE American Insurance Company ("ACE") |

Dear Mr. Halffield:

ACE American Insurance Company ("ACE") insured Sears Holding Corp. under policy # HDOG27334143, for the period of 8-1-14 to 8-1-15. The policy was written with a Combined General Aggregate Limit of $5 million. It has been determined that paid losses falling within this Aggregate are in excess of the $5 million limit.

ACE writes this letter to inform you that with the exhaustion of the Combined General Aggregate limit, no coverage exists under this policy. Any additional loss in this policy period falls outside the scope of coverage granted under this policy. ACE has no obligation to pay for any loss within this policy period in excess of the Combined Aggregate Limit. We hope the references below will more fully illustrate ACE's position.

The Declarations of the above cited policy states:

In return for the payment of the premium indicated above, we agree with you to provide the following coverage(s) at the limits shown, subject to all the terms and conditions of this policy.

| Coverage Form: | Limits of Insurance |
|---|---|
| COMMERCIAL GENERAL LIABILITY | |
| General Aggregate Limit (other than Products/Completed/Operations) | $5,000,000 |
| Products/Completed/Operations Aggregate Limit | $5,000,000 |

The Insuring Agreement within the COMMERCIAL GENERAL LIABILITY COVERAGE FORM states that there is no duty to defend or indemnify an Insured once the limits have been paid in settlement or judgment of claims. With the payment of losses in excess of $5 million, there is no longer a duty for ACE to provide coverage under this policy.

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we," "us," and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured. Other words and phrases that appear in quotation marks have special meaning. Refer to Section V – Definitions.

**Section I – COVERAGES**

1. **Insuring Agreement**

   a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1)   The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

      (2)   Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

Additionally, the policy contains the COMBINED POLICY AGGREGATE endorsement. The endorsement states:

   **Section III – LIMITS OF INSURANCE**

   2.   The General Aggregate Limit is the most we will pay for the sum of

        a.    Medical expenses under Coverage C.

        b.    Damages under Coverage A, and

        c.    Damages under Coverage B

With the payment of losses in excess of the Combined General Aggregate Limit, the policy is exhausted and Coverage is no longer available to you under this policy.

Should you have questions, please contact this writer. The above recitation of ACE's position regarding coverage is neither expected nor intended to be a waiver of ACE's right to assert any other rights or defenses it may have under the Policy, legally, equitably or otherwise, and ACE shall not be estopped from asserting said rights.

The language of the policies quoted herein is provided for ease of reference only and is not intended to change, alter or amend the Policy in any way.

Page 2/3

ACE expressly reserves its rights and defenses at law, in equity and under the Policy at issue.
ACE reserves its right to assert new, additional or different coverage defenses should new,
additional or different information and/or documents be received that warrant such action. ACE
reserves its right to supplement this letter. ACE also reserves its right to assert additional terms
and conditions of the Policy at issue to its current coverage determination should new, additional
or different information and/or documents warrant such action.

If you have any questions or would like to discuss, please feel free to contact me at (818) 428-
3763.

Sincerely,

Keri Lefferts

cc:  AON:     Tim Routhieaux, Tim.Routhieaux@aon.com

              Carol Murphy, Carol.Murphy@aon.com

    ACE:      Christine Kloss, Christine.Kloss@acegroup.com

**Exhibit E**

WEIL:\96861059\1\73217.0004

**CHUBB**

Chubb North American Claims

Primary Casualty
P.O. Box 5113
Scranton, PA 18505

818-428-3744 tel
818-428-3588 fax
will.elkner@chubb.com

**Will Elkner**
*Senior Claims Specialist*

July 22, 2016

<u>**VIA CERTIFIED MAIL & EMAIL**</u>

Rob C. Fanning
Managing Litigation Counsel
Risk Management Department
Sears Holdings Management Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

| | | |
|---|---|---|
| Re: | Policy #: | HDOG27334143 |
| | Policy Period: | 8/1/15 - 7/31/16 |
| | Insurer: | ACE American Insurance Company ("ACE") |

Dear Mr. Fanning:

Chubb North American Claims ("Chubb") is now responsible for handling claims previously handled by ACE American Insurance Company ("ACE"). ACE insured Sears Holding Corp. under policy # HDOG27334143, for the period of 8-1-15 to 7/31/16. The policy was written with a Combined General Aggregate Limit of $5 million. It has been determined that paid losses falling within this Aggregate are in excess of the $5 million limit.

ACE writes this letter to inform you that with the exhaustion of the Combined General Aggregate limit, no coverage exists under this policy. Any additional loss in this policy period falls outside the scope of coverage granted under this policy. ACE has no obligation to pay for any loss within this policy period in excess of the Combined Aggregate Limit. We hope the references below will more fully illustrate ACE's position.

The Declarations of the above cited policy states:

In return for the payment of the premium indicated above, we agree with you to provide the following coverage(s) at the limits shown, subject to all the terms and conditions of this policy.

| Coverage Form: | Limits of Insurance |
|---|---|
| COMMERCIAL GENERAL LIABILITY | |
| General Aggregate Limit (other than Products/Completed/Operations) | $5,000,000 |
| Products/Completed/Operations Aggregate Limit | $5,000,000 |

The Insuring Agreement within the COMMERCIAL GENERAL LIABILITY COVERAGE FORM states that there is no duty to defend or indemnify an Insured once the limits have been

paid in settlement or judgment of claims. With the payment of losses in excess of $5 million, there is no longer a duty for ACE to provide coverage under this policy.

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we," "us," and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V – Definitions.

**Section I – COVERAGES**

1. **Insuring Agreement**

    a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

        (1)   The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

        (2)   Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

    No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

Additionally, the policy contains the COMBINED POLICY AGGREGATE endorsement. The endorsement states:

**Section III – LIMITS OF INSURANCE**

2.   The General Aggregate Limit is the most we will pay for the sum of:

    a.   Medical expenses under Coverage C.

    b.   Damages under Coverage A, and

    c.   Damages under Coverage B

With the payment of losses in excess of the Combined General Aggregate Limit, the policy is exhausted and Coverage is no longer available to you under this policy.

Should you have questions, please contact this writer. The above recitation of ACE's position regarding coverage is neither expected nor intended to be a waiver of ACE's right to assert any other rights or defenses it may have under the Policy, legally, equitably or otherwise, and ACE shall not be estopped from asserting said rights.

The language of the policies quoted herein is provided for ease of reference only and is not intended to change, alter or amend the Policy in any way.

ACE expressly reserves its rights and defenses at law, in equity and under the Policy at issue. ACE reserves its right to assert new, additional or different coverage defenses should new, additional or different information and/or documents be received that warrant such action. ACE

reserves its right to supplement this letter. ACE also reserves its right to assert additional terms and conditions of the Policy at issue to its current coverage determination should new, additional or different information and/or documents warrant such action.

Rule 9.19 of the Rules and Regulations of the Illinois Department of Insurance requires that our company advise you that, if you wish to take this matter up with the Illinois Insurance Department, it maintains a Public Services Division to investigate complaints at 100 West Randolph, Chicago, IL, 60601 and at 320 West Washington Street, Springfield, IL 62767.

If you have any questions or would like to discuss, please feel free to contact me at (818) 428-3744.

Sincerely,

ACE American Insurance Company

Will Elkner

Senior Claims Specialist

cc: AON:        Tim Routhieaux, Tim.Routhieaux@aon.com

              Carol Murphy, Carol.Murphy@aon.com

    ACE:        Christine Kloss, Christine.Kloss@acegroup.com

## Exhibit F

Will Elkner                    O  +213.612.5365
Pacific Region                 F  +818.428.3588
555 S. Flowers Street, 5th Floor, Los    will.elkner@chubb.com
Angeles, CA 90017
USA

July 24, 2017

## VIA CERTIFIED MAIL & EMAIL

**CHUBB'**

Robin C. Fanning
Managing Litigation Counsel
Risk Management Department
Sears Holdings Management Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

*(handwritten: Coverage for Dec 2016 symptoms started)*

Re:      Policy #:        HDO G27853717
Policy Period:    08/01/2016 -08/01/2017
Insurer:          ACE American Insurance Company ("ACE")

Dear Ms. Fanning:

Chubb North American Claims ("Chubb") is now responsible for handling claims previously handled by ACE American Insurance Company ("ACE"). ACE insured Sears Holding Corp. under policy # HDOG27853717, for the period of 8-1-16 to 08/01/2017. The policy was written with a Combined General Aggregate Limit of $5 million. It has been determined that paid losses falling within this Aggregate are in excess of the $5 million limit.

ACE writes this letter to inform you that with the exhaustion of the Combined General Aggregate limit, no coverage exists under this policy. Any additional loss in this policy period falls outside the scope of coverage granted under this policy. ACE has no obligation to pay for any loss within this policy period in excess of the Combined Aggregate Limit. We hope the references below will more fully illustrate ACE's position.

The Declarations of the above cited policy states:

In return for the payment of the premium indicated above, we agree with you to provide the following coverage(s) at the limits shown, subject to all the terms and conditions of this policy.

| Coverage Form: | Limits of Insurance |
|---|---|
| COMMERCIAL GENERAL LIABILITY | |
| General Aggregate Limit (other than Products/Completed/Operations) | $5,000,000 |
| Products/Completed/Operations Aggregate Limit | $5,000,000 |

The Insuring Agreement within the COMMERCIAL GENERAL LIABILITY COVERAGE FORM states that there is no duty to defend or indemnify an Insured once the limits have been paid in settlement or judgment of claims. With the payment of losses in excess of $5 million, there is no longer a duty for ACE to provide coverage under this policy.

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us", and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V – Definitions.

**Section I – COVERAGES**

1.  **Insuring Agreement**

    a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

        (1)  The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

        (2)  Our right and duty to defend the insured ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

        No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

Additionally, the policy contains the COMBINED POLICY AGGREGATE endorsement. The endorsement states:

**Section III – LIMITS OF INSURANCE**

2.  The General Aggregate Limit is the most we will pay for the sum of:

    a.  Medical expenses under Coverage C.

    b.  Damages under Coverage A, and

    c.  Damages under Coverage B

With the payment of losses in excess of the Combined General Aggregate Limit, the policy is exhausted and Coverage is no longer available to you under this policy.

Should you have questions, please contact this writer. The above recitation of ACE's position regarding coverage is neither expected nor intended to be a waiver of ACE's right to assert any other rights or defenses it may have under the Policy, legally, equitably or otherwise, and ACE shall not be estopped from asserting said rights.

The language of the policies quoted herein is provided for ease of reference only and is not intended to change, alter or amend the Policy in any way.

ACE expressly reserves its rights and defenses at law, in equity and under the Policy at issue. ACE reserves its right to assert new, additional or different coverage defenses should new, additional or different information and/or documents be received that warrant such action. ACE reserves its right to supplement this letter. ACE also reserves its right to assert additional terms and conditions of the Policy at issue to its current coverage determination should new, additional or different information and/or documents warrant such action.

Rule 9.19 of the Rules and Regulations of the Illinois Department of Insurance requires that our company advise you that, if you wish to take this matter up with the Illinois Insurance Department, it maintains a Public Services Division to investigate complaints at 100 West Randolph, Chicago, IL, 60601 and at 320 West Washington Street, Springfield, IL 62767.

If you have any questions or would like to discuss, please feel free to contact me at 213.612.5365.

Sincerely,

ACE American Insurance Company

2

Will Elkner
Senior Claims Specialist

cc:     AON:        Carol Murphy, Carol.Murphy@aon.com

        Sears:      Laurence Jenchel, Laurence.Jenchel@searshc.com
                    David Halffield, David.Halffield@searshc.com

        Chubb :     Christine Kloss
                    John Edmonds
                    Neal Bhatnagar
                    Steve Naylor
                    Roland Banini

EXHIBIT  12

The court in <u>Curry v. Superior Court</u> (1970) 2 Cal.3d

707, 712, set forth the law against double jeopardy as follows:

> (2) Article I, section 13, of the California Constitution declares that "No person shall be twice put in jeopardy for the same offense. . . ." Implementing this constitutional command, the decisions of this court have settled the now familiar rules that (1) jeopardy attaches when a defendant is placed on trial in a court of competent jurisdiction, on a valid accusatory pleading, before a jury duly impaneled and sworn, and (2) a discharge of that jury without a verdict is equivalent in law to an acquittal and bars a retrial, unless the defendant consented thereto or legal necessity required it.

We need not determine whether there was legal necessity for the

declaration of a mistrial because we conclude defendant's trial

attorney consented to the mistrial. (<u>Ibid.</u>)  We construe

defense counsel's response of "okay" to the court's

announcement it would declare a mistrial as to the count on

which the jury had not yet reached a verdict as a consent to

the mistrial. <u>Curry</u> stated:

> When a trial court proposes to discharge a jury without legal necessity therefor, the defendant is <u>under no duty to object</u> in order to claim the protection of the constitutional guarantee, and <u>his mere silence in the face of</u> an ensuing discharge cannot be deemed a waiver. (*Mitchell* v. *Superior Court* (1962) 207 Cal.App.2d 643, 647 [24 Cal.Rptr. 671]; *Hutson* v. *Superior Court* (1962) 203 Cal.App.2d 687, 691-692 [21 Cal.Rptr. 753]; cf. *People* v. *Valenti* (1957) 49 Cal.2d 199, 202, 208-209 [316 P.2d 633].)  (5)  It is true that affirmative conduct by the defendant may constitute a waiver if it clearly evidences consent (*People* v. *Kelly* (1933) 132 Cal.App. 118, 122-123 [22 P.2d 526]; cf. *People* v. *Terry* (1970) 2 Cal.3d 362, 386 [85 Cal.Rptr. 409, 466 P.2d 961]; see generally Note, 63 A.L.R.2d 782), and such a waiver will a fortiori be implied when the defendant actually initiates or joins in a motion for mistrial (*People* v. *Mills* (1957) 148 Cal.App.2d 392, 394-395 [306 P.2d 1005]).

The statement "okay" was not equivalent to silence by counsel

and, instead, was "affirmative conduct" by counsel "clearly

[evidencing] consent" to the mistrial. (<u>Ibid.</u>)  "'O.K.' means

'correct,' 'all right,' and indicates approval." (<u>Grimes v.</u>

<u>Nicholson</u> (1945) 71 Cal.App.2d 538, 541.)  At the beginning of

the second trial defense counsel in support of the motion for

-7-

FILED

JAN 2 8 1987

BY _Adam Hardy_

DEPUTY

APPELLATE DEPARTMENT OF THE SUPERIOR COURT

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, ) | Superior Ct. No.CR A23138 |
| Plaintiff and Respondent, ) | Municipal Court of the |
| vs. ) | Santa Anita Judicial Dist. |
| MARY ELIZABETH BECKER, ) | No. M54385 |
| Defendant and Appellant. ) | OPINION AND JUDGMENT |

Appeal by defendant from Judgment of the Municipal Court, Brian L. Rix, Judge.

JUDGMENT AFFIRMED.

For Appellant  –   Tamkin, Vazquez & Sarin
                   By Harold Tamkin

For Respondent –   Ira Reiner, District Attorney
                   Donald J. Kaplan, Deputy District Attorney
                   Eugene R. Tavris, Deputy District Attorney

-o0o-

A complaint was filed against defendant Mary Elizabeth Becker alleging she violated Vehicle Code sections 23152, subdivisions (a) (driving while intoxicated) (count I); (b) (driving with a blood alcohol content level of .10% or more) (count II); and 14601.1, subdivision (a) (driving with a

EXHIBIT A

revoked or suspended license) (count III).  It was alleged

defendant suffered from two prior convictions of drunk driving.

Defendant admitted the priors and pleaded guilty to count III.

The jury heard the case and went into deliberations.  When the

jury had reached a verdict one count, the court was approached

by an individual juror and the following discussion occurred in

chambers:

THE COURT:  I WILL STATE THAT FOR THE RECORD WE ARE IN CHAMBERS.  THE COURT IS PRESENT WITH BOTH COUNSEL.  A QUESTION HAS BEEN SUBMITTED TO THE COURT BY THE JURY AND IT IS MR. BATISTE THAT SUBMITTED IT AND IT SAYS:

"IF A JUROR HAS KNOWLEDGE OF THE OPERATION OF THE INTOXOLYZER CAN HE TALK ABOUT IT?"

THAT BRINGS OUT THE QUESTION ON OUR PART, THE COURT'S AND COUNSEL'S PART, MR. BATISTE, AS TO ARE YOU THE SOURCE OF THE KNOWLEDGE RELATING TO THE EQUIPMENT?

JUROR BATISTE:  YES.

THE COURT:  WHAT IS THE STATE OF YOUR KNOWLEDGE REGARDING THE EQUIPMENT?

JUROR BATISTE:  THIS IS THE TYPE OF EQUIPMENT THAT I PURCHASE.  I AM A PURCHASING AGENT FOR IT.

THE COURT:  YOU BUY THAT TYPE OF EQUIPMENT?

JUROR BATISTE:  YES, SIR.

THE COURT:  NOW, HAVE YOU EVER ENCOUNTERED THE EQUIPMENT TO THE POINT THAT YOU HAVE ENCOUNTERED SPECIFICATIONS AND PERFORMANCE CHARACTERISTICS O I THE EQUIPMENT?

JUROR BATISTE:  THIS SPECIFIC UNIT, NO, BUT DEVICES THAT ARE LIKE THIS DEVICE, YES.

THE COURT:  BY "DEVICES LIKE THIS DEVICE" CAN YOU COMPARE AND GIVE ME A SPECIFIC EXAMPLE?

JUROR BATISTE:  I PURCHASE A DEVICE THAT IS USED TO TEST FOR ALCOHOL LEVEL BUT IT IS NOT CALLED AN INTOXOLYZER.

THE COURT:  WHAT IS IT CALLED?

JUROR BATISTE:  I CAN'T THINK OF IT MATE BUT IT USES A MASS SPECTRUM.

-2-

1  THE COURT:  DO YOU KNOW ABOUT THE INTOXOLYZER PER SE

2  IN PRINCIPAL AS FAR AS HOW IT WORKS IN PRINCIPAL?

3  JUROR BATISTE:  WELL, THE QUESTION IN THE JURY ROOM THAT

WE HAD WAS NOT SPECIFICALLY THAT UNIT IT WAS THE PRINCIPAL OF

4  HOW THEY CAN DO WHAT YOUR INSTRUCTION INDICATES CAN BE DONE

5  AS FAR AS A CHEMICAL ANALYSIS.  THE QUESTION IS WHETHER THAT

MACHINE IS DOING THAT.

6  THE COURT:  I KNOW BUT WE HAD SUBMITTED NOTHING TO THE

7  JURY BY WAY OF EVIDENCE REGARDING THAT MATTER AND WHAT WE

ARE ATTEMPTING TO DETERMINE IS HOW IS THE JURY SEEKING TO

8  MAKE A DECISION?  WHAT FACTS HAVE BEEN SUBMITTED INTO THE

9  DISCUSSION BY WAY OF EVIDENCE AND BY WAY OF DISCUSSION

RELATING TO THE CIRCUMSTANCES, THE NATURE OF WHICH I HAVE

10  DESCRIBED.  YOU SAY THAT YOU HAVE KNOWLEDGE OF SOME SIMILAR

11  MACHINE OR SIMILAR OPERATING MACHINE; WHAT HAS THE JURY

12  RECEIVED IN THE WAY OF STATEMENTS FROM YOURSELF OR FROM OTHERS

THAT MAY HAVE SOME KNOWLEDGE REGARDING THAT MACHINE'S

13  OPERATION, OPERATING CHARACTERISTICS?

14  JUROR BATISTE:  THEY HAVE RECEIVED NOTHING.  THAT IS

THE QUESTION.  THEY ARE NOT SURE.

15

16  THE COURT:  ALL RIGHT.

THEY HAVEN'T RECEIVED ANYTHING?  NOTHING HAS BEEN

17  SAID TO THEM SO FAR?

JUROR BATISTE:  NO.

18  THE COURT:  BUT YOU ARE INQUIRING AS TO HOW MUCH YOU

19  MIGHT SAY?

JUROR BATISTE:  YES.

20  THE COURT:  BASED UPON WHAT YOU KNOW ABOUT THE MACHINES?

21  JUROR BATISTE:  RIGHT.

THE COURT:  WELL, I DO NOT THINK THAT WE COULD AUTHORIZE

22  YOU TO SAY ANYTHING.

23  JUROR BATISTE:  OKAY.

THE COURT:  BUT THE DIFFICULTY THAT WE HAVE AT THIS

24  POINT IN TIME IS THAT YOU MAY HAVE A STATE OF KNOWLEDGE

25  RELATING TO WHICH THE ATTORNEYS ATTEMPTED TO IDENTIFY THAT

26  STATE OF KNOWLEDGE  AND IT WOULD BE DISQUALIFYING TO HAVE YOU

CONTINUE TO SERVE IF THAT STATE OF KNOWLEDGE IS ABOVE ANYTHING

27  THAT ONE WOULD ACHIEVE BY MERELY BEING TOLD THAT THERE IS A

28  MACHINE THAT DOES SOMETHING OF THAT NATURE; HOW MUCH DO YOU

HAVE IN SPECIFIC KNOWLEDGE OF THE MACHINE'S CHARACTERISTICS?
YOU DESCRIBED AND USED THE TERM A MOMENT AGO THAT KEYED SOME
KNOWLEDGE IN THAT AREA; CAN YOU BROADEN ON THAT?

JUROR BATISTE:  MY KNOWLEDGE OF THIS MACHINE IS IT IS
A MASS SPECTRUM PHOTOMETRIC FREQUENCY WHICH THAT SAMPLE IS
TESTED ON AND THAT IS MORE KNOWLEDGE THAN THE AVERAGE PERSON,
I WOULD SUPPOSE.

THE COURT:  OH.

MS. KASS:  YOUR HONOR, I AM SURE THAT MR. SCHOENBURG
WILL WANT TO SAY SOMETHING.  I DON'T HAVE A PROBLEM WITH
THAT AS LONG AS THE JURY DOESN'T KNOW THAT HE HAS A
SPECIALIZED KNOWLEDGE AND THEN USE THAT TO RELY ON HIM AS TO
HOW HE VOTES.

THE COURT:  RIGHT.

MS. KASS:  THAT IS MY CONCERN IF THEY FEEL THAT HE HAS
SOME EXTRA KNOWLEDGE FROM WHAT HE HAS SAID AND HE TENDS TO
LEAN IN A CERTAIN DIRECTION THAT MAY INFLUENCE THE JURY AS
ADVERSELY BECAUSE IT IS SOMETHING THAT WE WERE UNAWARE OF.
EVERYONE COMES TO TRIAL WITH SOME KNOWLEDGE THAT MAY BE MORE
SPECIFIC THAN OTHER PEOPLE HAVE.  I THINK THAT THE
INSTRUCTIONS ADEQUATELY COVER THE FACT THAT YOU ARE TO BASE
YOUR DECISION UPON THE EVIDENCE IN THE CASE AND THAT IS
REALLY WHERE MY CONCERN LIES.

THE COURT:  SO, YOU WOULD FEEL SECURE WITH A CAUTIONARY
INSTRUCTION TO THIS JUROR FROM THE COURT THAT THE PARTICULAR
AREA THAT YOU ARE CONCERNED ABOUT WOULD BE CURED TO YOUR
SATISFACTION?

MS. KASS:  WELL, I WOULD APPRECIATE IT IF THE COURT
WOULD INQUIRE AS TO WHETHER THE JURY IS AWARE THAT HE HAD
SOME SPECIAL KNOWLEDGE AND HAS ASKED THEM ABOUT THAT.

THE COURT:  I AM GOING TO INQUIRE OF THAT BUT WOULD YOU
FEEL SECURE IF THEY DID NOT KNOW THAT HE HAD THIS SPECIAL
KNOWLEDGE AND IT HAD NOT BEEN DISCUSSED WITH THE REMAINING
JURORS?

MS. KASS:  WELL, I -- WELL, I DON'T HAVE DIFFICULTY
WITH THAT.

THE COURT:  DO YOU, MR. SCHOENBURG?

///

1    MR. SCHOENBURG:  TO SOME EXTENT I DO.  NOT KNOWING WHICH

2    WAY IT WOULD WORK.  JUST THE FACT THAT HE MAY BE HOLDING BACK

IN DISCUSSIONS.

3         THE COURT:  HE IS NOT PARTICIPATING AS A FULL JUROR

4    BECAUSE OF HIS KNOWLEDGE?

5         MR. SCHOENBURG:  THAT'S THE PROBLEM.

     THE COURT:  ALL RIGHT.

6              WELL, THE DIFFICULTY IS THAT BOTH COUNSEL

7    ATTEMPTED, MR. BATISTE, TO ELIMINATE THE POTENTIAL OF ANY

SPECIAL KNOWLEDGE OF THE EQUIPMENT ANTICIPATING THAT THEY

8    WERE GOING TO PRODUCE EXPERTS.  THEIR PLANS WENT ALL TO HECK

9    AND NOW --

         JUROR BATISTE:  SO WE NOTICED.

10        THE COURT:  SO, AS THE DEPUTY DISTRICT ATTORNEY SAID

11   WE HAVE MURPHY'S LAW OPERATING.  EVERYTHING HAS BEEN GOING

12   WRONG.  NOW HERE YOU ARE A PERSON WITH A SPECIAL LINE OF

KNOWLEDGE.  HAVE YOU DISCLOSED TO THE JURY THAT YOU DO HAVE

13   SOME EXPERIENCE IN BUYING THIS EQUIPMENT?

14        JUROR BATISTE:  THE REASON FOR THE QUESTION BEING ASKED

WAS BECAUSE OF A DISCUSSION AND WHILE I DIDN'T SAY THAT I HAD

15   KNOWLEDGE OF THIS EQUIPMENT BECAUSE I BOUGHT IT THE DISCUSSION

16   LED TO THE INDICATION THAT I KNOW HOW THIS UNIT OPERATES.

17        THE COURT:  I AM GOING TO DECLARE A MISTRIAL.  ALL RIGHT,

LET'S CALL --  YOU TAKE THE STAND AND I THINK THAT MURPHY'S

18   LAW HAPPENS TO BE OPERATING SO COMPLETELY --

19        MR. SCHOENBURG:  YOU'LL GET AN EARLY START OUT OF HERE,

YOUR HONOR.

20        MS. KASS:  DOES THIS APPLY TO BOTH COUNTS OR JUST --

21        THE COURT:  HAVE THEY REACHED A VERDICT ON EITHER

COUNT?

22        JUROR BATISTE:  THEY HAVE REACHED A VERDICT AS TO ONE

23   COUNT, COUNT I.  YES.

24        THE COURT:  MURPHY'S LAW.

              AT ANY TIME PRIOR TO REACHING THAT VERDICT HAD

25   YOU DISCLOSED THAT YOU HAD ANY SPECIAL KNOWLEDGE OF THAT

26   EQUIPMENT?

27        JUROR BATISTE:  NO.

         THE COURT:  ARE YOU BOTH SATISFIED ON THAT SCORE?

28        MR. SCHOENBURG:  I AM SATISFIED ON THAT SCORE.

-5-

MS. KASS: YES.

THE COURT: ALL RIGHT. I'LL DECLARE A MISTRIAL ON THE ONE THAT THEY HAVEN'T GOT A VERDICT ON.

MR. SCHOENBURG: OKAY.

THE COURT: ALL RIGHT.

LET'S BRING THE JURY OUT.

On May 25, 1984, the jury returned a verdict of not guilty to count I and a mistrial was declared as to count II. On October 9, 1984, a new trial commenced as to count II. Defense counsel moved to dismiss the case due to double jeopardy. The motion was denied. On October 15 the jury found defendant guilty on count II. Defendant appeals from the judgment of conviction.

On appeal defendant contends the trial court wrongfully declared a mistrial to count II and should have instead selected an alternate juror to replace the juror with the special knowledge about the intoxilyzer machine. Defendant argues this option of selecting an alternate juror had not been made available to defense counsel. Defendant further argues the trial court should have granted defendant's motion to dismiss count II due to double jeopardy because no necessity had been established to discharge the jury on count II. Finally, defendant argues he was denied effective assistance of counsel because his attorney did not object when the judge at the first trial declared a mistrial. We have reviewed the record on appeal and reject defendant's contentions.

///

///

///

///

The court in <u>Curry v. Superior Court</u> (1970) 2 Cal.3d

707, 712, set forth the law against double jeopardy as follows:

> (2) Article I, section 13, of the California Constitution declares that "No person shall be twice put in jeopardy for the same offense. . . ." Implementing this constitutional command, the decisions of this court have settled the now familiar rules that (1) jeopardy attaches when a defendant is placed on trial in a court of competent jurisdiction, on a valid accusatory pleading, before a jury duly impaneled and sworn, and (2) a discharge of that jury without a verdict is equivalent in law to an acquittal and bars a retrial, unless the defendant consented thereto or legal necessity required it.

We need not determine whether there was legal necessity for the

declaration of a mistrial because we conclude defendant's trial

attorney consented to the mistrial.  (<u>Ibid.</u>)  We construe

defense counsel's response of "okay" to the court's

announcement it would declare a mistrial as to the count on

which the jury had not yet reached a verdict as a consent to

the mistrial.  <u>Curry</u> stated:

> When a trial court proposes to discharge a jury without legal necessity therefor, the defendant is <u>under no duty to object</u> in order to claim the protection of the constitutional guarantee, and <u>his mere silence in the face of</u> an ensuing discharge cannot be deemed a waiver. (*Mitchell* v. *Superior Court* (1962) 207 Cal.App.2d 643, 647 [24 Cal.Rptr. 671]; *Hutson* v. *Superior Court* (1962) 203 Cal.App.2d 687, 691-692 [21 Cal.Rptr. 753]; cf. *People* v. *Valenti* (1957) 49 Cal.2d 199, 202, 208-209 [316 P.2d 633].)  **(5)**  It is true that affirmative conduct by the defendant may constitute a waiver if it clearly evidences consent (*People* v. *Kelly* (1933) 132 Cal.App. 118, 122-123 [22 P.2d 526]; cf. *People* v. *Terry* (1970) 2 Cal.3d 362, 386 [85 Cal.Rptr. 409, 466 P.2d 961]; see generally Note, 63 A.L.R.2d 782), and such a waiver will *a fortiori* be implied when the defendant actually initiates or joins in a motion for mistrial (*People* v. *Mills* (1957) 148 Cal.App.2d 392, 394-395 [306 P.2d 1005]).

The statement "okay" was not equivalent to silence by counsel

and, instead, was "affirmative conduct" by counsel "clearly

[evidencing] consent" to the mistrial.  (<u>Ibid.</u>)  "'O.K.' means

'correct,' 'all right,' and indicates approval."  (<u>Grimes v.</u>

<u>Nicholson</u> (1945) 71 Cal.App.2d 538, 541.)  At the beginning of

the second trial defense counsel in support of the motion for

1  double jeopardy dismissal told the court that he did not

2  remember whether there was an implied consent by defendant to

3  the mistrial and did not recall such a consent.  This statement

4  did not establish lack of consent.  On appeal defendant argues

5  defense counsel's use of the word "okay" was not meant to give

6  consent to a mistrial.  However, the issue is whether the trial

7  judge was justified to construe defense counsel's statement as

8  one of consent.  The court in People v. Kelly (1933) 132

9  Cal.App. 118, 123-124, stated:

10      It may be further observed that the statements made were
11      such as would naturally lead the court to believe that the
        defendant consented to a mistrial order.  Had nothing been
        said in this regard, the court could have protected the rights
12      of the People by proceeding with the case.  Even if the
        statements made are capable of a double construction, they
13      should be viewed in the light of the circumstances in which
        they were uttered and with a view of determining what was
14      intended.  Thus viewed, we think the statements made were
        such as to justify the court in believing that an order of
15      mistrial was consented to.  Under such circumstances an
        appellant may not insist upon such a construction of state-
16      ments made by him as would only tend to show that the
        court was misled thereby.

17  We conclude the judge was justified in construing the word

18  "okay" as a consent.  Defendant, having consented to the

19  mistrial, was precluded from raising the issue of double

20  jeopardy at the second trial.  (Curry, supra, at p. 712.)

21      As to defendant's contention that he received

22  ineffective assistance of counsel, we conclude the record on

23  appeal fails to support this contention.  In order to establish

24  inadequacy of counsel "[defendant] must show that trial counsel

25  failed to act in a manner to be expected to reasonably

26  competent attorneys acting as diligent advocates" and either

27  that (1) the "counsel's acts or omissions resulted in the

28  withdrawal of a potentially meritorious defense" (People v.

-8-

<u>Pope</u> (1979) 23 Cal.3d 412, 425) or that "it is reasonably probable a determination more favorable to the defendant would have resulted in the absence of counsel's failings. [Citations.]" (<u>People v. Fosselman</u> (1983) 33 Cal.3d 572, 584.) Incompetency of counsel is not shown where there could have been a "rational tactical purpose" for counsel's acts or omissions. (<u>Fosselman</u>, at p. 582.) The reviewing court will not second guess the tactical choices of trial counsel. (<u>People v. Whittington</u> (1977) 74 Cal.App.3d 806, 819.) Perhaps counsel hoped the People would decide not to retry the mistried count or would be more open to enter into a plea bargain for a reduced charge. The actual reasons of defense counsel's failure to object or the reasons why defense counsel used the word "okay" if he did not mean to consent are issues more appropriately addressed at a habeas corpus hearing where evidence can be taken and credibility be weighed. (<u>Pope</u>, at p. 426.)

      The judgment is affirmed.

_____
Judge

We concur.

_____
Presiding Judge

_____
Judge

EXHIBIT  13



## Definition of OK

Home

Definitions from Black's Law Dictionary: 2nd Edition and Ballentine's Law Dictionary as are available for each term in each dictionary.



O.K

Ballentine's Law Dictionary

**Definition:**

A mark signifying the approval of the maker of it. See 149 Mass. 459, 14 Am. St. Rep. 439, 21 N. E. 765.



O.K.

Black's Law Dictionary: 2nd Edition

**Definition:**

A conventional symbol, of obscure origin, much used in commercial practice and occasionally in indorsements on legal documents, signifying "correct," "approved," "accepted," "satisfactory," or "assented to." See Getchell & Martin Lumber Co., v. Peterson, 124 Iowa, 599, 100 N. W. 550; Morgan-ton Mfg. Co. v. Ohio River, etc., Ry. Co., 121 N. C. 514, 28 S. E. 474, 61 Am. St. Rep. 679; Citizens' Bank v. Farwell, 56 Fed. 570, 6 C. C. A. 24; Indianapolis, D. & W. R. Co. v. Sands, 133 Ind. 433, 32 N. E. 722.

EXHIBIT  14

NEW YORK STATE
DEPARTMENT *of*
FINANCIAL SERVICES

Andrew M. Cuomo
Governor

Maria T. Vullo
Superintendent

## ADJUSTER RENEWAL – BOND  INSTRUCTIONS

Please read carefully before submitting the bond. Do not submit the bond to the Department until the online application is completed.

The Name on the Bond must agree with the name of the applicant.

Bond must be in the amount of $1,000.

Bond must be effective 1/1/2019 (wording "on or after 12/31/18" is acceptable") to expire on 12/31/2020.

Bond must be signed  by Principal and the   Attorney-In-Fact.

There must be an Acknowledgement completed and notarized on behalf of the Principal and a Surety Acknowledgement completed and notarized on behalf of the Attorney-in-Fact.

The surety and principal/corporate acknowledgements must be dated the same date or after the date of the bond.

There must be a Power of Attorney page. The Attorney-In-Fact must be listed in the Power of Attorney.

The date of the Power of Attorney must be the same date or after the date of the Surety Acknowledgment.

NOTE -the online adjuster renewal application must be fully processed PRIOR to submitting the bond.   The adjuster renewal license will not be issued until the application is fully processed and bond is received that is complete and correctly filled out with original signatures. If said bond is not received by December 31, 2018, the license will expire.

The bond must be attached to a copy of the renewal payment invoice and mailed to:

> Licensing Bureau – Adjuster  Renewal
> New York State Department of Financial Services
> One Commerce  Plaza
> Albany, NY 12257

Licensing Services Bureau
LicRenewal@dfs.ny.gov

# SAMPLE  ADJUSTER'S  BOND

BOND NO. _____
$1,000

## KNOW  ALL  MEN  BY  THESE  PRESENTS

THAT_____of
_____

as  Principal,  and_____, as  Surety  are  held
and firmly bound unto  the PEOPLE OF THE STATE OF NEW YORK in the penal sum of
ONE THOUSAND DOLLARS ($1,000), for the payment of which sum the said Principal and
Surety bind themselves, their legal representatives, successors and assigns, jointly and
severally,  by  these  presents.

Signed,  sealed,  and  dated  this _____day  of_____, 20
_____.

WHEREAS, pursuant to Section 2108 of the Insurance Law of the State  of  New  York,
amended, said Principal has made or is about to make application to the  Superintendent of
Financial Services of the State of New York for a license to transact business as  (A
PUBLIC) (AN  INDEPENDENT)  Adjuster  for  the term  beginning on or   after _____,
20 _____and expiring  December 31, 2020;  and

WHEREAS, pursuant to said Section 2108 of the Insurance Law, the Principal has
made, or may, if a firm, association, or corporation, make application to have certain
individuals  named  in  said  license as  sub-licensees;  and

WHEREAS, under said Section 2108 of the Insurance Law, such a license may not be issued
unless a bond as therein  conditioned  is  filed  with  the  Superintendent of Financial Services.

NOW, THEREFORE, the condition of this bond is such that if the Principal and  all sub-
licensees named in the (PUBLIC) (INDEPENDENT) Adjuster's license issued to the Principal
for the term as aforesaid shall, during said term, faithfully perform their duties as
(PUBLIC) (INDEPENDENT) Adjuster, then this  bond  shall  be  null  and  void;  otherwise to
remain  in  full  force  and  virtue.

Recovery of the penal sum of this bond by the PEOPLE OF THE STATE OF NEW YORK is
specifically authorized in case the (PUBLIC) (INDEPENDENT) Adjuster, or any sub-licensee,
shall have been guilty of fraudulent or dishonest practices in connection with  the
transaction of his or its business as (A PUBLIC) (AN INDEPENDENT) Adjuster during the
license period for which this bond is issued or shall have been convicted under any of
the Sections contained in  Article  150  of  the  Penal Law  for  an  offense  or  offenses
committed  during  such  license period.

This bond is subject to any and all Regulations newly promulgated after the effective
date  of  the  bond.

_____                Principal's Signature
(L.S.)

_____

Surety's Signature

(L.S.)

By _____

(Acknowledged by Surety
    and Principal)

Each bond must include a Power of Attorney, a completed Surety Acknowledgement and a completed Principal Acknowledgement. (See samples on reverse side.) Signatures of the principals on the Power of Attorney and acknowledgements cannot be be dated prior to the date of the bond

NOTE:  BOND MUST SPECIFY EITHER INDEPENDENT <u>OR</u> PUBLIC ADJUSTER

AdjBond(Rev.2018)

# SAMPLE ACKNOWLEDGEMENTS

## SURETY ACKNOWLEDGEMENT

State of_____

County of_____

On_____, before me personally came

_____
to me known who being by me duly sworn did depose and say that he/she resides in

_____

_____

____,
that  he/she is Attorney-in-Fact of

_____,
the corporation described in and which executed the above instrument; that he/she knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation, and that he/she signed his/her name thereto by like order; and the affiant did further depose and say that the Superintendent of Financial Services of the State of New York, has, pursuant to Section 1111 of the Insurance Law of the State of New York, issued

to_____
his/her certificate of qualification, evidencing the qualification of said Company and its sufficiency under any law of the State of New York as surety and guarantor, and the propriety of accepting and approving it as such; and that such certificate has not    been revoked.

_____

                                                        Notary Public


To be completed when the applicant is an individual, partnership, or limited liability company:

## PRINCIPAL'S ACKNOWLEDGEMENT - IF INDIVIDUAL, PARTNERSHIP  OR LIMITED  LIABILITY COMPANY

State of_____

County of_____

On_____, before me personally appeared

_____
to me known to be (the individual) (one of the members    of

_____)
described in and who executed the within instrument, and he/she thereupon duly acknowledged to me that he/she executed the same (as the act and deed of said partnership or limited liability company).

_____

                                                        Notary Public


To be completed when the applicant is a corporation:

## CORPORATION ACKNOWLEDGEMENT

State of_____

County of_____

On_____, before me personally came

to me known, who being by me duly sworn, did depose and say; that he/she resides in

_____

_____, that he/she

is the_____of

_____

_____, the corporation described in   and  which
executed  the  above  instrument;  that  he/she  knows  the  seal  of  said  corporation;  that  the  seal
affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of
Directors  of  said  corporation,  and  that  he/she  signed  his/her  name  thereto  by  like   order.


_____

                                                                                        Notary Public


AdjBond(Rev.2018)

EXHIBIT  15

Sedgwick CMS
P O Box 14448
Lexington, KY 40512-4448



**Sedgwick CMS**

Sedgwick Claims Management Services, Inc.

Phone: (866)352-1521 Fax: (866)876-7050

03/03/2017

Brian Coke-Ng
Po Box 23723
New York NY 10008

RE:    Claimant Name:      Brian Coke-Ng
       Claim Number:       L1702245137-0001
       Date of Incident:   02/24/2017

Dear Brian Coke-Ng :

This letter is to advise you we have recently received notice of this matter.

Please be advised Sedgwick Claims Management Services, Inc. is the Third Party Claims Administrator for Kmart Corporation and I am the examiner assigned to your file. On behalf of our client, I would like to apologize for any inconvenience this incident may have caused you.

If we have not yet had the opportunity to speak, please contact me at 866-352-1521. I can be reached weekdays between the hours of 8:00 a.m. and 3:00 p.m. Central Time.

Be advised, under Federal Law (the Medicare, Medicaid, and SCHIP Extension Act of 2007), we have certain reporting requirements to Medicare concerning any and all bodily injury claims. Therefore, for that reporting purpose and in order to assist in the investigation of your claim, please complete Sections I and II of the enclosed Medicare Request for Social Security Number/Health Insurance Claim Number form and return it to me at your earliest convenience. If you are not a Medicare Beneficiary, please indicate that on the form, sign it and return it to me as well.

Be further advised, this information is requested for reporting and claims investigation purposes only and should not be construed as acceptance of the claim. Please feel free to contact me if you have any questions or to discuss the claim.

Sincerely,

Sandra Brach
Claims Representative
(847)645-0951

3-3-2017                          L17022451370001                      7020170303019081

Sedgwick CMS
P O Box 14448
Lexington, KY 40512-4448



**Sedgwick CMS**

Sedgwick Claims Management Services, Inc.
Phone: (866)352-1521 Fax: (866)876-7050

03/01/2017

Brian Coke-Ng
Po Box 23723
New York NY 10008

RE:    Claimant Name:      Brian Coke-Ng
       Claim Number:       L1702245137-0001
       Date of Incident:   02/24/2017

Dear Brian Coke-Ng :

This letter is to advise you we have recently received notice of this matter.

Please be advised Sedgwick Claims Management Services, Inc. is the Third Party Claims Administrator for Kmart Corporation and I am the examiner assigned to your file.  On behalf of our client, I would like to apologize for any inconvenience this incident may have caused you.

If we have not yet had the opportunity to speak, please contact me at 866-352-1521.  I can be reached weekdays between the hours of 8:00 a.m. and 3:00 p.m. Central Time.

Be advised, under Federal Law (the Medicare, Medicaid, and SCHIP Extension Act of 2007), we have certain reporting requirements to Medicare concerning any and all bodily injury claims. Therefore, for that reporting purpose and in order to assist in the investigation of your claim, please complete Sections I and II of the enclosed Medicare Request for Social Security Number/Health Insurance Claim Number form and return it to me at your earliest convenience. If you are not a Medicare Beneficiary, please indicate that on the form, sign it and return it to me as well.

Be further advised, this information is requested for reporting and claims investigation purposes only and should not be construed as acceptance of the claim. Please feel free to contact me if you have any questions or to discuss the claim.

Sincerely,

Sandra Brach
Claims Representative
(847)645-0951

EXHIBIT  16

05/26/2017 FRI 11:22 FAX                                                        @004/005

REPORT ID-PHSFE-3

SOLD DATE   RX NUM      DRUG NDC      QTY   DAYS      FILL      REFILLS   CARRIER   PHYSICIAN
                        DRUG NAME           SUPPLY    NUMBER

12/06/2009  05757259    0016801399O   30    7         0         2         PPN

PATIENT ID: Redacted
PATIENT: ALEXANDRIA [Redacted]   VA

FLUOCINONIDE 0.05%

MEDICAL EXPENSE    PERIOD:01/01/2007 TO 05/03/2017    STORE:4483    PAGE: 1    ISSUED:05/03/2017

BIRTHDAY ID: [Redacted]   CRE FOUND

PAI IN   Redacted

TOTAL PRICE   CUSTOMER PAID
5.44          5.44

TOTAL=   5.44   5.44

ATTESTED TO BY:

_____
REGISTERED PHARMACIST

*Handwritten note:*

Note: This Document Have Been Respectfully Redacted And Checked By Plaintiff Brian Coke To Protect The Other Patients Protected Health Information (PHI) and Identity

CIVIL ACTION#: _____

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**
**U.S. COURTHOUSE, 500 PEARL STREET, NEW YORK, N.Y. 10007**

BRIAN  COKE NG

Plaintiff,

-against-

SEDGWICK CMS HOLDINGS, INC.;
FIDELITY SEDGWICK CORPORATION;
FIDELITY SEDGWICK HOLDINGS, INC.;
THE CARLYLE GROUP INC.,
DAVE NORTH;

Defendants

# VERIFIED COMPLAINT

**To the best of my knowledge, information and belief,**
**formed after an inquiry reasonable under the circumstances,**
**The presentation of these papers or the contentions therein**
**are not frivolous as defined in subsection (c) of section**
**130-1.1 of the Rules of the Chief Administrator (22NYCRR)**

**SELF REPRESENTED LITIGANT INFORMATION**
**September 28, 2023**

**Sign Name:** _____

**Print Name: BRIAN COKE NG**

**Address:**
Church Street Station
P.O. Box 2723
New York, N.Y. 10008
Tel/Fax: 646-820-9238